## MUNICIPALITY No. 2 *vs.* ORLEANS COTTON PRESS.

### APPEAL FROM THE PARISH COURT FOR THE PARISH AND CITY OF NEW ORLEANS.

The right to future *alluvial* formation or *batture* is a *vested right;* inherent in the property itself, and forms an essential attribute of it; resulting from natural law, in consequence of the local situation of the land to which it attaches.

Cities may acquire *jure alluvionis*, but it must be as owner of the front, or as *Riparian* proprietor; for the *alluvion* is but an accessory to the principal estate or land.

There is nothing in the Roman law which restricts the right of *alluvion* to particular localities, or portions of land, having particular names; but the right depends on the question whether the land had fixed and invariable limits, or a natural boundary on one side by a water course.

The Jesuits' plantation, out of which the *locus in quo* arises was originally entitled to the alluvion or batture in its front. The mere act of incorporation of the city in 1805 changing the name of this property from *rural* to *urban*, neither made the city a front proprietor, so as to acquire *jure alluvionis*, or deprive the front lots of the right to such accretion.

The onus or burden consequent on the right of alluvion is *natural*, not civil; it is a risk arising from the exposed position of the land, not the expense of making embankments; for the right of alluvion exists on streams which do not overflow.

The public, through the agency of the corporation, has the sole use of the levee and of the bank of the river; and the front proprietors cannot extend the levee without the consent of the corporation, which in the meantime has the right to make all improvements for rendering it useful to the public and favorable to commerce.

The French government in laying out the ancient city of New-Orleans left an open space between the front row of houses and the river, marked *quai* on the

plan, which was a dedication of this space to public use, and it became there-by *a locus publicus.*

EASTERN DIS.
*April,* 1841.
═══════════
MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

If in laying out the Faubourgs, the ancient proprietors of those riparian estates, had left an open space between the front street and the river, marking it as a public place on the plan, it would have amounted to a dedication, if accepted by the public.

But none of the plans show any indication of Madame Delord and her vendees having ever dedicated the front of her property on the river to public use: on the contrary she continued to exercise acts of ownership as *a riparian proprietor,* and was required by the city ordinance of 1830 to keep up the levee in front as such.

*Garland, J.*—The right of alluvion is not based exclusively on the principle of being subject to the expense and burden of keeping up roads and levees. The Roman jurists say it is a mode of acquiring property by natural law; that it is just the advantages of the thing should belong to him who supports its disadvantages.

The plan of Madame Delord, leaving an open space between New Levee street and the river, was not a dedication of this space to public use. There was nothing marked or written on it indicating an *intention* so to dedicate it.

There is no particular form, necessary to a dedication of land to public use.— But it requires the assent of the owner and the fact of its being used for the purposes intended.

*Martin, J., dissenting.*—Where the plan of a City or Faubourg fronting on a navigable river, or the sea, has an *open space* between the front row of houses or street, and the water, it becomes part of the port, and is a *locus publicus,* dedicated to public uses, without any other designation whatever.

The Batture which formed in front of the Faubourgs of the City of New Orleans, *after their incorporation with the City,* became the *property of the City,* and not of the front proprietors.

In countries governed by the civil law, the ports or landing places of cities situated on navigable rivers, lakes or the sea, are *locus publicus,* in which individuals have no right of property.

The plans of Faubourgs Delord and Saulet laying off these plantations into City lots and squares, divested the owners of all interest, except in the lots and squares sold to individuals, &c. All the rest was dedicated to the public. The land or space between New Levee street and the river became a *locus publicus,* destined to the *public use.* This dedication required no further evidence than the plan and the *use* of these places by the public.

This is an action in which the second Municipality claims title to and the possession of a parcel of ground lying in its front, within the limits of Faubourgs Delord and Saulet, bounded in front on Front street, on the upper line by Roffinac

EASTERN DIS.
*April,* 1841.
_____
MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

street by property or lots separating it from Benjamin street; and in the rear by New Levee street, formed by alluvion from the Mississippi in front of said Faubourgs, and now in the possession and claimed by the Orleans Cotton Press Company.

The plaintiffs allege that this alluvion or Batture was formed long since the said Faubourgs were incorporated into and brought within the limits of the City of New-Orleans by the act of incorporation in 1805; that the title to this property became vested in the corporation for the sole and exclusive use and benefit of the public, and is now by law vested in Municipality No. 2, within whose limits it is situated; that the Orleans Cotton Press Company have proceeded to build and erect on said ground, large establishments, buildings and stores for pressing and storing of Cotton, &c.; and have appropriated the same to their sole and exclusive use. They pray judgment declaring that the title to said property *is vested in them,* for the use and benefit of the public, and that the possession thereof be decreed to them.

The defendants first pleaded the peremptory exception of *res judicata,* founded on a suit of Henderson et al. *vs.* Mayor et al., in 3 and 5 La. Rep., 563, 416.

For answer, the defendants pleaded the general issue; and denied specially that the plaintiffs had any right, title or legal claim to the premises whatever. They further aver that they are riparian owners of the alluvion or Batture which has by increase and accretion attached itself to their front property, situated in front of said Faubourgs Delord and Saulet; that they own and possess said property, originally by concession from the King of France; and that it has descended by various conveyances together with all the rights to increase or Batture, and is now vested in them; that they cannot be divested of their said property without their consent and without just and previous indemnity:—and finally, if the act of incorporation of the City of New-Orleans, in 1805, under which the plaintiffs claim title, divests them of their title it is in viola-

tion of the Acts of Congress creating the territory of Orleans, the treaty of cession, and repugnant to the constitution of the United States; and that so far as said act affects or divests them of their right and title to the premises, it is *null and* *void.* They reiterate that they are Riparian owners, and have been burthened with the charges and duties, of such.

Upon these pleadings and issues the cause was tried.

The Parish Court sustained the plea of *res judicata* so far as respects the ground or square, on which the Cotton Press stands :—Being of opinion that the defendant's claim to it was confirmed in the case of Henderson et al. *vs.* Mayor et al. The evidence of the case consisted of various plans and title deeds from Madame Delord and others, from and to whom the original property passed, from the time it was laid off into town lots in 1806, 7 and 8, down to the present owners. In February, 1806, Madame Delord caused a plan to be made and laid off of her plantation, lying immediately above the Faubourg St. Marie, into city lots; making it a continuation of that Faubourg. In front of the outer range of lots *on the* Batture was Front or New Levee street; leaving still a space between it and the river Mississippi or water's edge. It is the Batture or alluvion that has accrued out-side of the street and the then levee, that forms the object of the present contestation or the *locus in quo.*

The defendants produced evidence to show that they and those under whom they claim, always claimed and exercised acts of ownership over the alluvion or Batture that accrued in front of their property.

The plaintiffs' demand to be considered in the place of riparian owners; that the *open space* left between Front street and the river in 1806, as represented on the plan of Madame Delord, became public—a *locus publicus,* and vested in the corporation, under the act of 1805, as a public place, to be administered for the use of the public; and further, that all the accretions or alluvion which formed in its front, was public; partaking of the same character. Of this opinion was the

EASTERN ·DIS.
April, 1841.
——————
MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS. Parish Court. There was judgment decreeing the title to the space of Batture now vacant unoccupied, lying front of the Cotton Press, situated out-side of the levee and road established by the corporation, to, and vesting it in the plaintiffs for *public use and purposes.* The defendants appealed.

*Mazureau*, for the plaintiffs, maintained that the question in this case is—Whether the alluvion, which was covered by the river at the highest stage of its waters, lying outside the *levee street*, known by the name of New Levee street, at the time when the plantations Delord and Saulet were erected into faubourgs, belongs to the public or to the Cotton Press Company ?

The facts requisite to be known, and the truths of which it is necessary to be satisfied, for the purpose of coming to a satisfactory conclusion, by a correct application of the law, are the following :

1st. The plantations Delord and Saulet were portions of the ancient plantation of the Jesuits. And it is well known that according to the acceptation of the term in Louisiana, *plantation* means a rural estate, that is to say, situated beyond the limits of a town. It is equally well known, that a rural property, lying upon the bank of a stream or river, and having no other boundary on that side, is called a riparious estate. Such was the Jesuits' plantation. Such were the plantations Delord and Saulet, as forming parts of it.

2d. In 1805, by a law of the territory of Orleans all that tract of country included within the following boundaries was erected, incorporated and continued to be a city, by the name of New Orleans, to wit :

On the north by Lake Pontchartrain, from the mouth of Chef Menteur to the bayou Petit Gouyou to the place where the upper line of the plantation, on the west by the bayou Petit Gouyou, called Mazange, (since of Norbert Fortier,) passes ; from thence along the line of the plantation of Forcel to the

Mississippi, and across the same to the canal of Mr. Ha-
rang, &c.

3d. This corporation was created by the title of " The
Mayor, Aldermen and Inhabitants of the city of New Or-
leans."

4th. For the administration of the property and affairs of the
city, the same law created a Mayor and fourteen Alder-
men, the latter to be elected by the citizens; for which
purpose the territory of the city was divided into seven dis-
tricts.

5th. The sixth district embraced the plantations Delord and
Saulet, and extended to the upper limits of the city.

6th. By the act of incorporation, the City Council was em-
powered to impose taxes upon every description of property,
moveable and immoveable, situated within the limits of the
city, for the purpose of raising the sums necessary " for light-
ing, cleaning, paving and watering the streets; for supporting
the city watch, the levee of the river, the prisons and other
public buildings, and for such other purposes as the police and
good government of the city required. Provided, that no real
property within its limits, and not situated in any part thereof,
which shall at the time of imposing such a tax, be laid out into
streets, shall be taxed for the maintenance of lights, of the city
watch, or for watering and cleansing said streets."—2 *Moreau's
Digest, p.* 111

7th. In 1807 or 1808, the plantations Delord and Saulet, the
former of which adjoined the Faubourg St. Mary, were divided
into streets, squares and lots.

8th. At that period, there existed and passed between the
enclosed lands of Mme. Delord and Mr. Saulet and the river,
a *levee street*, being the continuation of the *levee street* running
along the front of the Faubourg St. Mary, still existing and
known by the name of Tchoupitoulas street.

9th. There existed also, outside of this *levee street*, a certain
strip of ground, known here by the name of *batture*, which
was covered by the river at the annual high stage of its waters;

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

a part of which was susceptible, by the construction of a new levee, of being occupied by the owners of the original estate.

10th. In the exercise of their riparian and still rural rights, and wishing to take possession of and occupy as their private property the portion of the batture capable of being owned by reason of its elevation, Mme. Delord and Mr. Saület constructed upon it, in advance of Tchoupitoulas street, a new levee, to serve as a street or road; which they called "New Levee street."

11th. This being done, they divided the whole of this accession into streets, squares and lots, in the same manner as their principal properties; leaving outside the new levee, what remained of the batture, which being very low and of small extent, continued as before to be the bed of the river.

12th. In this manner their estates were enlarged by all the space contained between the two streets; and the lots formed from this accession were sold by them in the same manner as those forming their primitive estates. They had the right so to do; no one contested it.

13th. In 1810, the legislature of the Territory of Orleans, passed a law by which it was enacted:

" Section 1. That the keeping and repairs of the levees of every real property, situate on the banks of rivers, which have been or shall be for the future divided into lots, and which shall not have been annexed to a city already incorporated, or which shall not have been erected into a city, borough or village, and as such incorporated, *shall be at the charge of the whole of the proprietors of the lots* situate on the said real property; and for that effect the parish jury shall cause to be valued every one of the said lots; and the amount to be paid by every one of the proprietors for the keeping and repairs of the said levees, shall be in proportion to the valuation of the said lots; provided, that in the valuation of the said lots by virtue of this act, the same shall be valued without including in the said estimation the value of any part of the improvements which might have been made by the owners on the said lots.

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

" Section 2. That the repairs of the roads, streets, or avenues on the said real property, divided into lots without having been incorporated or annexed to some city, borough, or village already incorporated, shall be made by the proprietors of the lots in front whereof the said roads, streets or avenues are to run conformable to the plan of the said real property, situate on the banks of a river and divided into lots as aforesaid."

14th. In September, 1812, the limits of the city were changed, or at least narrowed, by law. The upper limit was reduced to the Nuns' plantation (at present the faubourg Annunciation.)

15th. The same law made a new division of districts, and enacted that the settlements between the suburb St. Mary and the Nuns' plantation, should form the 7th ward and elect one alderman.

16th. In March, 1818, the upper limit of the city was again extended and carried up to the lower limit of Miss Macarty's plantation, and the space between this limit and the preceding was constituted the eighth ward.

17th. From and after the year 1812, the seventh ward always elected and sent an alderman to the city council, and as I have before stated the plantations of Delord and Saulet were comprised within its limits.

18th. It is since 1812, that the defendants or their predecessors purchased that portion of the batture, which after the creation of the original property into faubourgs and the accession of the alluvion, I have before mentioned, remained outside the *levee street* called New Levee street, was covered by the water at the high stage of the river, and formed a part of its bed.

19th. This space taken from the batture, and consequently from the bed of the river, embraces, by the defendants' statement, the entire front of the faubourgs Delord and Saulet, by an irregular depth.

20th. The cotton press, erected on this batture, occupies a depth of about three hundred feet, being in proportion to the

17     VOL. XVIII.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

total depth of those faubourgs, as one to nineteen nearly, or in other words, as a narrow strip of list to a piece of cloth.

21st. Since 1808, the period at which the faubourgs Delord and Saulet were created, up to the date of the defendants' purchase, and from thence to the present time the batture has been continually increasing, and extending itself towards the opposite shore, by reason of the deposits made by the river in its high stages.

22d. In 1831, they pretended to have a right not only to the alluvial soil upon which their cotton press is built; but also the remainder of the batture, which by their own admission, formed a part of the port, and in consequence they instituted suit against the Corporation, denying its right, either to remove from the batture the nuisances which obstructed the free use given by law to the public, upon all the part situated beyond, as well as upon the banks of the river ; to construct a new levee, or to make a road at its foot; except in consideration of an indemnity previously granted and paid.

23d. The judgment rendered in that suit maintained the corporation in its right to clear the batture and make a new levee, but decreed that it should pay an indemnity for the space to be occupied by the street.

24th. Since the rendition of this judgment, the obstructions on the batture have been removed, and a levee has been made by the corporation, which serves, at the same time, as a street, throughout the whole front of the faubourgs Delord and Saulet.

These facts being known, we will again state the question to be examined.

Does the batture upon which the cotton press is built, and that which lies outside the levee constructed by the corporation in 1831, belong to the city ; or to the defendants ?

In other terms : does this batture belong to the nine individuals composing the Cotton Press Company, and which, admitting their title to be valid, occupies the whole front of the two faubourgs, by a depth of perhaps three hundred feet ? or

does it belong to the public, to the city, of which many hundreds of citizens, owners of houses and lots, situated in these two faubourgs, of which the cotton press occupies the whole front, form part?

Such is the question I am about to examine; I will first state the general rule:

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO 2.
*vs.*
ORLEANS
COTTON PRESS.

" The alluvions belong to the riparian proprietors. This rule is founded upon the equitable principle, that he who is exposed to loss, should profit by the gain."

I. It results from these facts, that the Cotton Press Company is not a riparian proprietor of the description of those, who are exposed to loss by the inroads of the river. If the river detaches suddenly, or insensibly and successively, certain portions of the soil, so that in the end the levee and road disappear, the Orleans Cotton Press Company, will not be bound to furnish another road and levee to the public, in the place of those so destroyed. It is nevertheless true, that the Jesuits, and also the persons who purchased parts of their plantation, were obliged to furnish the road and levee; and that the Cotton Press Company, allege themselves to be in their place and stead, and like them riparian proprietors.

But, when in 1831, the city wished to exercise, upon this, their self styled riparian property, the right of servitude, *via et iter*, created in its favor by law; what was the conduct of the immediate authors of the Cotton Press Company? They refused to permit the servitude, and a solemn judgment declared, that they owed it not. What consequence results from that this? they were not riparian proprietors. Had they been riparious owners of a rural estate, they would not, and could not, have been allowed to dispute the right of servitude sought to be exercised by the public. The court would never have admitted their denial. It would never have declared that the public could only take the road by paying for it. It did so decree in a most positive manner; and in thus deciding, declared that they possessed not the rights, were not in the place and stead of the Jesuits; who were bound to furnish a road

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO 2.
*vs.*
ORLEANS
COTTON PRESS.

and levee; and, consequently, that they possessed not the kind of property that could acquire by alluvion; for, once more, the accession by alluvion accrues only as a compensation for the loss and charges to which the riparian owner is exposed.

"Qui sentit onus, sentire debet commodum, et e contra."

II. In the first place, I maintain, that by law, the alluvion only accrues to the owner of a rural estate bordering on a river.

In the second place, that the alluvions formed on the shores in front of, and united to cities and their suburbs, belong to those cities. I commence with the first of these propositions:

The alluvion only accrues to the owner of a rural estate, bordering on a river.

The text of our Civil Code, art. **501,** is as follows:

"The accretions, which are formed successively, and imperceptibly to any soil situated on the shore of a river or creek, are called alluvions.

"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or creek, and whether the same be navigable or not, who is bound to leave public that portion of the bank (le chemin de halage) which is required by law for the public use."

To any person who has studied the civil law of Louisiana, and knows the source from whence this text is drawn, as well as the legal acceptation of the term *"fonds riverain," (riparious estate)* this text is sufficient to form a decision on the conflicting claims of the city and private individuals, owners of lots, which are only portions of the estate *(fonds)* upon which the city is founded (fondée.)

He will entertain no doubt, that the city, and not the owners of these lots, is the riparian owner.

There is an additional reason to strengthen an opinion, which nothing should shake; it is that if the river carries

away its bank and the road bordering it, a new bank must be left, and a new road constructed for the use of the public.

But the owner of a lot or site in front of that city, which is nothing more than a measured and limited parcel of its domain (fonds) cannot be obliged, by law, to make a gratuitous surrender of his lot or front site, for the purpose of furnishing a new bank and road for the public use. It is upon the city, as a body and community that this charge is imposed; and which it would be obliged to acquit, by purchasing the lots, on which the houses forming the front of the city, are built. It would have no other resource; and the price of this indispensable acquisition, since the bank and road must be furnished, would have to be paid out of the taxes and other revenues contributed by, and belonging to the citizens collectively.

III. A superficial observer would say: the lot upon which my house is built, situated in front of the city, is an estate (fonds.) Between it (ce fonds) and the river, there is no other estate (fonds,) consequently it (ce fonds) is riparian. Therefore, if the river, either by degrees, or suddenly, carries away the bank, the road and my estate, (fonds) no one will indemnify me. Being, therefore, exposed to the loss,. I ought to profit by the accession of alluvion.

To this I reply, that he who purchases a city lot, does it with a knowledge of the fact, because he cannot pretend ignorance of the law; at his peril and risk, because his lot is measured, and has fixed limits; because the road or street, which bounds his lot, does not belong to him, and he has only the use of it in common with every body; and lastly, because he is not personally charged with the keeping and repairs of the road, bank, or levee. Therefore it would be unjust, when protected by the revenues of all his fellow citizens, against the inundations of the river, and only supporting in common with them the expenses of the construction, keeping and repairs of the roads, streets, and levees, that he should alone profit by the alluvion. Because if instead of an accession by alluvion, a loss should accrue by the destruction of the bank,

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

levee, and roads, it would fall upon the whole of his fellow citizens, individually and collectively.

If *his soil* be carried away by the river, his fellow citizens, and the whole community would lose, by the same event, all the bank, road or street lying beyond it; and moreover, all the space, besides that formerly occupied by his lot, which would be necessary to replace the bank and road so destroyed, and for the construction of a new levee at such a distance, that in case of a repetition of the accident, they should be exposed less frequently to the same expenses. Indeed I am still at a loss to conceive, after long study and serious reflection, how the defendants could have had the assurance to put forth their present pretensions.

They pretend to say, that they are in the place and stead of Mme. Delord and Mr. Saulet, and also of the Jesuits, and to advance, that they are entitled, to the same rights as the latter.

Yet the Jesuits were owners of a rural estate, having the river for its limits; and Mme. Delord and Mr. Saulet, having purchased portions of that property, were, until the division of their plantations into lots and streets of faubourgs, actually riparian owners of rural estates. Where are those rural properties at the present day? we look in vain for them. They have disappeared by their conversion into urban properties; by the change of a plantation to a city.

You are proprietors of a riparian estate and in the place and stead of Mme. Delord, Mr. Saulet and of the Jesuits, and nevertheless you did not purchase from either of them. But the hundreds of persons who own lots, sold by Mme. Delord and Mr. Saulet, are also in the place and stead of those two persons, and of the Jesuits. Have not they equally as much right, as yourselves to the alluvion? I firmly believe it; for they all purchased, as you did, portions of that large riparian and rural property (fonds) which being exposed to loss, had by law, the right of accession by alluvion. Every portion of that property, has, in proportion to its value, the same charges to support as yourselves; each one ought therefore to enjoy

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

the same advantages. This is so far true, that the law of 1810, upon which you rely, has divided among all the inhabitants of the faubourg, without distinction as to situation, the charge of the levee, imposed originally upon the Jesuits, and after upon Mme. Delord and Mr. Saulet. Consequently this charge being imposed upon all the inhabitants, upon the public of the faubourgs, the advantage cannot accrue to you alone, to the exclusion of all the others.

Admit the system contended for by the company, it results, that if the owner of a property bordering on a river, and having a depth of forty arpents, sells the whole of his land, with the exception of the space occupied by the bank, the road, and every thing lying beyond the levee; his vendee will not be a riparian proprietor, and cannot profit by alluvion. Nevertheless, if, instead of an accession by alluvion, the bank, road and levee, should be carried away by the river, the land of the purchaser would become situated on the marginal line of the water, and hereafter exposed to every new loss and destruction that the river might occasion. Should a new road and levee be required from the vendor, he would instantly reply: It is out of my power to furnish them. I no longer hold any property, the river has carried away every thing that I possessed upon its banks. If he be listened to; if this true and incontestable reply is accepted, it becomes clear that it only depends upon the will of every riparian proprietor, to exempt his estate from the perpetual servitude imposed upon it of furnishing a road and levee for the public use; and this by the fact of selling his property, and reserving only the space occupied by the road and levee.

Still, it is indispensable, that a road and levee should be furnished, either by the public, or the purchaser of the land, from which the reserve was made, to supply those destroyed.

But which of the two ought to furnish them? Certainly not the public, for it cannot be thus frustrated in its rights. It must, therefore, fall upon the purchaser, who can in no manner be excused from it. I say, again, that it is not upon a *strip of*

EASTERN DIS.
April, 1841.
MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.
the land conceded, that the servitude is imposed but upon every part and portion of it. The purchaser would vainly say, that he did not buy a riparian estate ; that the portion of the original estate, which was riparian, or bordering on the river, had been reserved by the vendor, who was alone entitled to the accession by alluvion, and consequently exposed to all losses occasioned by the encroachment of the river. And that in consequence of not being a riparian proprietor, and not enjoying the advantages attached to that quality, he could not be made to bear the losses attendant on it. He would be successfully answered on the part of the public, that the land purchased by him, formed by far the largest and most considerable part of the primitive estate, conceded under the burden of furnishing a road and levee ; that every portion of it is subject to the servitude, and cannot be withdrawn from it; that if he has made an inequitable contract, it is no reason why the public should lose its rights ; that he must seek restitution from his vendor, who had taken advantage of his inexperience, and endeavored to enrich himself at his expense, by reserving all the chances of advantage and profit, without the risk of loss; that from him he might recover the value of the land required for the road and levee, he will be constrained to make, first, for his own security, second, for that of his neighbors, who are subjected to similar servitudes for his, and the general protection and safety.

IV. It is necessary for the defendants to show that in 1808, the batture outside the levee was " sufficiently high to be susceptible of private ownership, to enable them to recover and hold possession of the batture." This was required in the celebrated but disastrous suit of Gravier vs. the Mayor, Aldermen and inhabitants of New Orleans ; 1 *Condensed Martin's Reports*, 454.

Thus it will be perceived that the reason why John Gravier was recognized as owner of the batture in front of the Faubourg St. Mary, was not solely, because there was a batture in front of his brother's plantation at the time of its erection into a faubourg; but more especially, because that batture

was, at the time, " *of sufficient height to be considered as pri-*
*vate property; and had consequently become annexed to, and*
*incorporated with the inheritance of Bertrand Gravier.*"

Had the court not been convinced by the evidence produced
in the suit, that the batture was sufficiently elevated to be con-
sidered private property, the pretensions of Gravier would
have been repulsed, and the batture would have fallen into the
public domain of the city, by the simple fact of the conversion
of the plantation into a suburb. But in our case, when a year
after the judgment which I have just recited, (which was ren-
dered in May, 1807) Mme. Delord and Mr. Saulet, also erected
their plantations into faubourgs, there was a batture outside of
Tchoupitoulas street, which served as a levee, the same as be-
fore the faubourg St. Mary. Instructed of what they con-
ceived to be their rights, by the decree in favor of Gravier;
they took, in front of their respective plantations, all that
portion of the batture which was "*of a sufficient height to be
considered as private property*"; inclosed it within their domain
by means of a new levee and street, which they constructed
much nearer to the river, along the whole extent of the front
of their respective lands ; sold that considerable portion of
batture, which formerly extended from the marginal line of the
water to the foot of Tchoupitoulas street, into lots ; thus leav-
ing outside the *new levee street* the portions of the batture too
inconsiderable, or little elevated to be consolidated with the
surplus.

These facts being established (and they cannot be doubted
after examining the plans and the testimony of Perez and Li-
vaudais, produced by the defendants in the first suit); and suppo-
sing that in the present instance, Mme. Delord and Mr. Saulet,
were claiming the batture, or that portion of it, which in 1808
was left outside the new levee ; would it not be necessary, in
order to obtain a judgment, if the jurisprudence be established
by that decision of the superior court, for them to prove that in
1808, the batture was " *of sufficient height to be* (then) *consi-
dered as private property ?*" ·

18     VOL. XVIII.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

And here let it be remarked, that in limiting ourselves in this place, to the application of the principles as laid down by the superior court, we, by no means assume the most favorable position for ourselves.

V. At the commencement of the argument, I laid down the general, and with us undisputed principle, that the alluvions belong to the riparian proprietors, But I maintained that the principle was only applicable to the owners of rural estates, " prædia rustica."

I maintained that it did not apply to urban property.

I said that the alluvions on the banks of rivers, within the limits of cities, towns, faubourgs, or villages, belong to those bodies or communities.

To prove this : I made use of the Roman and Spanish laws, from which our own are derived, and which materially aid us in understanding the sense, and correct application of the dispositions of our code.

I here refer to the opinions of *Hulot*, 1 *vol. pages* 9, 10 *and* 11; *who also cites D'Aguesseau, Cujas, Dumoulin, Castilhon, Bretonnier and other French Jurisconsults*, on the excellence and authority of the Roman law. I resume this law as my guide.

I open the *Digest of Justinian, lib.* 41, *tit.* 1, *law* 7, *sec.* 1; *and* 16*th volume of Pothier's Pandects, page* 157, and I read the following text, of great assistance to the understanding of this discussion, and the source of article 501 of the *Louisiana Code.*

" Præterea quod per alluvionem agro nostro flumen adjicit, jure gentium nobis acquiritur."

The translation of which is :

" That which a river adds to our field by alluvion, belongs to us by the law of nations."

Little versed in the Latin language, but feeling doubtful whether " *agro nostro*," was correctly translated by " *our field*," I felt disposed to stop. But recollecting that the Roman Digest contains a book or title, appropriated to fixing and

determining the signification of words, I refer to that part, to
see the definition and sense of the word " *Ager*."

*Digest, lib.* 50, *tit.* 16, *l.* 27, *de verborum significatione,* I
read :

" *Ager est locus qui sine* VILLA *est.*"

Here I am stopped by the word " VILLA ;" by reference to
*Pothier's Pandects, vol.* 22, *page* 42, I find " *Ager*" vide in-
frà "*fundus.*" I look for the word " *Fundus,*" and at page
154, I read :

" FUNDUS," *ager, possessio; prædium, locus.*"

" FUNDUS," *est, omne quidquid solo tenetur.*"

At page 156 I find :

" AGER," *est, si species fundi ad usum hominis compa-
ratur.*"

" *Ager,* is a portion of land prepared (cultivated) for the
support of man."

" *Ager est locus qui sine villâ est.*"    Still the same thing:
What then is the meaning of " *villa ?*"    The French transla-
tion runs: " *Ager* est un lieu sans maison de campagne."—
" *Ager,* is a place without a country house ;" therefore, " *with-
out a country house,*" is the translation of " *sine villâ.*"    I look
above, and find that this is the correct translation.    In fact, I
read in the preceding paragraph :

" FUNDI *appellatione omne ædificium et omnis ager conti-
netur.    Sed in usu urbana ædificia,* ÆDES ; *rustica* VILLÆ
*dicuntur.*"

" The word ' *Fundus*' means every kind of property in
lands and buildings, but by custom, houses in a town are call-
ed ' *ædes*' and those in the country ' *villæ.*'

I am, therefore, better instructed, and I translate the law of
*Ulpian, ff.* " Ager est locus qui sine villa est," by the words :
" *Ager,* is a place without a country house ;" and I say that
the translation of the law " *Pretereà quod per alluvionem agro
nostro flumen adjicit, jure gentium nobis acquiritur,*" given
in the 16th volume of *Pothier's Pandects,* in these terms :

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

" Ce que le fleuve ajoute *à notre champ*, par alluvion, nous appartient par le droit des gens;" (" that which a river adds *to our field*, by alluvion, belongs to us by the law of nations,") is an exact and correct translation."

I no longer feel any doubt ; but wishing to fortify my position, I refer to the title of the Partidas, del significamento de las palabras, and I read law 8, tit. 33, Partida 7 :

" Otrosi decimos, que *ager*, en Latin, tanto quiere decir, en romance, como campo para sembrar, en que no ha casa ni otro edificio, fueras ende alguna cabaña o choça par cobrar los frutos."

And, in note 3, of Gregorio Lopez, upon that law, I find :

" Adde lex *ager* ff. eod. indè *agricultura*, quià omnium rerum ex quibus aliquid acquiritur, nihil melius, etc."

I was formerly wont to believe that the word *Agriculture*, was derived from *Ager*, but I am now still more firmly convinced of it, since my opinion is supported by that of a man like Gregorio Lopez. Thus enlightened, I return to my text " *prœtereà*, etc.," and, seeing more clearly than ever, that it only speaks of *a field*, as the species of property which obtains an increase by alluvion, I conclude that urban or city property, does not profit thereby, according to the maxim :

" Inclusio unius est exclusio alterius."

If the condition of urban property, was similar to that of rural ; if the *prædia urbana*, were subjected to the same charges and servitudes, and exposed to the same risks as the *prædia rustica*, it would be difficult to account for this disposition, which favors only a certain description of property, which, in appearance, at least, protects only certain riparian estates ; but on the one hand, I see that town lots, *prædia urbana*, are measured, and have their size determined by fixed and immutable limits ; and, on the other, that the *prædium rusticum*, that is to say the riparian *ager*, has no fixed and determinate limits, except those which it derives from nature, or its position on the banks of a river, which may destroy a portion of its soil. I further see that the *prædium urbanum*,

is not bound to furnish, either a street, road or levee, to the public; that, on the contrary, the *prædium rusticum* is ob- liged, by the law of the country, to furnish at least a tow path; and, according to the primitive title of concession, a high road and levee along its whole front, upon the bank of the river or stream. I observe that no *prædium urbanum*, has either a river or stream for its natural or conventional boundary; but I find on the contrary, that every *prædium rusticum*, or *ager*, (which is a species of prædium,) called riparious, receives that denomination, because it has a river or stream for its extreme limit. I observe that the *prædium urbanum*, not being the *principal* of which the street is the *accessory*, if the latter be destroyed, the loss will fall upon the public, and not on the urban proprietor. I see that such is not the case with the *prædium rusticum*, called *ager*, which in the event of the destruction of the road and levee, which the owner is obliged to make, by the encroachments, is still bound to furnish others to the public. I see, moreover, that in every possible event, all the risks and charges have been laid upon the *prædium rusticum*, while the *prædium urbanum* is only subject to the inconveniences resulting from the laws, which have for object the regulation of good neighbourhood, and the convenience of the citizens at large; and, I therefore conceive, that the law cannot be the same for both species of property.

If all things, if all the burdens and risks, were alike, I would say that the law of alluvion should apply to a city lot, as well as to a country estate: I would invoke the principle: " *Ubi est eadem ratio, eadem est et lex.*"

VI. I open then the Code of Alonzo the Wise, which, putting aside some slight imperfections, attributable solely to the age in which its immortal author lived, is still one of the most splendid monuments of human wisdom.

Many years have not elapsed since we were governed by that code, not enough, at least, to prevent us from feeling the evil which its abrogation has inflicted upon our legislation.

In this cause, it will be of so much the greater service to us,

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

as the public, whose advocate I am, acquired the rights, which it now asserts, under the empire of that code.

Law 26, title 28, Partida 3, enacts:

" Crecen los rios à las vegadas de manera que tuellen e menguan a algunos en las heredades que han en las riberas dellos e dan, e crecen a los otros que las han de la otra parte. E porende decimos, que todo quanto los rios tuellen à los homes poco a poco, de manera que non pueden entender la quantidad dello porque no lo llevan ayuntadamente, que lo gañan los señores de aquellas heredades, à quien lo ayuntan, e los otros a quien lo tuellen, non han en ello que ver. Mas quando acaeciesse, que el rio llevase de una heredad ayuntadamente, asi como alguna partida della con sus arboles, o sin ellos, lo que asi llevase non gañan el señorio dello aquellos á cuya heredad se ayunta; fueras ende, si estuviesse y por tanto tiempo que raigassen los arboles en las heredades de aquellos á quien se ayuntasen; ca estonce ganaria el señorio dellos eldueño de la heredaddo raigassen, pero seria tenudo de dar al otro el menoscabo que recibió porende, segun el alvedrio de omes buenos, et sabidores de labores de tierra."

This law, as is seen, agrees with that of the Roman Digest, which I have read; I mean the law "Prætereà." That there might be no doubt upon the subject, Gregorio Lopez, has so stated it, in his note No. 1, upon that law.

Has not the word "heredad," employed by the legislator in that law, the same meaning in Spanish, as the word ager, made use of in the Roman law prætereà?

I should have no hesitation in deciding for the affirmative.

This law, which was only abrogated in 1828, and must therefore be our guide in the present instance, since the rights now claimed by the public were acquired under its influence, most certainly gives the right of increase by alluvion only to riparious rural estates. This must be conceded by every person, not paid to say the contrary. In the terms it employs, there is neither obscurity, doubt or ambiguity, to any one who understands the language in which they are written.

Therefore, if, as I believe, I have firmly established by
reason, common sense and sound law, it is impossible for the owner of a *town lot* to acquire by alluvion, how can the public
fail in this cause? by what magic can the Cotton Press Company succeed? unless by a *tour de force*, which perhaps may not be beyond the resources of the genius of our age, it succeeds in proving that a faubourg is an "*Ager*," "*Una heredad*," an urban property; and that an "*Ager*, that *Heredad*, that *urban property*, belong to it.

Now or never is the time to show, not only that "the whole is contained in the part," but also that truth and error are one and the same thing. In case I should have omitted something, when I maintained that the ground (fundus) upon which a city is built, belongs to that community, body politic, and aggregation of men, which we term Corporation; let me be permitted to return for an instant to that subject.

To build a city, town or village, it is necessary, I conceive, to have, first the ground (fonds.)

This (the fundus) being had; the town is built upon it. Thus built the town becomes inhabited, and the inhabitants, for the purpose of ingress and egress to and from their houses, for attending to their business both in and out of town, for access to the river upon the borders of which it is situated, for returning therefrom, and for that of travelling over the whole front of the town, if their business requires it, have streets, roads, issues and avenues, which are no more than parts of the ground, foundation (fonds) upon which the town is seated.

What is the nature of this property (fonds) now? Is it not an urban property?

To whom does it belong? Necessarily to the community called a city, to that aggregation of men who inhabit it. Each of them is proprietor of the lot on which his house is situated, and all possess in common the streets, roads, issues and avenues, to the use of which every stranger, whose affairs lead him to the town, is in like manner entitled.

Eastern Dis.
April, 1841.

MUNICIPALITY
. NO 2.
vs.
ORLEANS
COTTON PRESS.
The destination of these public objects, the use of which is granted to every one, cannot be changed by the individual will of any person. It can only be done by the public, and for its interest and greater advantage. It, therefore, seems to me an irresistible conclusion, that the soil (fonds) belongs to no individual person.

VII. It is admitted the *ground* (fonds) on which the Faubourgs Delord and Saulet were laid out into lots was *riparian* while it was *rural*, and it did not cease to be so in becoming *urban ;* consequently the rural proprietor disappeared and gave place to the urban proprietor, which is the *Public ;* the successor of the individual founder of this part of the city, who was riparian owner.

The shore of the river in front of rural property belongs to the owner of the land, although the public has the use of it; but will it be said this is the case of the shore in front of a *town lot,* which is urban property ? Certainly not; for the public as owner of the ground (fonds) of the front lot is a small portion, is the riparian owner; and consequently the shore in front of the city, belongs to the public, *i. e. the city.* The same should be said of the public road running along the river's shore. The Cotton Press Company is therefore not a riparious proprietor, capable of acquiring by alluvion; see Partida, 3, tit. 28, law 6, on the subject of the public road and the *port :* also *Pandects,* law 59, *de verborum significatione ;* Lex. 7, tit. 12, lib. 8, Code ; Curia Phil., lib. 3, cap. 1, Nos. 35 and 37.

VIII. Nothing is more unreasonable and unjust than that an individual who happens to own a front lot, and has contributed only his bare proportion of taxes, for the construction of wharves, levees, streets, and the improvements of the port or harbor, should become the exclusive proprietor and immutable possessor of the alluvion which has become part of the port ; yet such are the pretensions of the Cotton Press Company.

But there is a positive law which gives to towns and cities the alluvion which are formed in front of them. This is to be

found in Partida 3, tit. 28; law 6 and 9.   See also the case of
Packwood *vs.* Walden, 7 Martin N. S., 90.   Pandect's lib.
41, tit. 1, law 16, de acqr. rer. dom.

IX. The numerous counsel for the defendants with so much
learning, skill and eloquence, seem to direct their principal
arguments against the pretensions of the plaintiffs, and to
persuade the court and the public that there is no foundation
for their claim to the alluvion.—Because say they, the alluvion
belongs not to cities, but to the owners of riparious lots.

2d. That neither the Roman or Spanish laws give the allu-
vions to the owners of rural estates only; because *ager* in the
former, and *heredades* in the latter law are generic terms, by
which are understood urban as well as rural property, and
that, as by both of them the alluvion is given to the riparian
proprietor, it makes no difference whether his property be si-
tuated in the country or in a city.   3d. That the Roman law
"*in agris limitatis,*" was made only in relation to lands taken
from the enemy, and afterwards divided and apportioned
amongst the soldiers; that, consequently, it is inapplicable to
other objects.   4th. That the word Arenales does mean Al-
luvion.   5th. That the law of the Partidas, which treats
thereof, does not give the Arenales to cities, but only enu-
merates them among the things which cities may acquire.
6th. That the Arenales belong to the Public and not to the
cities, unless they be expressly and specially granted and
conceded to them.   7th. And, lastly, that the faubourgs De-
lord and Saulet were not incorporated by the act of 1805, but
by a deliberation of the City Council in 1835; and, that con-
sequently, the alluvion formed and created before that period
cannot belong to the city.

Let us assail the first position.

1st. The alluvions belong not to cities, but, on the contrary,
to the riparian owners.

If this position were maintainable; if it were supported by
reason or law, the triumph of the Cotton Press Company
would be assured.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

But I have no knowledge of any thing that could lead me, or any other person, to believe that reason or law lend their support to a proposition so levelling. ·

Let us not go out of our actual legislation, let us confine ourselves within the textual dispositions of our Civil Code, and we shall there find the refutation of this proposition.

In truth, I believe what I have already said is sufficient to establish it without any further doubt.

But, not to stop at the principle laid down in the commencement of our article 501, which says,

" The accretions, which are formed successively and imperceptibly to any soil, situated on the shore of a river or creek, are called alluvions ;"

A principle from which, I believe, I have deduced an argument that is incontestible ;

Let us take up the disposition which, in the same article, declares to whom the alluvions belong :

"The alluvion belongs to the owner of the soil situated on the edge of the water, whether it be a river or a creek, and whether the same be navigable or not, who is bound to leave public that portion of the bank, (le chemin de hâlage) which is required by law for the public use."

These two dispositions existed in the old Code, page 107, art. 13, and 129, art. 12 and 13.

It is evident that these two dispositions, so ʼclear and free from ambiguity, are only applicable to riparious proprietors of rural estates, and not to those whom it is thought fit to call riparious owners of lots situated in a town.

The obligation "of leaving to the public that portion of the bank (le·chemin de hâlage) which is required by law for the public use," is imposed on the RURAL and not on the URBAN proprietor, because the land of the rural owner, has no limit but the river, ·and because the bank of the river belongs to him. *Civil Code, art. 446, Partida 3, tit. 28, Law 6.*

It is not imposed on the urban proprietor, because his lot is circumscribed by limits beyond which he has no right of pro-

perty; because the streets and roads, by means of which he <span style="float:right">EASTERN DIS.</span> has ingress and egress, do, not belong to him, but, on the <span style="float:right">April, 1841.</span> contrary, to the public; because his property, being limited, does not extend to the river; and because the bank of the river does not belong to him. Is it not, or at least would it not be absurd to talk of a tow-path, (chemin de hâlage) upon the bank of a river, in front of a city, which has a port?

Can a tow-path (chemin de hâlage) exist in a port?

The shore of a port is bounded by a quay, at which vessels moor, load and unload their cargoes. Must the hundreds of ships which, for six or eight months in the year, fill our port and moor at our quay, slip their moorings and move from that quay, for the purpose of leaving the tow-path (chemin de hâlage) to the enjoyment of skiffs and other small craft? It would be too absurd to suppose such a thing.

Were it necessary to add any further remark, it would be well to recollect what I said, and established at the opening of the cause, to wit: that the quays belonged in common to the inhabitants of the cities.

But what is a quay?

Ferraut's Dictionary, verbo "Quay."

"Quay, s. m., a levee made between the river or waters of a port, and the houses, for the convenience of passage, and to prevent the overflow in high tides."

Trevoux's Dictionary.

"QUAY, s. m., a construction of stone along the borders of a river, for the convenience of passage, and also to prevent it from inundating the land, and to preserve it in its bed." . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . .

"Some authors extend the signification of this word to dykes and roads." . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . .

"QUAY, in marine terms, is a space upon the shores of a port, for the loading and unloading of merchandize."

EASTERN DIS.
April, 1841.

MUNICIPAITLY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

Dictionary of the Academy, *verbo "Quay."*

"QUAY, s. m., *in a city or town, a levee made between the river or waters of the port, and the houses, for the conve. nience of passage. The shore of a seaport, which serves for the loading and unloading of merchandize."*

These definitions, all similar to each other, confirm what I have just said with respect to quays, and consequently their destination is incompatible with the existence of a tow-path (chemin de hâlage.) It is, therefore, correct to say that the 50Ist article of our Code, when speaking of alluvion, and saying that it "belongs to the riparious proprietor, on condition of leaving *le chemin de hâlage,"* does not include the urban proprietor.

It does not include him, because, I repeat it, the *quay* (which is the bank) belongs to the city, which is the riparian proprietor. It is useless further to discuss this point. It cannot be sustained by the Cotton Press Company.

2d. We will, therefore, proceed to the second part of the defence.

"That neither the Roman or Spanish laws give the alluvions to the owners of rural estates only, because *ager* in the former and *heredades* in the latter law, are generic terms by which are understood urban as well as rural property; and that as by both of them the alluvion is given to the riparian proprietor, it makes no difference whether his property be situated in the country, or in a city."

This learned proposition is about as solid as that which I have just examined. To reduce it to its just value, it would be sufficient for me to reply, at least as far as relates to the *Ager* of the Roman law: "You vainly pretend that it is a generic term by which is understood urban as well as rural property. Every thing of this kind which you have learned from the *American Law Journal* is but a thesis, supported by the aid of mutilated citations, in the interest of a suitor seeking to justify an erroneous judgment at the tribunal of public opinion."

Eastern Dis.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

Of what assistance can that clever, ingenious and well-written work be to you, when the Roman law has itself fixed and determined the meaning of the word *Ager?* All the dictionaries in the world, and even the *Gradus ad Parnassum !!!* cannot make the law different from what it is.

I am very ready and willing to believe that Calvin and your other authorities understood Latin; but I also conceive that the authors of the Roman Digest, who tell us that *ager* means *a field*, were equally well acquainted with *their own* language.

And when a law has fixed and determined the sense and meaning of words, from whence does the compiler of a dictionary derive his authority to change, to extend, or restrain their signification. Has he succeeded to the power of the legislator ? Is he intrusted with the revision and correction of the laws ? The authors of dictionaries have a right to our confidence, esteem and gratitude, by their labors ; but those who think, or affect to think, that their DEFINITIONS OF WORDS form authority, and that, of a nature superior to those, which for the interest and as a guide of all men, the law in its wisdom has given as well to the suitor as to his advocate, to the advocate as to the judge, display an extreme of *bonhomie,* which borders on downright imbecility.

And is it not in the Roman Digest, at the title " *De verborum significatione,*" that the definition of the word " *Ager*" is found ?

Alphonso the Wise, has likewise given it, in his Partidas, at the title " *Del significamento de las palabras.*" He therein says in the clearest language, that *ager*, means " CAMPO PARA SEMBRAR, *en que no ha casa ni otro edificio, fueras ende alguna cabaña o choça para cobrar los frutos.*"

But it was under the reign of these laws of the Partidas, that the alluvion, at present in question, has been formed, and the rights of property now asserted by the Municipality, acquired.

Can you oppose them by your *Gradus ad Parnassum ?*

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO 2.
vs.
ORLEANS
COTTON PRESS.

You may take, if you will, this *Gradus* to climb into Parnassus, but if you would earn a niche in the halls of Themis, be guided by the law and those who have expounded it.

When the law has not fixed, defined and determined the sense of the words it employs, nothing can be more reasonable than to refer to dictionaries to ascertain it : but when it has done this, to it alone we must have recourse. It has no need of the approval of Lexicographers to support it in the exercise of its authority ; nor does it prevent learned men from enlightening us, when it has not itself taken that care, relative to the expressions it employs : such at least is my opinion.

But if I am deceived, and it be necessary, that the law, in order to be esteemed as such, should receive the sanction of dictionary makers, I shall not be much embarrassed to find authorities.

I refer to Noel's Dictionary, (Latino-Gallicum) and find : " ' AGER,' *champ*, (field,) terre labourable, (tillable land,) *fonds* de terre (landed property)."

And again, Boudot's Dictionarium Universale Latino-Gallicum, " ' AGER,' champ, *fonds* de terre ; héritage, terre labourable."

" Agrum, novare, iterare, tersiare.   Donner la première, la seconde, la troisième façon à un *champ* : to give the first, second and third dressing to a field."

If further support be necessary to enable the law to stand, I refer to *Pothier du Droit de Propriété, page* 152, *No.* 157.

" 159. Par notre Droit français, les alluvions qui se font sur les bords des fleuves et des rivières navigables, appartiennent au roi, &c."

See also Partida 3, tit. 28, law 26, where the word *heredad* is employed and the meaning disputed.

3. Let us examine the third ground of defence.

" That the Roman law *in agris limitatis*, was made only in relation to lands taken from the enemy, and divided among the soldiers ; and that consequently, it is not applicable to our case."

This is erroneous, and all the writers in the world cannot prevent the proposition from being overthrown.

Let us here recollect what I have herein before said upon the law *in agris limitatis.*

Certainly, nothing can be more applicable to our case. We find two formal dispositions in that law.

1st. The exclusion of limited fields, from the right of alluvion.

2d. The alluvion given to cities.

Thus, say that your property is a *field*, an *ager*, which is not correct. It is limited, for your titles show it; therefore you could claim nothing, were it even rural. It is useless to tell us, that this law was made for the lands conquered from the enemy, and divided among the soldiers. You may exercise all your sagacity and logic, and you will find nothing of the kind in it. You will find it nothing but this : " It is well established, that limited fields have no right to the accession of alluvion, as was decreed by Antoninus."

Let us stop here, for this is the principle laid down by the legislator ; and in it there is nothing about lands taken from the enemy, nor divisions made among the soldiers : thus far you are condemned.

Now, let us continue : What do we see ? That Trebatius, who, I repeat, lived more than a century before Antoninus, had said, " that land, taken from the enemy, and conceded under the condition that it should belong to a city, enjoyed the right ' of alluvion,' &c."

Thus it must be felt and acknowledged ; that neither the principle laid down by Antoninus, nor the long anterior decision of Trebatius, say that fields, limited and distributed to the soldiers, shall be the only ones, which shall not enjoy the right of alluvion. But it would be necessary that one or the other, should be so expressed for your position to be correct. You might still perhaps be right, if the principle or decision, in question, said, " the limited lands or fields, divided among the soldiers, do not enjoy the right of alluvion, because it proceeds

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

from conquests made from the enemy." But, such an absurd proposition, is certainly not contained in that law.

We must, therefore, conclude, that this point is untenable.

4. The defendants' counsel contend that *Arenales* does not mean *alluvion*. Two dictionaries are referred to—Connelly and Nuñez de Taboado. These learned authors in their definitions agree perfectly with our alluvion. Both these authorities favor our pretensions. *Arenales* and *arenal grève* as defined by them, substantially agree that they consist of " *a shore* composed of coarse sand and gravel on the borders of the sea or a river, which affords a facility to land and discharge merchandize." There is a perfect resemblance between them and our alluvion, inasmuch as we land and discharge merchandize upon our alluvions. After examining other learned authors on this subject, Mr. Mazureau concludes that whether we take the authorities of Connelly or Nuñez de Taboado ; or rely on the popular signification of the word in question, that an *arenal* is only a *batture ; a batture* an *alluvion.*

5. The defendants' counsel say the law which speaks of the *arenales* does not give them to cities ; it speaks of them only as things that *may belong* to them. The law on which our adversaries found all their hopes, is precisely that upon which reposes a part of the pretensions of the public of the city. It is found in Partida 3, tit. 28, and law 9—already referred to.

In the case of Packwood vs. Walden, the Superior Court declared that the law 9, tit. 28, Partida 3, gave the *battures, arenales,* to cities.

In that of Cochran et al. vs. Fort et al., the court recognized this right in favor of the city ; and let it not be said, that each of these decisions is an " *obiter dictum,*" to which no weight should be attached.

I have no objection to its being said, that the passing remarks which a judge elsewhere makes in giving the motives which determine his decree, are *obiter dicta ;* but when I see, that the constitution makes it the duty of the tribunals here, to give the motives and reasons of their decisions and to cite the laws

upon which they are founded, neither the most adroit and sub-  EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO 2.
*vs.*
ORLEANS
COTTON PRESS.
tle reasoners, nor the most powerful authorities can induce me
to believe that what may elsewhere be called an *obiter dictum*,
is not with us an inseparable part of the judgment and decision
of the court.

The only object of the constitution, in exacting that the tri-
bunals should give the motives for their judgments, and cite
the laws upon which they were based, must necessarily have
been to banish every thing arbitrary from our jurisprudence,
and to place the law eternally above the judges.  If there were
any other, it could be only that of enabling the people to in-
form themselves of the wisdom, capacity and integrity of the
judiciary power; and this opinion is confirmed by the fact that
the state, the people by their representatives, have provided
with their own funds for giving a greater decree of publicity by
printing, to the decisions of the Supreme Court.

6. I have, I believe, said more than sufficient to overthrow
this last position of our adversaries, and shall, therefore, go on
to their sixth.   And here I find, that I am further advanced
than I imagined, and that, in driving the enemy from the fifth,
we have, at the same time, carried their sixth intrenchment.
In short, they can no longer be permitted to say, that the *are-
nales*, the battures in front of cities belong to the public, if by
that public is meant a being distinct and separate from the pub-
lic of New Orleans.   There seems to me to be no middle
point.

The batture belongs to the town or city, or it belongs to each
individual owner of a lot, a thousandth part of its foundation
(fonds,) situated on its front.

But I have already demonstrated, that the batture can nei-
ther be claimed nor owned by any individual.   Consequently it
must belong the city.

Can the state or nation have any right to it?   We no where
find, either in the Roman, Spanish, or French laws, that the
alluvions either within or without the limits of cities, belong to
the state, or nation.

20    VOL. XVIII.

EASTERN DTS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

Upon what foundation therefore, could it be pronounced, that the batture, which forms the object of the present suit, belongs to the state or nation, to all the people of the state or nation?

I submit this question to the boldest, and most learned of all our lawyers, whatsoever may be the dignity with which they are invested. And in so doing, I tell them not to forget, that, as the Roman law instructs us, the right of acquiring by alluvion is derived from natural law, from the "JUS GENTIUM," as it is called by Justinian. That if, with us, as among the Romans, the civil law sanctions the right of alluvion, it is from the supremely just and equitable consideration, that the land of the riparian owner, which has no other limit than the river, is exposed to be damaged, impaired, diminished, and carried away by that river; and that the alluvion is given to him as a compensation and indemnity for the risks and charges which the law imposes upon him.

When the city of Orleans was laid out, did it enter into the imagination of the founder, to say to the colonists, to whom he gave lots: You shall protect yourselves against the river, you shall make, and keep in repair the public road and streets. If the river washes away the bank, or destroys the road, you shall furnish others at your own cost. If, on the contrary, it adds alluvion to the shore it shall belong to me? Nothing can be more improbable, and yet he was a monarch, a despot.

And now tell me: if the river gradually undermines and carries away, or suddenly swallows up the shore and levee in front of the city, would the state or nation be affected by it? Would they be bound to furnish a new shore, levee and high road in front of the city at their expense? Should any one be found, endowed with sufficient hardihood to maintain the affirmative, a thousand voices would unite with mine to stamp the groundless assertion with the brand of utter absurdity.

Neither the state, nor the nation would have to support the losses, which the river might occasion to its banks, to the levee, quay or road, any more than they are bound to reimburse the

Eastern Dis.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

city the hundreds of thousands of dollars, which during the last thirty years, it has expended in the construction, keeping, and repair of those objects.

We must, therefore, conclude that the city, which has alone and always supported these expenses, and been exposed to the loss; which ever and alone has been burthened with every charge, should alone profit by the alluvions.

7. I proceed to the seventh, and last position, assumed by the defendants, to wit:

"That the faubourgs Delord and Saulet were not incorporated by the act of 1805, but by an ordinance of the City Council, in 1835; consequently, that the alluvion, formed before that period, cannot belong to the city."

If I be not greatly deceived, nothing is more easy to overthrow than this their last proposition.

For this purpose, the examination of two facts is involved; and our duty, in investigating them, is to search for and bring to light the truth, and nothing but the truth.

In one sense, it is correct to say, that the plantations Delord and Saulet were not incorporated with the city of New-Oleans by the act of 1805; but this sense is very limited, and far from being absolute.

It were unnecessary for me to say, that it is true that the *faubourgs* Delord and Saulet were not incorporated by the act of 1805. To say that they were, would be to assert, that a being which is not born, has no existence, nor is yet thought of, might be an active or honorary member of a company; a folly, which, I believe, has not yet been here advanced.

But it does not result from thence, that the two plantations, Delord and Saulet, were not in any manner incorporated: they were really incorporated by the act of 1805, though only for the purpose of police.

But they were not incorporated in such a manner as to make them urban properties, they still remained rural; and the law which created the corporation, within whose limits they were embraced, considered them in no other light. In fact, the

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.
sixth section of that act forbade the city council, which it created, to impose upon the properties situated within its limits, and which were not divided by streets, any tax for lighting, cleaning, watering, and city watch. It would have been very strange, arbitrary, and even tyrannical, to constrain a rural proprietor to become urban. Such a law would have been a violation of the great principles of our constitutions. This I have said and acknowledged, as well in the court below, as here.

Therefore, so long as Madame Delord and Mr. Saulet made no change in their respective rural properties, they continued to be riparian · owners of rural estates, although embraced within the limits given to the city. Thus, so long as they were only connected with the city, for the simple purposes of police, they had an incontestable right to profit by every ac-·cession made to their respective plantations, their rural estates, by alluvions.

But in 1806, or 1807, these two plantations, situated within the limits of the city, were both divided into squares and streets, converted into faubourgs.

From that time, the prohibition, contained in the 6th section of the act of 1805, was removed.

From that time, by the express will of their proprietors, these two plantations ceased to be rural, and became urban estates, integral parts, for all public, legal purposes, of the city of New-Orleans, and could be taxed.

What are we to conclude from these indisputable facts ? That, very long before 1835. the faubourgs Delord and Saulet were duly incorporated with and united to the city of New Orleans; that they were so united and incorporated from 1806 or 1807. I will now examine the assertion, that those faubourgs were only incorporated by an ordinance of the city council in 1805. I ask, by what authority could the city council incorporate faubourgs ? For my own part, I know it not; and if such authority has been delegated to it by law, it has escaped all my researches.

But, in 1810, a law was passed by the territorial legislature, (page 49 of the acts of that year) of which I have already spoken, which enacts:

"SECTION 1. *That the keeping and repairs of the levees of every real property situated on the banks of a' river, which have been, or shall be for the future, divided into lots, and which shall not have been annexed to a city already incorporated, or which shall not have been erected into a city, borough or village, and as such incorporated,* SHALL BE AT THE CHARGE OF THE WHOLE OF THE PROPRIETORS OF THE LOTS *situate on the said real property; and, for that effect, the parish jury shall cause to be valued every one of the said lots; and the amount to be paid by every one of the proprietors, for the keeping and repairs of 'the said levees, thall be in proportion to the valuation of said lots: Provided, that, in the valuation of said lots, by virtue of this act, the same shall be valued without including, in the said estimation, the value of any part of the improvements which might have been made by the owners upon said lots.*

"SECTION 2. *That the repairs of the roads, streets, and avenues on the said real property, divided into lots, without having been incorporated or annexed to some city, borough, or village, already incorporated, shall be made by the proprietors of the lots in front, whereof the said roads, streets, or avenues, are to run conformable to the plan of the said real property, situated on the banks of a river, and divided into lots, as aforesaid.*"

In March, 1813, a new law was passed by the legislature of the state, upon the same subject, the first section of which is conceived in the following terms:

"*That so much of the sixth section of the act incorporating the city of New-Orleans, passed in one thousand eight hundred and five, as gives the city council power to lay tax, for the use of the city, on the suburbs, which are laid out into streets,, outside of the city and incorporated suburbs, shall be, and is hereby repealed, with all acts having reference*

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

*thereto, until the city council shall extend to the aforesaid suburbs equal support and privileges with the city and incorporated suburbs, agreeable to the tax that may be laid on such suburbs by the city council.*"

These two laws are the only enactments which I know, having any relation to the subject in question.

But I do not see any thing in those acts which gives the city council the right of incorporating faubourgs.

On the contrary, the first seems to me to repel the idea, and to be in no manner applicable to the property *(fundus)* contained within the incorporated limits.

The second abrogates, without repealing, the sixth section of the charter of 1805; for, if it prohibits the execution of the powers contained in that section, it also authorizes their exercise, when the city council shall judge it convenient to extend to the faubourgs, of which it speaks, the same support and privileges which it accords to the city and incorporated faubourgs, in respect to the tax that may be imposed on them.

This law, well examined, signifies then, simply, that the city council shall employ for the lighting, cleaning and watering of the faubourgs in question, the proceeds of the tax that may be imposed upon them. It signifies, and can signify neither more nor less, if its expressions be compared with those of the 6th section of the act of 1805.

Thus, I nowhere find, but that the plantations Delord and Saulet were incorporated by the act of 1805, at least for certain objects of police, such as subjecting them to the ordinances and regulations which might be made by the city council, concerning the roads and levees, and also the public order and safety.

I see, on the contrary, by the act of 1805, the express faculty given to the proprietors of those plantations, to assimilate themselves entirely to the city and faubourg already existing; always under the condition of paying such a tax as should be imposed upon them, after their division into streets, squares, lots, &c., for their lighting, cleaning, &c.

I see, afterwards, a modification of the dispositions contained in the 6th section; a modification which, in its result, forever subjects the faubourgs Delord and Saulet to a tax; provided, that the proceeds thereof be employed for their exclusive benefit.

Thus, when, in 1806, the plantations of Delord and Saulet were divided into streets and lots, &c., they profited by the faculty of being assimilated and annexed, by the pure, simple, free and entire consent of their proprietors; and, since that time, the faubourgs, into which these two plantations were converted, have never ceased to be, in fact and in law, incorporated with the city of New Orleans. It is, therefore, to a certain degree an error, to advance that those faubourgs were not incorporated by the act of 1805. Their incorporation goes back to that period. Whether in 1835, or at any other time, the city council may have made any act, passed or adopted any resolution, deliberation or ordinance, which may have been entitled, either by itself or others, an act of incorporation can be a matter of no importance.

We will discuss the supposition, that the act of 1810, which I have cited, is applicable to the faubourgs Delord and Saulet.

Madame Delord and Mr. Saulet were obliged, by their original title, to furnish and keep up the levees and road along the front of their respective lands. This charge was imposed upon them, and from thence resulted their right to the accession by alluvion.

On the erection of their plantations into faubourgs, in 1806, they enclosed by a levee, all the part of the batture sufficiently high to be incorporated and united to the principal property, and thus subjected to their private ownership.

From that period, they both ceased to be burdened with the care of the levees and roads, which was then thrown upon the public of the city.

In 1810, this charge was taken from the public of the city by law, and imposed upon the whole of the proprietors in the faubourgs erected upon the plantations Delord and Saulet,

EASTERN DIS. which had, since two years, ceased to exist as plantations.
April, 1841. Thus, the charge did not return to these *ci-devant* rural pro-
MUNICIPALITY prietors; they were altogether discharged from it.
NO. 2.
vs.          Can the Cotton Press Company, supposing it to represent
ORLEANS
COTTON PRESS. the rights of those two persons, take advantage of either of
these circumstances, to call itself the owner of the batture
which existed outside New Levee street, by means of which
those persons had reclaimed and taken possession of all that
portion of the batture which was "*of sufficient height to be
considered as private property.*"

*L. Peirce*, on the same side, argued to show that from the
time Faubourg Delord became a part of the city, the plaintiffs,
as the successors of the Corporation of New Orleans, were the
*owners of the alluvion* formed thereafter. This right is found-
ed in natural law, in Roman law, in Spanish law, in the Lou-
isiana Code, and in the declarations of jurists and others of
what the Louisiana law is and has been administered. It is
proper to begin by explaining the law of alluvion as received
by those nations from whom we derive our legal system and
whose texts we have adopted. These will show that the de-
fendants have not a shadow of claim to the alluvion in contest;
on the contrary, that the *batture* formed outside of the levee on
which the Cotton Press stands, and that in its front belongs to
the Municipality. The following are the sources of these
laws:

*Vide* Roman law—" Præterea quod per alluvionem agro tuo
flumen adjecit jure gentium tibi acquiritur;" 1 Institutes, tit. 2,
law 1, sec. 20.

" Præterea quod per alluvionem agro nostro flumen adjecit,
jure gentium nobis acquiritur; Dig., lib. 41, tit. 1, law 7 and
16, sec. 1, p. 261, 269, *Hulot*. Code, lib. 7, tit. 41, law 1;
Tissot's translation, vol. 3, p. 243.

The counsel then goes into learned and critical definitions
of the Latin words *Ager*, *ager limitatus*, *agro tuo* and *agro
nostro*, and contended that *ager* only applied to fields or rural

estates which may belong to a community; clearly showing that not lots in towns, but fields, cultivated farms belonging to communities, or rural estates were alone contemplated by the word *ager*, and consequently the alluvions formed to them are not governed by the same principles as urban property. See also Calvin's Dictionary, *Verbo Civitas*. He also contended that the Roman law was the common source of the Spanish law, and their tribunals *applied and adopted it*, when their own statutes were silent. So the Spanish and Roman laws may be considered as the same on this subject; both giving the right of alluvion to rural estates or *Riparian proprietors* only.

2. He further urged that the law of Louisiana was not in conflict with either the Roman, Spanish or French texts on this subject. They have been construed by our courts and found to accord with those ancient laws, from the decisions in the cases of Gravier vs. Mayor, Aldermen, and inhabitants of New Orleans in May, 1807, and in Morgan vs. Livingston, down to the latest periods. See 1 Harrison's Cond., 451.

The decisions under the Code of 1808, page 96, are to be found in the cases of Livingston vs. Morgan, 6 Martin, 19; Packwood vs. Walden, 7 Martin, N. S., 87; Cochran vs. Fort & Story, idem, 627; Cambre et al. vs. Kohn et al., 8 idem, 575.

The Louisiana Code of 1825 has made no change in the law or legislation on this subject. We submit, therefore, with confidence that by the law as always existing in Louisiana, the *alluvion* was only given to rural estates; and that the word *"lands"* was understood as not applying to city lots fronting on a *port*.

3. The defendants have not brought themselves within the textual provisions of our laws. Are they owners of rural estates having natural boundaries, or bounded by the river and as such entitled to alluvion? They derive title from Madame Delord, who in 1806, divided her property into town

HARVARD LAW SCHOOL LIBRARY

Marginal notation:

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

lots, as an addition to the faubourg St. Mary; and sold among others to Larche and Saulet the property that figures on their plans which was also divided into lots. These plans designate the form and boundaries, and show that Madame Delord sold no more than what is described upon her plan, and *is a limited lot*. The plan makes part of the contract of sale, for the lots were sold in reference to it. See the case of Suarez vs. Duralde, 1 La. Rep. 260. In the sale to Larche she does not sell *face au fleuve*, but fronting on the *road and levee;* and expressly charges his lot more, as he is not to be burthened with keeping up and in repair the road and levee. She expressly says: "en outre elle se désiste de toutes pretensions sur le fleuve." The right of alluvion that she had, when a riparian owner of a rural estate, is gone and abandoned.

4. In this case, we prove by Madame Delord's plan that her whole plantation was divided into lots; that the three lots sold to Larche, and those sold to Saulet, forming the source from which the defendants claim the greater part of their front, were of small extent and the whole of it within the incorporated part of the city; and from the time of altering the original condition of the plantation it ceased being such; and every purchaser became owner of an "*area*" or "*insula*" and not of an *ager*. If these divisions had not been within an incorporated city, but continued to be . *rural* property they would have come under that class of property to which the right of alluvion was refused. The *ager limitatus* was not confined to those lands taken by the Romans from the enemy, &c.; but applied to all rural property having limits affixed by the hands of man; and whenever there was such boundary the *alluvion was not given*. See *Claude Ferrière, Inst. vol. 2, p.* 44. 1 *Dumoulin, p.* 91 *and* 92. *Gloss.* 5 *sec.* 120 *et* 122.

5. It is contended that the city or municipality has lost any rights it may have had to this batture, by the supineness of the city authorities to a late period, and the acknowledgment of the defendants as proprietors conveyed in the expressions of the ordinances, &c. Property cannot be taken away by

loose expressions and wording of legislative and city enact-
ments; though their solemn and direct enunciations as to
future acquisitions would no doubt be effective. The neglect
of our rights and interests caused the separation of the city
into municipalities. As soon as the second municipality be-
came the administrator of the public affairs within its limits, it
asserted the right to the batture in its front, and to administer
it for the *use of the public*. Administrators of communities
are not created with such powers that by negligence or igno-
rance, they can alienate the property intrusted to their charge.
Consequently nothing could be lost by the former administra-
tions of this property, by admissions, acknowledgments, or by
implication from their acts. La. Code, art. 426-7-430. See
also the case of Pierce et al. vs. New-Orleans Building Com-
pany; 9 La. Rep. 403. See act of 1805, sec. 11 *ad finem*.

6. We conclude that any expressions used in the ordinances
cannot be urged against us to deprive us of our property; and
that no solemn recognition of any rights of the defendants was
ever made by the Council and approved by the Mayor; that
had it been so, an acquiescement or abandonment would not
have had any binding effect, because not within the scope and
power of their administration. Had they done so, their acts
could at any time have been attacked before the judicial
tribunals.

7. We have shown that the defendants have no title by the
Roman, Spanish, or Louisiana laws, as construed by our own
courts; and we will now proceed to prove and show to whom
the alluvion or batture now in contest does belong; according
to the *jus gentium*, and the Roman, Spanish and Louisiana
laws.

The learned counsel then proceeds to show by the act of
1805 incorporating the city of New Orleans, and the act of
1810, amendatory thereof, that the making and keeping in re-
pair roads and levees, in front of all real property situated on
the banks of a river, which has been or shall in future be divi-
ded into lots and annexed to a city already incorporated, shall

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

be at the expense and charge of the whole of the proprietors, &c., in proportion to the valuation of said lots, &c., and that in 1812, the limits of the city were reduced, and the *settlements*, including Madame Delord's property, was made a ward and elected an alderman. Therefore the alluvion formed after 1805 was the property of the public; from the time that the limits of the city were established, every thing hereafter created outside of the then existing levee, did not by any law belong to individual proprietors, and consequently all the alluvion that was formed from the bed of the river *became public.*

8. This alluvion is not formed from the gradual wearing of the land on the other side by the negligence of the proprietors, but is acquired by a regular and an immense deposit. If any loss had accrued by the land being decreased instead of increasing, it would have been the loss of the city; for it would have had to purchase land for a street and levee; the *rural* servitude being extinguished. The city, therefore, has the right and is entitled to the alluvion by the *jus gentium.* See *Puffendorf, droit des gens, de l'acquisition des Accessoires, liv.* 4, *cap.* 7, *p.* 636, 637, 638; *Barbeyrac's note on this passage; Grotius de Jure, Pac. et Bell., lib.* 2. *cap.* 3, *sec.* 19, *No.* 3, *p.* 262. The Code of 1808 declared that things which belong to cities are public; see also La. Code, art. 445. It is also a matter of history that while this country was in possession of the Spanish government, the use and occupation of the batture formed before and in front of the city, was strictly public; and every edifice erected on it without special permission *was abated,* and the space covered by high water was considered as the bed and bank of the river; all alluvions were held as soon as formed for the *use of the city and the public.* The Legislature, by the 13th section of the act of 1805, chartering or incorporating the city, expressly transferred all rights of property which the State might have of every kind; not only what it owned, but also of that of which it had only the *use and enjoyment.* The State did not reserve any public rights within

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

the city limits; only reserving the power of modifying the charter when it suited.

*Preston, Roselius, R. Hunt, Eustis, Soulé & Hoffman*, for the defendants, made the following points in argument:

1. The front proprietors, and owners of the Cotton Press, are riparian proprietors of the soil, and as such entitled to all the *alluvion or batture* which attaches to their property. This character and right is secured to them by both the old and new Civil Codes of Louisiana, and cannot be taken away by any provisions or principles of the Spanish or Roman law, or by the fact of this property being brought within the corporate limits of the city of New Orleans by the act of incorporation of 1805.

2. From the year 1763, when the Jesuit's order was abolished, down to 1831, the defendants and those under whom they claim, held undisputed possession of the property now claimed by the Municipality. During that time it was always considered riparian property. In all the titles of conveyance the *alluvion*, or future increase in front, is expressly mentioned and passed to the purchaser. This property too was liable to all the burthens and duties of riparian owners. They kept the highway and levee in repair. They were repeatedly allowed to change the levee in order *to take in* the alluvion. In 1821, Geo. Hunter, one of the persons from whom the defendants derive title, was authorized by the Parish Court to extend his levee; the police jury recognized him as riparian owner. In 1830, Burthe's property was recognized as riparian, and he was allowed to extend his levee in order to take in the batture; and the City Council and city authorities repeatedly recognized the front owners to be riparian proprietors. The city ordinances relating to roads, bridges and levees made the same recognition. The front proprietors were considered as proprietors and makers of the levee, and required under penalties to keep them in good repair. See old edition of the "city laws," pages 39 to 53, 61, 167.

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

3. All the authorities and the principles derived from the civil law agree in establishing two main points for the defendants : 1st, that the banks of a river are the property of those who possess the adjoining lands ; and 2d, that what is added to an estate by alluvion belongs to the proprietor of that estate.

In the Institutes of Justinian, lib. 2, tit. 1, sec. 4, de usu et proprietate riparum, principles in support of the above position are laid down. See also Dig., lib. 1, tit. 8, sec. 5, *verbo* Riparum ; idem, lib. 41, tit. 1, sec 30. The Spanish law is also explicit on this point ; Pardida 3, tit. 28, law 6, which says, " *every one may make use of ports, rivers, and public roads.*" Civil Code of 1808, page 96, art. 8, " The property of the shores of rivers belongs to those who *possess the adjoining lands.* See Morgan vs. Livingston, 6 Martin, 230 ; La. Code, art. 446.

4. Whatever is added to an estate by alluvion becomes the property of the owner of that estate ; and therefore Madame Delord Sarpy and the defendants claiming under her are entitled to the alluvion formed in front of and united to the said property. The principle on which this rule is based is so natural and just that it will be found to pervade all systems of law. The Roman law lays down the rule in a variety of forms. See Institutes, lib. 2, tit. 1, sec. 20, verbo de alluvione ; idem, lib. 3, tit. 24, sec. 3 ; idem, lib. 2, tit. 1, sec. 22 ; Digest, lib. 41, tit. 1, sec. 7, § 1 ; Code, lib. 41, tit. 1, sec. 56 ; idem, lib. 7, tit. 41, 1, 3 ; Partida 3, tit. 28, law 28, 31 ; Civil Code of 1808, page 102, art. 3 ; idem, 104, art. 8 ; idem, 106, art. 13 and 14 ; La. Code, art. 490, 496, 501.

5. The plaintiffs rely with great confidence on the Spanish laws, especially Partida 3, tit. 28, law 9. This law speaks of things which belong to a city as founded by the sovereign under the Spanish laws. The lands were granted and appropriated for the site, and other lands granted and appropriated for the use of the city. Therefore the beaches and sand-bars within these lands belonged to the city by the grant or appropriation of the founder, under the authority of his sovereign. These

sand-bars were not necessarily alluvions, but might be formed
by the washing of the soil from the sand-banks.    *Alluvions,*
too, under these regulations and laws, in the front, &c., of the
city, became *its* property, because the city was by *grant* or
*appropriation* the riparian proprietor of the land to which it
was added ; just as they would have accrued to an individual
who owned the front or land to which they accreted.    The
*Arenales* were granted or appropriated to a city ; they were
entitled under the appropriations or grants of the sovereign or
founder to all the sand-bars, which is proved by the fact that the
liberties of the city, the forests, pastures, &c., are placed on the
same footing and could only be held by grant or appropriation.
See 2d vol. Land Laws, appendix 1 ; Nos. 66, 69, 70, 92,
pages 36, 37, 44, Recopilacion de leyes de las Indias, book 4,
tit. 7, law 13 ; idem, lib. 4, tit. 13, law 1.

6. It is not denied that the general rule laid down in the
Civil Code, art. 501, is that *"the alluvion belongs to the* own-
er of the soil situated on the edge of the water,
*whether it be a river or a creek, and whether the same be na-*
*vigable or not ; who is bound to leave public that portion of*
*the bank which is required by law for the public use."*    This
is the principle of the law in Louisiana, but the learned counsel
of the plaintiffs say the Roman law must be consulted, and its
modifications taken as the true rule on this subject.    With the
view of proving this, it is contended that the word *ager* referred
to, must be properly understood and its different meanings
attended to.    We find it first in the Digest book, 50, tit. 16,
law 27, *de verborum significatione*—"Ager est locus qui sine
villa est;" *Ager* is a place without buildings.    See Cujas, vol.
8, p. 481.    Calvin's Dictionary is likewise quoted verbo *Ager.*
For the definitions of the words *fundus* and *predium* see Dig.
book 50, tit. 16, law 211, 215.    According to all these defi-
nitions it is clear that *ager* means a piece of land without any
buildings ; *fundus* is applied to land on which buildings are
erected ; and the word *predium* (to use the language of the
Judge *a quo*) "in its restricted sense means perhaps only a

EASTERN DIS. rural property, to wit : a farm, an estate, a manor ; in its more
April, 1841. extended sense it includes *ager*, or any other real property
MUNICIPALITY and the possession of it." These *words* according to the au-
NO. 2. thorities cited, it is contended, show us "that in the text of
*vs.* the Roman law, the alluvion is given only to the *ager*." That
ORLEANS
COTTON PRESS. *heredad* in Spanish means the same ; the translation of the In-
stitutes into Spanish by *Berni*, using this word for the Latin
word *ager*. It is admitted the two words are the same in the
different languages. But the word *ager* in the Institutes and
Digest is simply used to express the idea of *land, ground*,
or *soil ;* and how can this advance the pretensions of the
plaintiffs ? The context of Ager is "*Præterea quod per allu-
vionem agro flumen adjecit, jure gentium nobis acquiritur.*"
This law is merely enunciative of a general principle of the
law of nations on the subject of alluvion. The plaintiffs how-
ever claim on the distinction between *urban* and *rural* pro-
perty; that on becoming a city they are entitled to the alluvion.
In support of the foregoing principles and rules, see La. Code,
art. 501. Napoleon Code, 556. Institutes, tit. 1, law 2 ; *de
alluvione.* Partida 3, tit. 28, law 26. 8 Locré, No. 15, 21.
p. 163, 182. 3 Toullier, No. 149 et seq. 4 Duranton, No.
400. Merlin verbo *alluvion.*

7. It is next urged that the reason on which the principle in
relation to the right of alluvion is founded, is inapplicable to
the riparian owner of riparian property. The maxim of na-
tural justice and equity expressed in the Roman law is *qui
sentit onus, sentire debet et commodum ;*" he who is exposed
to the loss of the thing, ought to profit by the advantages
which may accrue to it. But it is boldly assumed that the
riparian owner of city property is not exposed to suffer loss
from the river, and that he is not therefore entitled to the ad-
vantages resulting from it. This position is incomprehensible.
Suppose a town lot or square is undermined by the current and
is carried away by the abrasion, it cannot be denied that the
owner sustains a loss, occasioned by the river, which would
not have happened if the property had not been *riparian*. Will

either the corporation or any other person indemnify the
owner for the loss? Certainly not. How then can it be said that the owner of city property thus situated is not exposed to
sustain damage from the river? So far from being exempted
from the *onus*, the loss to which the riparian owner of urban property is exposed, is infinitely greater than that of the rural proprietor.

8. But the court below lays down the broad rule, and says, "if the right of alluvion is a consequence of that principle of law and equity, that he who is exposed to suffer by the encroachments of a river, should likewise have the benefit of the additions which the river makes to his land; or in other words, that he who has against him the chances of loss, should also have in his favor the chances of gain, a powerful reason at once presents itself, why the owners of front lots in a city should not be entitled to the alluvion, and why the city should be. In a city the owners of front lots, if the bank is carried away by the water, are not bound to give their lots for the establishment of a new bank, unless the community indemnifies them; the city, on the contrary, if the bank is washed away is obliged *to pay for the ground necessary to build a new bank upon.*"

This assumption of principles although sanctioned by the solemn judgment of the court *aquâ*, is, so far as our researches carry us, without the aid of any provision of law to justify them. The 501 article of our Code, quoted above, enacts in the most positive manner that the front proprietor "is bound to leave public that portion of the bank which is required by law for the public use." The space thus required to be left for the public use is fixed by the Municipal Councils, or Police Juries. In the case of Henderson and others vs. Mayor, Aldermen and Inhabitants of New-Orleans, so much referred to, it was decided that the present defendants, or what is the same thing, those to whose rights they have succeeded, were bound to give the land necessary for a new levee, without indemnity. The judgment declares that "*no indemnity is due*

22      VOL. XVIII.

EASTERN DIS.
April, 1841.
═══════════
MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS. *for land used for a levee. This is a charge to which all riparian proprietors are subjected. It is different when new roads or streets are to be established. The law provides in such cases that the owner of the land over which they pass, is to be indemnified.*" Here it is seen the present defendants were required by the decree of this court to give the land necessary for a *new levee without indemnity ;* and now when their right of alluvion is disputed, they are told they do not possess that right, because if a new levee is to be made they are not bound to furnish land for that purpose, without being indemnified by the city. Is this any thing but mere mockery?

Both the court *aquâ* and the counsel for the plaintiffs are mistaken. The owners of front lots in a city are bound to give sufficient space for a new levee, if the former bank is carried away by the water. This is a "charge to which all riparian proprietors are subject."—It results from the situation of the property. This is the well known and settled law of the land; and it had never before been seriously disputed. There is not an instance on record in which the city has paid for the ground necessary to build a new levee? Besides the riparian owner has no choice; for if he should be obstinate and attempt to withhold the ground for a new levee, his property would be exposed to ruin.

9. The claim of the plaintiffs to the property in dispute is based upon the supposed legal effect of the incorporation of the city of New Orleans, and of the division and sale of the plantation, of which the property formed a part, into lots. It is stated, that by reason of these acts, the title to the alluvion or batture in front became vested in the corporation of New Orleans, for the sole and exclusive use and benefit of the public, and is now vested in its successors, the present plaintiffs.

The whole of the property in dispute is alluvial : part is applied to the purposes of private ownership, and that portion outside the present levee is subjected to the public use: the

title to this latter portion the plaintiffs assert is also vested in <span style="float:right">EASTERN DIS.<br>*April,* 1841.</span> them, for the causes before recited.

Thus, it will be seen that the plaintiffs take upon themselves affirmatively to show that the law gives them the title to the property. <span style="float:right">MUNICIPALITY<br>NO. 2.<br>*vs.*<br>ORLEANS<br>COTTON PRESS.</span>

Considering the case entirely independent of the exceptions taken to the plaintiffs' right of recovery in the plea and answer of the defendants, it has all the appearance of an experiment —certainly a bold one. It meets at the very commencement the judgment of the Superior Court of the Territory in the case of Gravier, which negatives every proposition of law on which the plaintiffs can expect to recover. It is opposed by the acquiescence in the principles settled in that case by the city and the community for upwards of thirty years. Since that decision, battures in front of our suburbs have been the subject of *private ownership*; they have been occupied and improved by the proprietors; they have been in all respects considered as any other *private property*; they have been bought and sold, and interests have been created in relation to them, which would never have existed but from the confidence of the people in the integrity and intelligence of their principles of justice.

To disturb the possessors of property under circumstances like these—to scatter to the winds interests created under the sanctions under which these have grown up—there must be a reason of the strongest kind. The high intelligence of the court would in such a case at least require from the plaintiffs indisputable evidence of the existence of the law which vests the title to the property in them. They must be satisfied beyond a doubt, that the laws of the country impose on them the stern duty of undoing what has been done. Nothing must be left to surmise: nothing can be inferred concerning the laws from mere implication: there must be no doubt in a matter of this kind. If there be any doubt, the principles settled in the case of Gravier must stand—the jurisprudence of the country must remain undisturbed, and the defendants remain in the possession of their property.

EASTERN DIS.
April, 1841.
_____
MUNICIPALITY
NO. 2.
vs.
ORLEANS
·COTTON PRESS.

By the law of alluvion—a law founded on justice, reason and sound policy, and which prevails throughout the different countries of christendom with a singular uniformity—land is considered not in relation to the ownership of it, but its position. The alluvion accrues to the soil, whether its owner be the sovereign or a corporation, subject or citizen; and a corporation owning the soil must necessarily acquire by alluvion, in the same manner as any other owner would.

The court will consider our codes as the best exponents of the law. The meaning of the word SOIL is certainly beyond doubt or cavil. The terms *ager* and *heredad* will remain unchanged in their primitive and generic signification—co-extensive with our terms lands and hereditaments of the common law—and the law of alluvion will be left to its general operation, unless something else is shown against it besides the verbal criticism, by which its application has been attempted to be restricted.

What possible relation has the law ARENALES to the law of alluvion? If the city held an arenal or a batture, they would hold it under the class of property in which this law places it; they would hold it as property which could be alienated. But this law has no relation to the means of acquiring property. The city may acquire the arenal by alluvion, if it owns the soil to which the alluvion is attached, in the same manner that an individual would acquire it. But of itself the law *arenal* has no relation to the law of alluvion. No mention is made of it in the text, no reference is had to it in the commentators. The attempt to force this law from its evident meaning and operation is not new. It was made in the case of Gravier, by the eminent counsel who argued the case—and failed; for if the court had considered that the law *arenales* gave the battures in front to the city, in the sense now and then contended for, the city would have succeeded in its suit. In deciding that case in favor of Gravier, the court repelled this application of law *arenales*.

The law *in agris* has no more relation to the law of this case, than that just commented on.

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

It was not in force in Spain, and this court has determined conclusively in the case of Morgan *vs.* Livingston, as to its non-existence as law in this country.

The view taken of this law in the tribunals of France, coincides in a singular manner with that given by Judge Martin, in delivering the opinion of the court.

The royal court of Toulouse, in the case of Marguet *vs.* the Commune of Blagnac, in determining that the intervention of a road was no impediment to the right of alluvion—the road belonging to the proprietor of the riparian estate, and not to the commune—state, in commenting on this law:

" Enfin la loi invoquée n'avait de rapport ' qu'aux champs qui, après la conquête d'une province ou d'une ville, étaient distribués aux soldats romains, ou partie aux soldats et partie au public, sous certaines bornes ou limites, qui étaient décrites et désignées avec grand soin dans des tables d'airain ; et afin que ce partage ne put point être altéré et qu'il n'y eût jamais de confusion au discernement de ce qui leur avait été assigné, on voulait que ces bornes fussent inviolables, et que, pour cet effet, elles ne pussent être ni restreintes ni étendues par le droit d'alluvion.' C'est ainsi que Duperier explique cette loi, dans ces questions notables de droit, liv. 2, question 3, ou il observe avec M. le Président de Lestang que pour obvier à l'altération que l'alluvion pourrait occasioner aux dits champs ainsi distribués, on laissait toujours un grand espace de terre entre les champs assignés aux soldats et les bords de la *rivière* voisine ; en sorte que son eau ne put aller jusqu'à ces champs, qui, pour cette cause, étaient appelés *agri limitati*." (22 Sirey, 2, 34.)

The law *in agris* excluded in Rome the description of lands of which it treats, from the operation of the general law ; it has no relation to the provisions of our code concerning alluvion or the principles upon which they are founded.

The defendants have no interest in contesting the soundness

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

of the principle of the law in agris : it is only its application to to the present case that they deny.   It would be idle to contend that, in the case provided for by that law, the principle is not properly applied.

In the distribution of lands among the soldiers of the Roman empire, if each concession was limited, and if the space between the lands parcelled out and a river was reserved to the state, or should be granted to a city, there is nothing to interfere with the right of the proprietor of the bank to the alluvion, be he the sovereign power or a city.

How would the application of the principles of the law of alluvion be different under ours, or any other system of jurisprudence ?   If a man have an estate on the bank of a river, and he chooses to sell part of it, and reserve the bank, what is there to prevent it ?   What law does he violate ?—what right does he interfere with ?   The purchaser would in this case acquire an *ager limitatis*, and the proprietor retaining the bank necessarily owns the alluvion which may attach to it.   Such would be the rights of the parties, without reference to any provision of the law *in agris.*

There can certainly be nothing in this law, or in its consequences, which can give the plaintiffs any right to the property in question.

Chancellor Kent, in treating on the subject of highways, says : " It may be considered as the general rule, that a grant of land bounded upon a highway or river, carries the fee in the highway or river to the centre of it, provided the grantor at the time owned to the centre, and there be no words or specific description to show a contrary intent.   But it is competent for the owner of a farm, *or lot,* having one or more of its sides on a public highway, to bound it by express terms on the edge of the highway, so as to rebut the presumption of law and thereby to reserve his latent fee in the highway.   It is equally competent for the riparian proprietor to sell his upland to the top or edge of the bank, and to reserve the stream or flats below high water mark, if he does it by clear and distinct boundaries.   The

purchaser in such a case takes the bank of the river as it is, or EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO 2.
*vs.*
ORLEANS
COTTON PRESS. may thereafter be, by alluvion or decrease of the flow of the river. He takes it subject to the common incidents which may diminish or increase the extent of his boundaries." 3 Kent's Commentaries, 434, and cases cited.

Some confusion of ideas is created by connecting the charge of making a levee with the right of property in the soil. There is no necessary connection between the two. The levee, which protects the riparian estate, also saves the adjacent country from inundation. By law, it is at the charge of the riparian proprietor ; and by the act of 1821, by which the port of New Orleans was extended, the construction and even repairs of any other levees than those at that period kept up by the corporation, were left at the option of that body.

The riparian proprietor had no right to receive wharfage for the use of his bank ; but on making or taking on itself the repair of a levee, the corporation could indemnify itself by exacting wharfage. 1 Moreau's Digest, 653.

By constructing or repairing a levee, or making a road or other way, by the corporation or any public body, no rights of property in the soil are lost or acquired, as these acts depend on the right of use vested in the public, of which the municipal government is the guardian and representative. Our law on the subject of alluvion is general, and assigns no difference in its application to the soil on which a levee is required, and that on which it is not.

The alluvion accruing under our laws *to the soil*, without reference to the ownership, whether it be vested in the State, a corporation or an individual, a question might arise out of the late accident to the town of Plaquemine, which would test practically the application of the principles of the law of alluvion.

Portions of the front lots have been carried away by an avulsion of the river, so that parts of these lots now form a portion of the bank of the river.

The levee which is to be constructed anew on these lots will form the bank of the river. La. Code, art. 448.

EASTERN DIS.   . The use of this bank is public, the property remaining un-
April, 1841.   changed in the owner.   Art 446.

MUNICIPALITY        The levee being constructed under the direction of the mu-
NO. 2.
vs.          nicipal authority, the public convenience as to the use of the
ORLEANS
COTTON PRESS. bank can be protected.

If án alluvion be formed in front of these lots, to whom would
it belong ?   If the law of alluvion in the code governs, it must
belong to the owner of the soil to which it is attached.   *As
yet*, no law has been found giving alluvion formed in front to
cities ; and on the principle of equity, on which it is said the
law of alluvion is founded, the owner of the land, one half of
which has been lost to him by the force of the river, is certainly
entitled to the increment which the river may·afterwards insen-
sibly and gradually add to his property.

But it might thus happen, that the owner would have more
land than his title originally gave him ; his land may have
been strictly speaking a limited field and not a riparian es-
tate.   This increase of quantity might be a consequence of
the application of the law of alluvion, and would not be in-
consistent with the equity of the rule, that he who is exposed
to the loss is entitled to the advantage which may accrue to an
estate.

10.  The incorporation of the city and the division of the
principal estate to which this alluvion belonged, into lots, are
alleged to have given the plaintiffs a right to the property in
dispute.   In order to test the fallacy of this proposition, it is
necessary to examine each branch of it separately.

How the separation of a number of inhabitants and a dis-
trict inhabited by them from the general civil division of the
territory of the State, and authorizing them to exercise certain
special powers through their representatives can be construed
into a cession of any other substantial powers, or as conferring
any powers not expressly delegated, is under our system of
government not easily understood.

But the division and sale of the estate into lots—how does
this affect the right of alluvion ? or what is produced by all the

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

causes combined—the incorporation of the city, division and sale of a riparian estate in lots? It must be borne in mind, that since the first discussion of this question as to the right of the city to the batture in front of the suburbs, there have been two revisions of our laws, and that before the adoption of the old civil code, the claim of the city to the batture of the suburb St. Mary had been rejected in a decision of the Superior Court of the Territory, after an elaborate argument of the ablest counsel at the bar. The subject was a most exciting one at the time; and from the passions it enlisted and the talent which the controversy brought forth, it may be assumed that it occupied a large space of public attention, and was a matter of interest to those who were entrusted with the legislative power. We find in both these codes—that of 1808 and 1825—the subject of alluvion re-enacted, or rather re-asserted, and provision made in the codes for the use and property in the banks of rivers—a classification and mention made of things belonging to *cities and other places*, distinguishing the species of property they may have in each; indeed a thorough and complete legislation on the law of ownership and accession: but we do not find one word directly or indirectly recognizing the right of *cities and other places* to battures, or any thing from which it can be inferred; nor do we find that they have any authority in relation to the acquisition of property; nor is there any distinction between the property of cities and *that of other places* recognized in the codes—they are on precisely the same footing. Civil Code, book 1, tit. 2, art. 440, and seq.; Code of 1808, book 2, tit. 1, art. 7, and seq.

If those rights now claimed for the city are recognized by our laws, is it not singular that no trace of them should exist after these two memorable occasions? If they were deducible from any general principle, there might be a very good reason for their not being mentioned in our codes; but at the time these codes were made, the decisions of our courts were virtually adverse to them. Those decisions were acquiesced in— battures became private property, and the silence of the codes

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS. in relation to these rights now claimed by the city, when treating on the subject with which, had the rights claimed existed, they would have been identified, will have great weight with this court in their deliberations on these important principles.

There is nothing in the charter of the city, there is no text of the law, which recognizes the principles on which the plaintiffs base their pretensions. They must then be derived from implication? And from what can they be implied? Is it from the silence of our legislation on these two occasions mentioned? Is their existence to be inferred from their now recognition? Is it from the municipal legislation and the conduct of either or of both of the parties in relation to this property? Have such powers been ever held or exercised in any other city? Do our flourishing maritime cities or towns of the north, with their intelligent inhabitants, pretend to possess them? It is believed that neither of these sources will aid the plaintiffs in their attempt to create these powers.

There is something which is very extraordinary in the idea, that the circumstance of a part of a river being made a port, affects the right of property of a riparian proprietor. Do not the banks of our navigable rivers form in fact one continuous port, used by the steamers which land at all points which the wants of our population require? And is it understood that by extending the port of a city, that any thing more is done or attempted than to extend the space in which goods shipped and destined technically *to the port* may be landed, and where voyages are originated and terminate? Indeed, in extending the port of New-Orleans, in 1821, the legislature expressly disclaim any obligation on the part of the city *to make and repair any levees and wharves* other than those at that time kept up by them. 2 Moreau's Digest, 259, verbo *Port.*

The representation of a batture on the plan of a riparian estate divided into lots, without any words indicating a transfer, dedication, or change to be made in relation to it, is the representation of a thing that exists, and which is to continue

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

in a state which is to be regulated by law; the rights of the owner are not changed in relation to it, by the representation that is made.   The batture is to be kept as the law leaves it, subject to the public use as long as it is required; and when it is no longer required for that purpose, the owner, never having parted with his property, takes it unincumbered with the use. It must not be lost sight of, that under the law of this state, *the owner of the batture* is obliged to contribute to keep up the levees.   Out of cities and incorporated towns, the owners of whole estates, though sub-divided into lots, must contribute to that expense.   In those places the matter is left to the municipal government; and we find this charge sometimes thrown on the proprietors of the front lots, and sometimes assumed by the municipal government.

It could hardly be sustained as a plausible proposition, that on a sub-division of a riparian estate, a city would necessarily have forced upon itself, *nolens volens*, what might be the onerous charge of keeping up an expensive levee from their general funds.   So important a rule as this, certainly, if it existed, would have some other foundation than mere surmise: nor would the usage of upwards of thirty years have failed to recognize it.   If the estate or lot be riparian, how can it be supposed that the city, by making a levee on it, or repairing one, or keeping up one, or intending to do either, can affect the rights of the proprietor, or that they can be affected by giving him the privilege of voting for an alderman, and being taxed?

The grounds just examined are those stated in the plaintiffs' petition, as the foundation of their title to the property in question; and in order to avoid the consequences of their refutation, which was inevitable, a bolder and less tenable position is taken, viz: that the ground on which the city is founded belongs to the city or to the aggregation of individuals composing it.

This proposition, unsupported by reason or authority, we are content to leave to its own refutation.  It carries with

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.
itself the elements of its own destruction, and any opposition to it would retard its inevitable fate before any tribunal in which justice is administered. At what period did the city acquire the property of that portion of the Delord estate which was not sold to individuals? It surely was not when the city was incorporated? That at the time of division of the estate, the city might have exacted for the public use the part then existing as batture, may be admitted for the sake of argument, for it might have the right to impose that condition on the proprietor before consenting to the sub-division; but to believe that the batture and the levee charges were forced upon it against its will, and against the evidence of continuous use, is too severe a tax upon human credulity.

The fate of the case necessarily depends on this position assumed by the plaintiffs; and unless it can be maintained, there is nothing before the court on which the defendants can be disturbed in the enjoyment of their property. Nor is it surprising that the position so vitally important should be assumed: it could be taken in no other way. It can be deduced from no known principles of law; it is supported by no analogy; usage and experience are against it; the acts of the plaintiffs themselves repudiate it.

It must be supposed, that by this time the law of property relating to *cities*, if there be any legal principles peculiar to them, as distinguishable from any other civil divisions of the state, must be understood, that at least so important a principle must have been mooted in the different cases which have presented themselves to courts in which the rights of cities have been discussed.

In the cases which have been cited, in which the rights of the cities of Cincinnati and Pittsburg to the property between front streets and the river were involved, no such pretension on the part of either of the cities was urged nor intimated by counsel or judge, and we find that the Congress of the United States, as early as 1806, transferred the right of the United States to the space between the front street and the river, in

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

the city of *Natchez*, to the corporation of that city, on the condition that it should be planted with trees and be preserved exclusively for the public use.    1 Land Laws, 540.

Acts of Congress at different times have been passed, granting portions of the property in front of the city of New Orleans to the corporation.    Vide acts of April 3d, 1812; of the 20th of April, 1818; of the 30th of March, 1822; of the 28th of February, 1823.

It may be admitted, that these acts in themselves are not conclusive evidence of the fact that the property granted was not legally in the grantee, but they will have due weight with the court in an inquiry of this kind.

And what have been the decisions on the title of the corporation to the property in front of the city?    It was claimed as the property of the city, in the case of New-Orleans *vs*. the United States.    10th Peters, 665.    Let the arguments of the counsel and the opinion of the court be examined, and nothing implying a recognition of this right on the part of the city can be found in the elaborate opinion delivered by Mr. Justice McLean.    Nothing was decided in that case except that neither the fee in the land nor the right to regulate the use was vested in the government of the United States.    The land was held to be subject to the public use, in consequence of the dedication, which was conclusively established by evidence; but the title of the city to the property never was recognized by the court.

In the case of Cucullu *vs*. De Armas, Judge Porter says, "on the first point which presents the question of title in the city, I believe the court is unanimous.    Our consultations, if I understand them right, brought us to the conclusion that it had no solid basis to rest upon." &c.    5 La. Rep. 186.

Judge Martin, in that case, says: "The appellees (meaning the appellants) have shown no legal title, or right of property in the premises.    I have not considered the first plea."

EASTERN DIS.    Judge Bullard, in the case of the two municipalities, 12 La.
April, 1841.   Rep. 65, says:

MUNICIPALITY      "The pretensions of the defendants, as set up in their
  NO 2.        answer to the *exclusive ownership of the property* in question,
   vs.         (the batture,) and those of the plaintiffs as evinced in their
 ORLEANS
COTTON PRESS.  ordinance of the 9th of February, 1837, to take one hundred
               thousand cubic yards of sand from the batture, *ad libitum*,
               (if indeed either party has seriously urged such pretensions,)
               are, in our opinion, equally unfounded and preposterous."

Neither from the act of incorporation, nor the division into lots, nor the extension of the port, nor the establishment of the city, can any vested rights of property be affected by implication. The changes, which are produced as to the rights of property, are matters of contract between the owner, the purchaser, and the sovereign authority or its delegate. Nothing can be implied except such easements of way and other rights which are necessary to the enjoyment of the property as it is sold. And the idea of the title of property of this description being vested in the city, place, parish, or any other civil division of the State, unless it be acquired in the same manner as a natural person would acquire it, is not only unsupported by reason or authority, but is repudiated by both.

11. The last question raised in argument by the counsel for the plaintiffs, is, that Madame Delord dedicated the property in dispute to the use of the public. This evidently is an afterthought, as there is no averment whatever in the petition on the subject. According to the rules of correct practice, the point does not arise at all in the case. If the court should be of opinion, however, that the question can be examined in the present suit, we would ask the adverse counsel, what evidence there is of a dedication? They say it results from the plan of the faubourg. It has been already shown, in a previous part of this argument, that Madame Delord sold the front lots, *face au fleuve;* or, in other words, the river was their natural boundary. This fact, is certainly not evincive of an intention, on the part of Ma-

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

dame Delord to dedicate the space between the road and the river to the use of the public; it is, on the contrary entirely inconsistent with such an intention. Nor can the dedication be deduced from the plan. This case cannot be assimilated, in this respect, to that of De Armas et al. vs. the Mayor, Aldermen and inhabitants of New Orleans: in that case the space of ground in controversy had been specially dedicated to the use of the public on the original plan of the city, by writing on it the word *quai*. The objection urged by the senior counsel of the plaintiffs to the dedication, (and successfully urged too,) was, " That the space of ground under consideration, and which the counsel for the corporation, and the plan of the city, calls a *quai*, is not a *quai*, but is formed by nature, while *quais* are the works of man. That on rivers and in cities, they are levees; in the sea ports the shores of the sea are called *quais*." *Dictionaire de Feraud* and De Verger, *verbo quai*. Traité de la Police de Paris, 97, 98, 99, 102. Loi de *St. Domingue*, 2 vol. 725; 3 ibid, 447, 763; 4 ibid, 771, 791; 5 ibid, 473, 651; 6 ibid, 57, 290, 526, 528, 568; 5 La. Rep., p. 144–5.

In the present case one of the same authorities is cited to prove that a *quai* is not always an artificial construction of man, but is often formed by nature. One of the definitions quoted by him is—

" *Quai*, en terme de marine, est un espace sur le rivage du port, pour la charge et la décharge des marchandises."

Judge Martin was of opinion that the plan afforded sufficient evidence of dedication: and in this he was clearly right, although he was overruled by the majority of the court. In support of this opinion, the learned Judge takes the same distinction which we have endeavored to point out, between common property, to the use of which only the public is entitled, and common property the title to which is vested in the corporation. 5 La. Rep., 132, 144–5.

The principles here inculcated are fully recognized by the Supreme Court of the United States in several decisions. In

EASTERN  DIS.
*April*, 1841.
───────────
MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.
the case of the city of Cincinnati vs. the Lessee of White, 6th Peters' Reports, p. 437.

The same doctrine is substantially laid down by the same court in the case of Barclay and others vs. Howell's Lessee, 6th Peters' Rep. p. 498.

In the case of Crossman et al. vs. Vignaud et al., decided by this court in October term, 1839, the question was whether an alley, nineteen feet wide, which had been open and used by the public as a passage, for thirty or forty years, should be considered as having been dedicated to the public. In delivering the opinion of the court, Judge Strawbridge remarks: 14 La. Rep., 175.

"In support of the first ground, the counsel have referred us to the cases of the city of Cincinnati vs. White's Lessee, 6 Peters' Rep. 435; Mayor, &c., of New Orleans vs. The United States, 10 ibid, 712, and the opinion of Judge Martin, in the case of De Armas vs. the city of New Orleans, 5 La. Rep., 132.

"Had the plan of the town of Natchitoches (a portion of which is in evidence,) exhibited this space as an open lane, or had the premordial titles so treated it, these cases would have applied; but it is admitted that the defendants have shown a good title to fourteen feet. The town surveyor deposes that no such space has been marked on the plan; that, though all the streets have been named, this has been nameless; and it is shown by the act, or deed, under which the plaintiff holds, that the boundary given is the defendant's line, thus including the remaining five feet of the alley in his lot. These circumstances, so far from showing any destination to public use, leave on our minds the conviction that the property was private, and that the case does not fall within the rule invoked."

But it is insisted that the dedication results from the necessity of the case—that unless the property belongs to the public, all ingress and egress will be shut up. If this be true, then we must suppose that Philadelphia, Baltimore, Boston, and the other large commercial cities in the Union, are entirely unap-

Eastern Dis.
*April*, 1841.

MUNICIPALITY
NO 2.
*vs.*
ORLEANS
COTTON PRESS.

proachable.   The alluvion and even the wharves, in all those cities, belong to private individuals, who charge wharfage for the use of their wharves.   The objection, however, is only imaginary, and is entirely unsupported by the facts of the case. The streets in the faubourg Delord are run out to the river, consequently all the alluvion which forms in front of their abutments, adds to their prolongation; there is, therefore, no reasonable ground to fear that the streets will be shut up.   As to the free passage along the shores of the river, it is fully secured by the obligation imposed on the riparian proprietor, " to leave public that portion of the bank, which is required by law for the public use." La. Code, art. 501.

So far from there being any evidence of dedication, there is the strongest negative proof that the parties never dreamed of such a thing.   It is a fact that in 1806 Madame Delord sold the front lots *face au fleuve*, and ceded all her right of batture to the purchasers in express terms.   Since that period the right of the riparian owners was never contested until 1830, when the suit of Henderson and others against the Mayor et al. was instituted.   During the twenty-four years that intervened between 1806 and 1830, the rights of the front owners were repeatedly recognized ; the levee was advanced nearer the river, and the riparian owners were put in possession of the batture reclaimed.   The soil thus added to the city was treated in every respect as private property.   The front proprietors were compelled to make the levee and keep it in repair.   This was an illegal exaction, but still they complied with it.   Mr. Pilié, in his cross examination, at page 17, of the printed record, says :

"Previous to 1831, the levee and road in front of Faubourg Saulet, were made and kept in order by the front proprietors. He does not know that any orders were given to the front proprietors to make and repair the levees and road in front of their properties.   He does not know of any refusal of the Cotton Press to make the road and repair the same ; on the contrary, the Cotton Press always insisted on making the road and levee

EASTERN Drs.
April, 1841.
MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.
themselves in front of the Cotton Press—that is, since 1831— previous to that time they have always made it themselves *and also repaired it.*"

When we examine the city ordinances, we find abundance of proof that the defendants were always treated as riparian owners. We will cite a few of these ordinances:

The first is the fourteenth article of an ordinance approved 28th July, 1815, p. 45 of the City Laws:

" Art. 14. The works necessary for making and keeping in repair the said roads, bridges, ditches and levees, shall continue to be done at the expense of the respective landholders; the said works shall be commenced every year in the course of the month of July, or at the latest, in the course of the month of August, and they shall be completed by the first of October following, at farthest."

The second, is the seventh article of an ordinance, approved on the 15th December, 1817. City Laws, p. 163.

" Art. 7. The levees adjoining the estates bordering on the river, situate in front of unincorporated boroughs or suburbs, which have hitherto been kept in repair at the charge of the proprietors whose lands are bounded by the river, whether by virtue of a particular clause stipulated between the vendor and the purchaser, or of an obligation anterior to the settlement of said boroughs or suburbs, shall continue to be kept in repair at the expense of said proprietors, in the manner prescribed by the ordinance concerning highways, bridges and levees within the liberties of New Orleans."

And the first four articles of an ordinance, approved the 5th of October, 1830. City Laws, p. 61.

" Art. 1. Be it and it is hereby ordained by the City Council (being vested with the powers of police jury) that the City Surveyor shall lay off and mark with stakes, the lines for a new levee, according to a plan submitted by said Surveyor to the City Council, commencing at the lower line of Faubourg Delord and running parallel with the New Levee street to Rof-

Eastern Dis.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

fignac street, thence to the upper line of Mr. Byrne's property and in front of said Byrne's steam saw mill.

" Art. 2. After the Surveyor shall have finished making and staking off the above work, the proprietors shall be notified accordingly, and they shall be bound to complete and deliver said levee on the first day of November, eighteen hundred and thirty-one, as surveyed by the City Surveyor, under the penalty prescribed in the third section of this ordinance.

" Art. 3. The Mayor shall notify the front proprietors of lots in Faubourgs Delord and Saulet, in one or more of the gazettes of the city, in French and English, stating that they, the front proprietors, are required to have the said levee completed and delivered at the period fixed by article second of the present ordinance ; and in case of contravention, the same work shall be done by the city at the expense of the front proprietors, as soon thereafter as the said work can be done in a proper manner ; and any person neglecting or refusing to comply with the provisions of the present ordinance, shall pay a fine of one hundred dollars.

" Art. 4. The said work shall be constructed under the direction of the City Surveyor, whether made by the proprietors, or by the city at their expense. The Surveyor shall lay off at the same time, a new road, running inside said levee, sixty feet wide from the outside and including said levee. Said proprietors shall be obliged to make and keep in repair said levee at their own expense."

Is it possible, with all this evidence before our eyes, that the gentlemen can still talk about a dedication? This proof is sufficient to show that, even if there had been an intention to dedicate, it was repudiated by the corporation.

The use of the banks of the river, and of the unreclaimed batture, was vested in the public by law,—hence no dedication was necessary as to those things. But suppose there had been a dedication, what would be the legal consequence? As regards the soil that has been reclaimed, and converted into private property, with the consent and approbation of the muni-

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO 2.
vs.
ORLEANS
COTTON PRESS.

cipal authorities, it would not produce the least difference. We have seen, in reading the decision of the Supreme Court of the United States in the case of the city of Cincinnati vs. the Lessee of White, that when a person dedicates property to the use of the public, the *fee* or title remains in him, unless there is a regular transfer of it to a grantee. It follows, as an inevitable consequence, that where there is no transfer of the title, and the legal representatives of the public ordain that the property dedicated shall no longer be applied to the use to which it was dedicated, the property reverts back to the owner, in whom the title has always remained. This appears too clear to admit of a doubt. If there was a regular donation or other transfer of title to the corporation for a special object, and the corporation violated the condition of the contract, by applying the thing given or transferred to another purpose than that stipulated, the donor or transferror would have to bring his action to dissolve or annul the contract, in order to obtain the retrocession of his title. When there is a mere dedication of the use to the public in general, without any transfer of title, no action is necessary. Apply these principles to the case before the court. The public authorities have declared that all the soil reclaimed from the river, and lying between certain boundaries, shall no longer be used by the public : they have given express permission to the defendants to take exclusive possession of it, and to apply it to private purposes. So, even if there was a dedication, all the property now susceptible of private ownership, would no longer be affected by it. This hypothetical reasoning, however, is useless in the present case, as there is not a tittle of proof of a dedication.

See also the case of Vick and Rapplye vs. the Mayor and Aldermen of Vicksburg, decided by the High Court of Errors and Appeals of the State of Mississippi, reported in Howard's Rep., vol. 1, p. 379, et seq.

12. Let us now take a brief review of the various decisions of the Supreme Court on this much vexed question, and ascertain what is the well settled doctrine of the jurisprudence of

this honorable court on the subject of alluvion. Some of the
cases have already been cited in the course of the preceding observations; but we wish to present a succinct and connected
view of the whole current of decisions, from the beginning of the memorable batture warfare up to the present time, for the purpose of showing that the right of the riparian proprietors to the alluvion has always been maintained.

The first case is that of Jean Gravier vs. the Mayor, Aldermen and Inhabitants of New-Orleans, reported in 1st Condensed Reports, p. 453 et seq. That suit was commenced in 1804, and decided on the 23d May, 1807. The claim of the corporation to the batture formed in front of the faubourg St. Mary, was sought to be supported on the ground that the "tract of land on which the faubourg St. Mary is situated, was bounded by the highway." It never entered the minds of the eminent counsel who were charged with the defence of the city, to place its pretensions on the grounds taken in the present case. The court decided, however, that the river was the boundary of the land, and that consequently the right of alluvion existed. The very point, then, which arises in the case at bar, was most clearly determined in favor of the riparian owners against the corporation. But it is contended that the decision was mainly based on the fact "that, antecedent to the time when Bertrand Gravier ceased to be the proprietor of the land adjacent to the high road, a batture or alluvion had been formed, adjoining the levee, in front of the faubourg upon the river; and that this alluvion was then of sufficient height to be considered as private property, and had consequently became annexed to, and incorporated with the inheritance of Bertrand Gravier." It is said that this was the ground on which the property was adjudged to belong to Gravier. In this we fully concur with the adverse counsel;—that, indeed, was the sole foundation for Gravier's claim. If Gravier had sold all the front land susceptible of private ownership, it is difficult to imagine on what ground his pretensions to the batture could rest. But he alleged and proved that when he sold the lots,

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

front to the highway, there was a strip of alluvial land susceptible of private ownership, between the levee and the water's edge. The court decided, that by not selling this portion of soil, he continued to be the riparian owner, and as such, entitled to the increase by means of alluvion.— The principle laid down in that case has never been departed from, and has become the settled law of the land. What would have been the legal consequence if no batture susceptible of private ownership had existed when Gravier sold his front lots? The right of alluvion would have passed, as an accessory to the purchasers of those lots. That question arose in the next batture case, that of *Morgan* vs. *Livingston, 6th M. R., p.* 216 *et seq.* Morgan was the owner of a front lot "consisting of seventy feet of front and a hundred and eighty in depth, in conformity with the plan, &c." acquired through several mesne conveyances from Bertrand Gravier. Livingston had purchased of the heirs of B. Gravier all their right, title and interest to and in the batture in front of the faubourg St. Mary. The question to be decided was, to which of these parties did the alluvion belong? The former insisted that his lot was bounded by the river, and that therefore the accretion belonged to him: the latter, on the other hand, contended that the public road was Morgan's boundary; and that, at the time of the sale by Bertrand Gravier to the person under whom Morgan claimed, there existed a batture of sufficient height to be susceptible of private ownership, and which remained Gravier's private property. These were the grounds on which the respective parties placed their pretensions. The court decided in favor of Morgan, principally, because the evidence established that when Gravier sold the front lot there was no batture outside of the levee sufficiently elevated to be reclaimed and converted to private property. It is perceived that the rule established, in the case of Gravier vs. the Mayor and others, is here adopted and confirmed. The various other objections started by the surprising ingenuity of Mr. Livingston, were all overruled. Some of these objections were

much stronger than those raised by the counsel for the plain- tiffs in the case at bar. All the doctrines laid down in that case militate strongly in our favor.

In the case of *Livingston* vs. *Heermann,* 9th Martin's Reports, p. 656, the same doctrine was again confirmed. Judge Porter says :

"I have examined the case with the utmost attention, and with an anxiety that has more than once been felt painful, to do that which is right between the parties and satisfy the law. And on the whole, I am of opinion, that at the time of the sale from Gravier and wife, to Vessier, there existed a portion of soil susceptible of private ownership, between the levee and the river; that this soil was retained by the vendor, and that the expressions in the deed, *fronte à la levée,* did not carry the purchaser beyond it."

Judge Mathews, after expressing himself to the same effect, concludes by remarking :

"I doubted much on the propriety of the decision, in the case of *Morgan* vs. *Livingston,* and finally assented, under a conviction that full proof had been adduced showing that no alluvion existed in front of the trapezium, at the time of its sale to Poeyferré, the vendor of B. Gravier."

We come next to the case of Packwood vs. Walden, 7 N. S. p. 81 et seq. The plaintiff asserted that he, in common with the rest of the community, had a right of way, &c., over a lot of ground in the possession of the defendant, and on which the latter had erected buildings : he concluded by praying that the defendant's improvements might be declared a nuisance, and ordered to be abated. The property in question was a portion of batture in front of the suburb St. Mary. Two questions arose in the case : "first, by the formation of the batture, did the place which it occupied cease to be a part of the port of New-Orleans ?—Secondly, if so, after the change did it still continue to be public property, unalienable and unalterable in its destination, by any power except that

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

of the State, or of the United States?" In discussing the first of these propositions, Judge Mathews observes:

"We will now investigate the matters on which depends a correct solution of the questions proposed. And here it may be said, without impropriety, that the statement itself of the first proposition, seems to involve an absurdity. Land, according to any definition, can never be considered as making a part of a port. A bank, quay, or wharf, is a necessary appendage to it; and, according to the jurisprudence of this State, is always public and destined to the use of all, as well as the port itself. But this public use cannot legally be extended farther than the bank or wharf, which is always distinct from alluvion fully formed, and subjected by law to the ownership of private individuals or public bodies.

"By the Roman law, a port is defined to be *locus conclusus, quo importantur merces, et unde exportantur. D. 50, 16, 59.*

"The definition in the 8th law, tit. 33, part. 7, is nearly similar to the Roman Digest.

"That found in the *Curia Philippica*, page 456, No. 35, states a port to be a place either on the sea-coast or on a river, where ships stop for the purpose of loading and unloading, from whence they depart, and where they finish their voyages.

"It is clear, from these definitions, that the place now occupied by the alluvion in front of the faubourg St. Mary, although formerly a part of the port of New-Orleans, has long since ceased to be such. It is nearer to the port than other squares of the city situated farther from the river, but makes no more a part of it than they do. Reliance was had on the plan of the faubourg made by B. Gravier, to prove that the batture in front was destined for public use; in other words that it was designated as a public place. That such was not the intention of the founder, is evident from his having sold his right to a part of the alluvion to one or two of the purchasers of lots from him. The manner in which this place is marked out on the plan, indicates that it was done rather to

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

show the peculiar localities which were about to be changed into a town, than for any other purpose."

The whole of this reasoning is in perfect harmony with the principles for which we contend on the present occasion.

When the Judge comes to the examination of the second question, he finds it necessary to inquire whether a city can acquire *jure alluvionis*. He decides the question in the affirmative ; and it could not be decided otherwise. Alluvion is one of the legal modes of acquiring property : it was therefore incumbent on those who held the negative of the proposition, to show a law which incapacitated the city corporation from availing itself of this means of acquisition ; and as that could not be done, there was an end to the question. Whether there was any necessity, for the purpose of arriving at a correct conclusion, to invoke the law *in agris*, or the law *arenales*, and whether those laws have any bearing on the subject, may well be doubted. There is no difference, as regards the acquisition of property, between the corporation and a natural person, with a single exception, that is, legal inheritance. Hence, when the city owns property bounded by the river, it is, of course, entitled to the benefit of alluvion. And, in the same manner, when the proper representatives of the city make a compromise in relation to alluvion (as had been done with respect to Walden's property,) we are at a loss to conceive what objection can be urged against it.

In the case of *Cochran et al.* vs. *Fort et al.* 7 N. S. p. 622 et seq. The same question was again raised which had been decided in Gravier vs. the Mayor et al.; Livingston vs. Heermann, and Morgan vs. Livingston. The plaintiffs alleged that they were the proprietors of a lot of ground in the faubourg St. Mary, acquired through Joseph D. Hevia, of Bertrand Gravier : they aver specially "that it was the intention of Gravier to sell, and of Hevia to acquire, along with the said land, the right of alluvion, as the same belonged to the vendor ; and that by the deed of sale the vendee did acquire this

EASTERN DIS. right." They then state, that *since* the sale, alluvion has
April, 1841, formed in front of their lot, &c.—In delivering the opinion of
MUNICIPALITY the court, Judge Porter says:
NO. 2.
vs.          "Whether such a right does follow as a consequence of the
ORLEANS
COTTON PRESS. sale thus made to them, depends on a question of fact, namely,
whether any alluvion of sufficient height and magnitude was
formed at the time these conveyances were made to them, to
be susceptible of private ownership. If it was so formed, it
remained the property of the vendor, and did not pass to the
vendee.

"This principle was established in the case of *Livingston*
vs. *Heermann*, and it entered materially into the motives of
the decision in the case of *Morgan* vs. *Livingston*. Its cor-
rectness has not been impugned in argument, and a review of
the reasons on which it was founded, has satisfied us still more
of its correctness. 6 Martin's Reports. p. 19—9 ibid. p. 656.

After a full and minute examination of the testimony, the
Judge observes:

"There is some contradiction in this evidence. We think
the weight of it decidedly in favor of the assertion of the de-
fendants: that at the time the petitioners bought from Hevia,
there did exist alluvion opposite the lot of sufficient height and
magnitude to be susceptible of ownership."

This was the only question which the case presented and to
which the attention of the counsel had alone been directed:
after solving it, the decretal part of the judgment ought to
have followed. But the Judge, in the heat and fervor of com-
position, dashes on, and makes those remarks on which so
much stress is laid by the counsel for the plaintiffs in the pre-
sent suit. He says:

"Supposing, however this view of the subject incorrect, and
that we are to conclude with the plaintiffs, that no batture sus-
ceptible of ownership existed in February, 1803, their case
could not be made much stronger. The faubourg was incor-
porated two years after. To enable them, therefore, to
recover in this action, they must show a batture created be-

tween the day of their purchase, and the date of the act of
incorporation, which was susceptible of ownership; for if the
alluvion was formed afterwards, it became the property of the
city, and not of the front proprietors."

This is a mere *obiter dictum*, and is entitled to little or no
weight as an authority. The Judge refers, in support of his
observations to the famous law *arenales*, and to the case of
Packwood vs. Walden. It is very certain that these autho-
rities do not bear him out. But all doubt and difficulty on this
subject is dissipated by the opinion expressed in the most
emphatic terms, by the same learned Judge, in the case of
Henderson et al. vs. the Mayor, Aldermen and Inhabitants of
New-Orleans, when the question whether the alluvion created
since the act of incorporation belonged to the city or to the
riparian proprietors, was raised in the most formal manner.
On that occasion he says:

" The laws of the country give to the front proprietor, all the
batture formed in front of the soil owned by him on the banks
of the river. When this batture has risen to a height to be
susceptible of private ownership, it becomes as much his pro-
perty as the land it is attached to."

This decision was rendered in 1833, and in reference to the
very batture in controversy in the present suit. The alluvion
was formed many years after the act of incorporation. No
candid man will, for a moment, contend, that the loose and
uncalled for remarks of Judge Porter, in the case of Cochran
et al. vs. Fort et al. can be seriously put in opposition to his
solemn adjudication of the question in the case of Henderson
et al. vs. the Mayor et al.

The decision in the case of Cambre et al. vs. Kohn et al.
8 N. S. p. 575 et seq. was placed on the ground "that the ex-
pressions in the act of sale did not convey to the vendee any
right to the alluvion then formed and attached to the lot which
he bought." In that case the well established rule on the
subject of batture was applied.

The next case in a chronological order, is that of Henderson

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
. NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

et al. vs. the Mayor et al. That case has been, perhaps, already too often referred to, and requires no further notice here.

The case of *Cire* et al. vs. *Rightor,* 11 La Rep., p. 140, is the last on this subject, and was decided in May term, 1837. The question was, which of the parties was entitled to the alluvion formed in front of a lot of ground in the town of Donaldsonville.—The rule laid down and acted on in all the previous cases, was again recognized, and made the basis of the decision. Judge Bullard remarks :

" On the merits, this case is strongly analogous to that of Cochran et al. vs. Fort et al., and turns upon a question of fact, to wit: whether in 1812, a batture had been formed of sufficient height and magnitude to be susceptible of private ownership. 7 Martin, N. S. 622.

"The jury to whom this question was submitted, decided in favor of the defendant, and negatived the allegation in the petition, that at the time of the sale from Conway, no batture existed in front of the lot in question. The evidence on this point is before us, and after a careful examination of it, we are unable to pronounce that the verdict was erroneous."

Thus then, it is seen, that during a period of thirty years, there is a uniform current of decisions, recognizing the right of the riparian owner of city property to the alluvion attached to their soil. This is the jurisprudence of the State, and with a knowledge of that jurisprudence, our clients, and hundreds of other individuals, similarly situated have acquired property, which the plaintiffs value at twelve millions of dollars. This honorable court will pause before they will sanction a departure from the principles consecrated by so many decisions; and before they will suffer "hurly burly innovation" to throw us once more afloat on a sea of uncertainties, and to despoil a large class of honest and industrious citizens of valuable property, acquired in good faith, on which they have made great improvements, and the title to which was never before disputed.

*Carter*, for the plaintiffs, in conclusion, said:

The defendants rely upon four means to defeat our claim. They say:

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

1st. Your rights have been passed upon, and the batture awarded to us, by the decision in the case of Henderson et al., vs. Mayor et al. They therefore plead *res judicata.*

2d. The plaintiffs have acknowledged the title of the defendants by repeated acts; and they cite in support of this position, various ordinances of the City Council.

3d. That, at law, the batture in a city belongs to the owners of the front lots, and not to the city.

4th. They plead prescription.

Upon the plea of *res judicata*, I shall not trouble the court with any observations. The able arguments of my colleagues upon this branch of the subject leave nothing to be said which can strengthen the positions they have taken, and from which, in my humble opinion, they have demolished the first barrier which has been raised by the defendants to defeat this action.

It has been admitted by one of the counsel for the defendants in this case, (George Eustis, Esq.,) and who appeared in the Supreme Court on behalf of the Mayor, Aldermen and inhabitants, in the case of Henderson and others, that he did not consider that case, when tried, as involving the question *of title to property;* and, with a frankness becoming his high reputation, he did not presume to invoke the decision in that cause, to maintain the plea of *res judicata* in this.

And how could any person, having the knowledge which that gentleman possesses of the case of "Henderson et al.," attempt before this court to persuade your honors that the title to the batture had been litigated and passed upon in that cause?

He knew that the City Council had, by a solemn ordinance, which, like all the city laws, was published to the whole world, proclaimed its determination not to permit the rights of the public to the batture to be invaded with impunity; that the

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

attorney of the corporation was directed to maintain those rights, if necessary, by suit.

And who was the attorney thus directed? Mr. Moreau Lislet; a gentleman; who, from 1805, had at all times boldly proclaimed the doctrine that the alluvion in front of a city belongs to the city; a man who had, by word and writing, repeated this doctrine before courts, to clients, and to all who asked his opinion; and yet, if we are to believe the defendants, in one of the last cases which he tried, as the closing event of a long and honorable professional career, abandoned all his former doctrines upon the subject of batture, and admitted, what he had for thirty years contended against, that the batture in front of a city belongs to the owners of the front lots!

I pass on to the second defence; the repeated acknowledgments of the plaintiffs, that the front proprietors had title to the property in dispute. It is a matter of not much consequence at what period and how often the front proprietors may have been alluded to in the laws and ordinances passed by the City Council; nor is it a matter of any importance whether the allusions made to them in this way implied an admission of title. We contend that these admissions do not bind the plaintiffs, and cannot divest the public of their rights to the batture. Admissions of a similar nature were urged not many years since before the Supreme Court of the United States in a case in some respects like this.

It was then contended, as it is now, that the city of New Orleans had lost title to the property in dispute by its own acknowledgments of a title in another. Let us see how this doctrine was treated by the Supreme Court:

" To show that the federal government has considered this common as a part of the public domain under the treaty, various laws of Congress have been referred to, and official proceedings by the agents of the government in reference to it. And also it is shown that the action of the government has been solicited by the city authorities, who, by these acts, it is insisted, have acknowledged the right of property in the United

States, as asserted in their behalf by the district attorney of Louisiana."

The Court goes on, and enumerates the various acts and doings relied upon by the United States, and thus concludes:.

"It must be admitted, that several of these acts are unequivocal in their character, *and do show an admission on the part of the city, not only that Congress had a right to legislate on this subject, but also to dispose of certain parts of the common in fee.* It is a principle sanctioned as well by law as by the immutable principles of justice, that where an individual acts in ignorance of his rights, he shall not be prejudiced by such acts. And this rule applies at least with as much force to the acts of corporate bodies as to those of individuals."

But the Court does not stop there: "But, in addition to the consideration that the city authorities probably acted in ignorance of their rights, it may be safely assumed, *that they had not the power, by the acts referred to,* to divest the city of a vested interest in this common." Mayor et al. of New Orleans vs. United States, 10 *Peters,* 732, 735, 736.

Mr. Livingston, who has proved of so much service to the defendants, was in this case the counsel for the corporation. He says, page 707 : " The city, it is said, have, by various acts, acknowledged the right of the United States. They have petitioned for and accepted grants of the land; but this was done before they had discovered evidence of their title, and even if *done with a full knowledge of it, could never divest them of the property."*

Without multiplying citations from law reports and writers, it may be, without any presumption, concluded, that the second means of defence is entirely unavailable.

We come to the defence on the merits, viz : That, at law, the owners of the front lots in a city are entitled to the batture.

In asking this Court to decide against this title of the front proprietors, and to acknowledge the title of the city to the

EASTERN Dis.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

batture, we seek to establish no new doctrine, or to ask a departure from those principles of law applicable to the subject, and which have been laid down repeatedly in your decisions.

It is believed that a careful examination of the batture cases decided by this court, commencing with the case of John Gravier vs. the Mayor et al., will demonstrate that the title we set up has been fully recognized by this court.

It was said by one of the counsel for the defendants, that they had purchased and held in good faith ; that their title had been passed upon by this tribunal, and that it would almost amount to a species of fraud now to declare that title defective.

We think we will show that the defendants have not been possessors in good faith, and that the solemn declarations of this court had been promulgated long since to the people of this State, which plainly stated " that the owners of front lots in cities have no right to the batture." We seek to establish a distinction between the rights of the owners of *rural* estates and the owners of *urban* property to claim the batture which may be formed in front of their property.

By what right does the front proprietor claim the alluvion ? The decision in the case of Morgan vs. Livingston et al., 6 *Martin's Reports*, and delivered by the now presiding judge, furnishes an accurate reply.

" The defendant's counsel contends, that the law of alluvion is not founded on principles of compensation, and to be supported on the maxim *qui sentet et onus debet sentire et commodum*, but that the riparious owner is entitled to the profit, because, from the nature of the increase, it is impossible for any one else to claim it." The learned judge repudiates this definition, and after citing authorities from various authors and from various countries, adopts the conclusion, " that he who bears riparian burdens is, in consequence thereof by the principles of natural law, entitled to the increase."

But what are the burdens and the exposure to loss which gives the right to alluvion ? Following the decision rendered

in the same case, we find them clearly and accurately defined. <span>Eastern  Dis.</span>
See pages 235, 236, 237 : " These lots are not-charged with <span>*April*, 1841.</span>
any of the burdens attending rural riparious estates ; the levee, <span>Municipality  no 2.</span>
road or street, were made or kept in repair at the joint expense <span>*vs.*</span>
of every lot in the city, the farthest from the water contributing <span>Orleans  cotton press.</span>
as much thereto as the nearest."· The burdens, then, which
in Louisiana are imposed upon` the owner of riparian pro-
perty, are the making and keeping of the levee, and the
furnishing and keeping of a road between the levee and his
land for the use of the public. ' His exposure to loss is this :
the river may wash away the levee and the road, and then he
must furnish a new levee, and yield additional land for a new
road.

Starting, then, with this clear definition before us, upon
which the right of alluvion is founded, let us proceed to exa-
mine the first batture case which is to be found, in our reports,
John Gravier vs. the Mayor, Aldermen and inhabitants of the
city of New Orleans.

In 1804, Gravier, finding the alluvion in front of the faubourg
St. Mary, (now constituting a portion of the Second Municipa-
lity,) of sufficient value and extent to justify the expense,
threw up a dyke, enclosing a portion of about five hundred
feet square. The people and authorities of the city of New
Orleans felt indignant at this conduct, and alleged title to it.
Gravier commenced suit against the city, and prayed that the
corporation might set forth under what title they claimed this
alluvion, that he might be quieted in his possession, and the
city be perpetually enjoined from troubling him.

The city rested its title chiefly on this ground, that Ber-
trand Gravier, the ancestor of John, had *abandoned it to
the city*, and since then the levee had been kept up by the city.

What did the Superior Court decide ? I quote the very
words of the judgment: " It is, therefore, important to in-
quire, what was the situation of the batture at the time the fau-
bourg was established, or when the front lots were sold ; *for if
no alluvion had existed at that time*, when Bertrand Gravier

26    vol.  xviii.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.
ceased to be the owner of the land adjoining the high road, then it is the 'opinion of the court, *that an alluvion subsequently formed* would not become the property of Bertrand Gravier. The reason of this opinion is, that if Bertrand could be considered as the proprietor of the road after selling the adjacent land, or of the levee lying between this road and a public river, he would, nevertheless, not possess that title of property which gives the right of alluvion, *for the destruction of this property by the encroachment of the river, would be a public, not a private loss*, and the said road and levee would have become necessarily liable to be kept in repair at the public expense.

" It is, however, the opinion of the court, from the evidence adduced in this case, *that antecedent to the time when Bertrand Gravier ceased to be the proprietor* of the land adjacent to the public road, a batture or alluvion had been formed adjoining the levee, in front of the faubourg, upon the river, and that this alluvion was then of sufficient height to be considered as private property." *Harrison's Condensed Martin Reports*, vol. 1, *pp.* 453, 454.

Much stress has been laid upon this case, as admitting the doctrine that the owners of a front lot in a city are entitled to the batture, but most certainly not one word can be pointed at in the decision which justifies such a conclusion. The court decided that no abandonment had been made by Gravier to the city ; that, antecedent to the time when the plantation was laid out into a faubourg, the alluvion claimed by John Gravier was in existence, and then susceptible of ownership by the owner of the plantation ; and. upon the proof adduced, which they considered maintained these positions, they decreed to John Gravier the five hundred feet of alluvion so formed, and that he be quieted in his possession.

Is there any single feature in that case similar to this ? Was the batture, now existing outside of Front street, in existence when Madame Delord and Mr. Saulet laid off their rural estates into faubourgs ? It is admitted that it has come into ex-

istence within a few years past; and if the levee and the front <span style="float:right">EASTERN DIS.</span>
street should be washed away, on whom falls the loss? To <span style="float:right">*April,* 1841.</span>
use again the language of the Superior Court: "The destruc-
tion of this property, by the encroachment of the river, would
be a public, not a private loss." And here comes in that just
principle of relief that he who is liable to suffer the loss, shall
reap the benefit of any gain.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

The next case to which the attention of the court is called, is
Morgan vs. Livingston et al., 6 *Martin's Reports.* It will be
perceived that the right of the city to the batture was most
studiously kept out of view by both parties. It was a contest
between the owners of the front lots in the faubourg St. Mary,
against Livingston et al., who claimed under Gravier, and al-
leged, that the batture had not passed from Gravier to the own-
ers of the front lots. And here again the distinction between
rural and urban property was fully stated. It was declared
that the owners of the front lots were burdened with riparian
duties, and so long as they discharged these burdens, the in-
crease by alluvion belonged to them.

At that time the front proprietors were called upon to furnish
roads and make levees at their own expense; and although
the title of the city, might, on various grounds, have been,
with great propriety, placed for the decision of the court, yet no
attempt was made to make the city a party to these proceedings.

Although Livingston had been able to obtain a decree of the
Superior Court, in the case of John Gravier, that antecedent
to the year 1788, when the faubourg St. Mary was laid out,
a batture existed, susceptible of private ownership; although
when the sheriff attempted, in 1808, to put Gravier in posses-
sion of this property, he found it covered by water to the depth
of three or four feet from the natural rise of the river in its or-
dinary state; yet in the case of Morgan, he received the first
check to his batture speculation, which, for his own honor and
reputation, and for the rights of the citizens of New Orleans,
it would have been most fortunate had it been administered in
1807 by the Superior Court of the Territory of Orleans.

Eastern Dis.
April, 1841.
───────────
MUNICIPALITY
NO 2.
vs.
ORLEANS
COTTON PRESS.

I come to the case of Packwood vs. Walden, 7 *Martin, N. S.*, 81. The plaintiff alleged, that the property held by the defendant belonged to the public; he claimed it as private property, the use of which belongs to all, the right of soil to none, either individuals or bodies politic. It is proper, as strengthening the explanation made of the decision in the case of Gravier vs. the Mayor at al., to quote from the case of Packwood the very words of Judge Mathews in alluding to it, especially as he was one of the judges of the Territorial Superior Court: "The first title under which this property was claimed is that supported by a judgment of the Superior Court of the late territorial government. The decision of that case, as far as relates to facts, is based on evidence which proves that a batture in front of their ancestor's plantation existed, to the whole extent of said front, capable of being reclaimed from the river, and was a proper subject for private ownership at the time he established the faubourg St. Mary."

The judge then alludes to the case of Morgan vs. Livingston et al. "The next case in which the rights and titles of individuals were brought in question relative to this batture is that of Morgan vs. Livingston et al. The controversy was between the proprietor of a front lot, who claimed by right of alluvion, and a purchaser from the heirs of B. Gravier. Testimony was introduced which showed that no alluvion existed at the time of the sale from the original owner to his immediate vendee. Nothing in the evidence established the period when the alluvion might have been considered of sufficient elevation to become private property. *The cause was decided on principles applicable to rural estates.*" At page 91, the learned judge, after citing and examining various authorities, says: "In conformity with the provisions of the law first invoked, it must be inferred that a city can acquire *jure alluvionis*, and land thus acquired becomes the property of the whole community; it is *propria civitatis*, and may be sold, alienated and destined to private uses by the legal authorities of the city.

In alluding to the last case to which I shall refer the Court,

permit me to quote from the very able opinion delivered by the Judge of the Parish Court:

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

"The case of Cochran vs. Fort et al., *Martin*, 7 N. S. 622, is probably, of all those decided by our Supreme Court, the one that bears most directly on the questions before us. In that case, the whole of the evidence taken in all the previous batture cases was, by consent of parties, laid before the court, and the argument on the law involved in those cases is declared to have been able and elaborate. In that suit, the most important point decided, inasmuch as the decision applies to the case before us, is, that the plaintiffs, in order to recover from the defendants, must show a batture created between the day of their purchase and the date of the act of incorporation, which was susceptible of ownership; for if the alluvion was formed afterwards, it became the property of the city, and not the front proprietors. But the defendants have most earnestly insisted, that the passage just quoted, of the judgment of the Supreme Court, ought to be considered as a mere *obiter dictum* of Judge Porter, who delivered the opinion. Was it really an *obiter dictum?* And, first, what is an *obiter dictum?* If I understand the expression right, it means *a by-the-way phrase*, an opinion expressed *en passant*, without much reflection, but, at all events, in a circumstance which did not call for the expression of such an opinion. Now, was it under such a circumstance that the phrase, or rather the principle above quoted, was uttered in deciding the case of Cochran vs. Fort et al,? Certainly not. In that case the plaintiff claimed the property and possession of a certain batture from the defendants, upon a title by them set out, and the defendants, denying the plaintiffs' title, set up an adverse one. The evidence convinced the court that, at the time the plaintiffs purchased from Hevia, there was in front of the lot purchased a batture of sufficient height to be susceptible of private ownership, and that the same had not been purchased by the plaintiffs; but the court, after expressing that opinion, the correctness of which, from the clashing of the testimony,

EASTERN DIS.
April, 1841.
──────────
MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

they consider as, perhaps, admitting of some doubt, they go further; and, supposing their opinion as to the evidence to be incorrect, and assuming the plaintiffs' position, that at the time they purchased from Hevia there was not, in front of the lot, a batture susceptible of private ownership, they say the plaintiff's case could not be made stronger. The faubourg was incorporated two years afterwards. To enable them, therefore, to recover in this action, they must show a batture created between the day of their purchase and the date of the act of incorporation, which was susceptible of private ownership; for if the alluvion was formed afterwards, it became the property of the city, and not of the front proprietors."

It was argued by one of the learned counsel for the defendants, that when cases arise before this court, and it is apparent that there is a third party having a better title to the object in dispute than the parties litigant, that you are bound by every principle of law and justice to maintain his rights, and dismiss the parties before you.

Such a doctrine, I apprehend, will not be tolerated by this court; and although it apparently has received the support of an ingenious and talented advocate, is not destined to form a rule of conduct for any intelligent legal tribunal.

Courts of justice must decide cases as they find them. They must look to the record, and their decision cannot go beyond the merits of the case presented for the exercise of their judicial powers.

In no case till the present has this Court had an opportunity to pass directly upon the law which we contend gives the batture to the city.

In the case of John Gravier, the Superior Court of the Territory could not decide the question, because the testimony showed that the batture in dispute had been formed *antecedent to the time when Bertrand Gravier, in* 1788, *laid out the faubourg St. Mary.*

In the case of Morgan *vs.* Livingston et al., they treated the property as *rural*, and in fact, at that time, the owner of the front property was burdened with riparious duties.

In the case of Packwood *vs.* Walden, the plaintiff showed no title, and the title he set up was not for the city.

But in the case of Cochran *vs.* Fort et al., the parties were distinctly told that there was another party having title stronger than either, to wit, the city.

I have shown you the opinion of Judge Mathews, in the case of Packwood *vs.* Walden, who was one of the Judges who decided the case of Gravier *vs.* the Mayor et al. I have shown you the opinion of Judge Martin, in the case of Morgan *vs.* Livingston et al.; and, lastly, the solemn enunciation by Judge Porter, in the case of Cochran *vs.* Fort et al., concurred in by Judges Mathews and Martin, *that the title to the batture was in the city.*

On the faith of these solemn decisions, delivered at different times during the last thirty-five years, did I rest the opinion which I gave to my clients, and which led to the institution of this suit. I believed, and still believe, that the opinions of these learned Judges, one of whom presided on the bench more than a quarter of a century, another of whom was a prominent member for near twenty years, and the other, having taken his seat in 1810, now, as presiding Judge, maintains the high position accorded to him by the wise and learned, of being the first civilian of our country, were entitled to my concurrence. I repeat, that I believed, that the opinion of these expounders of the law, two of whom had been acquainted with the commencement and progress of the batture litigation, who had enjoyed the opportunity of hearing all the discussions upon the law of batture from the lips of the ablest lawyers at the bar of Louisiana—such men as Livingston, Moreau Lislet, Mazureau and Derbigny, had sufficient knowledge, experience and opportunity to acquire correct information upon this deeply important subject. It cannot be in error if I submit to their doctrines, and give full credence and faith to them, when pronounced in the most imposing manner, to wit: in the decisions of the Supreme Court of this State.

Against this tide of authority it is attempted to oppose the opinions and arguments of Edward Livingston. No man re-

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

verences more than I do his learning, pre-eminent talents, and the high reputation awarded to him as one of the first jurists that this country has produced.

But, in all the batture cases in which Mr. Livingston appeared, we find him *arguing his own cause.* In the case of Gravier *vs.* the Mayor et al., he was in fact the plaintiff, because he had purchased previous to the suit, a portion of Gravier's claim to the batture. In the case of Morgan *vs.* Livingston, he was the defendant. In the case of Hermann *vs.* Livingston, he also appeared in the same character. The Judge of the Parish Court very happily alluded to the authority to be yielded to Mr. Livingston, in connection with the question of batture. He says: "The defendants have greatly relied upon the authorities cited by Mr. Livingston in his memorial in answer to Mr. Jefferson, as reported in the Law Journal, volume 5, in which he contends that alluvions, by the Roman law, accrued to urban as well as to rural property. That the opinions of so distinguished a jurist as Mr. Livingston was should be entitled to much weight on a general subject, which he might have treated of *ex professo;* that those opinions by him, if embodied in a treatise, written with the sole view of advancing or illustrating the science of law, should be entitled to much consideration, no one is less disposed to deny than myself; but it must be remembered that the opinions and quotations which the defendants now cite as authority were urged by Mr. Livingston *in a case of his own,* in which he contended for the very principles that the defendants now contend for, a case, too, of the utmost importance to him; that they were addressed, not to a court of justice, but to the nation at large, with the view of showing that the President of the United States had committed an arbitrary act against him, and that their not being answered cannot be assumed as a proof that they were unanswerable, but merely as an indication that no one was disposed to answer them; finally, that it is to be supposed that, when advocating his own cause, Mr. Livingston took care not to quote any of the authorities which could militate against it."

Eastern Dis.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

[On coming to a decision in this case, Judge MARTIN dissenting, the Judges delivered separate opinions. The principal opinion and decision of the majority of the court was delivered by Judge BULLARD; the others, excepting the dissenting Judge, concurring. Judge GARLAND accompanied his concurrence in the judgment, with additional arguments and reasons.]

*Bullard, J.*—In this cause, the court has had the advantage of an able and elaborate discussion on both sides, as well in writing as oral, in which have been displayed the great resources of the Bar in ability and varied learning. We have been enabled at our leisure to weigh the arguments and examine the authorities on both sides, and to give to the whole subject that patient and dispassionate consideration due alike to the vast interest at stake, to the character of the parties and to public expectation. It would have been more satisfactory to ourselves if we could have been unanimous as to the final result; but as there exists some difference of opinion among the Judges, I proceed to pronounce mine, and to set forth the grounds and reasons upon which it rests. I will not affect to conceal with what anxiety I examined again and again the principal question in the case, when I discovered that I should have the misfortune not to concur with the senior Judge, who had been for so many years familiar with the vexed question of the batture in all its phases, while this is the first occasion, upon which it has been discussed, since I have been a member of this tribunal.

The Municipality claims to be owner of the alluvial formation fronting the suburbs Delord and Saulet, between New Levee street and Front street, bounded on the upper side by Roffignac street and by property in lots separating it from Benjamin; which lot or parcel of land, it is alleged, was formed by alluvion long after those suburbs were laid out as faubourgs of the city of New Orleans, and after they were actually attached to, united with, and incorporated into, and made a part and portion of the city of New Orleans, or was at each of the

27    VOL. XVIII.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

said epochs, so inconsiderable· in its formation and extent as to be incapable of individual possession, use or occupation of any kind whatever, without the use of artificial means, the same being even at the lowest stages of the water of the river barely perceptible, and all the rest of the year entirely covered and forming a part of the bed of the river—by reason of which incorporation with said city (the petition goes on to allege) and the laying out and dividing the said land, of which the said faubourg is composed, into town lots, streets, &c., as a part of said city, the title to all the said batture or alluvion then so imperfectly formed or thereafter to be formed, *became by law vested in the corporation* of the said city of New Orleans, for the sole and exclusive use of the public and is now vested in the plaintiffs.

Upon the lot of ground thus described, it is alleged, the defendants have erected buildings and stores for pressing cotton, &c., and have appropriated the same to their sole and exclusive use as their property, and to the entire exclusion of the public and have converted the natural and lawful destination of the said land to public purposes and uses into private property.

It is further alleged that within the last ten years there has been formed in front of the lot of land above described, by gradual deposit of the river, a considerable space of batture or alluvion, now vacant and unoccupied except for public uses, and which is in like manner vested in the said Second Municipality for public use and benefit, and that the defendants, pretending to claim the same as their private property, and as forming a part of the ground described, have menaced and, as the petitioners believe, are about to occupy the same and to convert it to their own use to the exclusion of the public.

The plaintiffs conclude by praying judgment that the title is vested in the plaintiffs for the uses and purposes above mentioned, and that the defendants be forever enjoined from any use, occupation or possession thereof and for damages.

The defendants first pleaded the exception of res judicata

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

founded upon the judgment rendered in the case of Henderson and others vs. the Mayor, Aldermen and inhabitants of the City of New Orleans; and in case the same should be over-ruled, they deny all the facts and allegations in the petition so far as they assert any color or pretence of title in the plaintiffs to the premises described: and they deny the plaintiffs' title to any alluvion already formed or which may hereafter be formed in front of said premises.

The respondents further aver, that they are the riparian proprietors of the property claimed by the plaintiffs, and as such entitled to all the alluvion which has been formed or may be formed in front of their said property. That they possess the same with all its rights and privileges, and especially as a part thereof, the right of alluvion, in virtue of a sale or concession of the King of France. That the said property with all its said rights was vested in these respondents, and those through whom they claim, from the date of the said sale or concession and that they cannot be divested of their right without their consent, and without a just and previous indemnity. They further aver that the plaintiffs have repeatedly admitted and recognized their right and title by formally putting them in possession of sundry portions of batture successively formed before their property and attached thereto since the incorporation of the city in 1805, by charging them with all the burdens and duties of front proprietors, and by various other acts by which the respondents' right is distinctly recognized.

Upon these pleadings the parties went to trial in the court below, and the exception of res judicata having been sustained as to the lots of ground first described, upon which the defendants had erected their warehouses, and overruled as it relates to that portion of the alluvion lying on the outside of the levee and in front of the same property; and after a trial upon the merits, judgment having been rendered in favor of the plaintiffs for the land last described, according to the prayer of the petition, the defendants appealed.

The Municipality has not appealed from that part of the judg-

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.
ment sustaining the exception of res judicata, as to that portion of the property in controversy upon which the defendants' buildings are erected, but they ask a modification of the judgment in that respect. We have therefore first to enquire into the question whether the judgment in the case of Henderson and others against the Mayor, Aldermen and inhabitants of the city of New Orleans forms a bar to this action, as carrying with it the authority of the thing adjudged between these parties.

A careful examination of the arguments and authorities on this point has failed to satisfy my mind that this exception ought to have been sustained in the court below. It appears to me so doubtful that I think the judgment in this particular should not be disturbed, and that the whole case is fairly open before us on the merits, on the answer to the appeal.

Proceeding, therefore, to examine the case upon the merits, I begin by assuming as undisputed facts, that the Jesuits' plantation, of which the lots in rear of the premises in controversy formed a part, was from its local situation, fronting on the Mississippi, and exposed to abrasion by its currents, entitled to any alluvial accretion upon its front, and that such was the condition of things in 1805, when the city of New Orleans was incorporated by an act of the Territorial Legislature, and the property in question embraced within its limits. That in 1806 or 1807 a part of the land was laid out as the faubourg Delord, and lots sold in conformity to the plan. Such being the case, if the same land or that part of it which still fronts upon the river has ceased to enjoy the same advantage, to the profit of the owners of such front, or has lost the right of accretion, and since that period the alluvion formed belongs not to the owners of the front lots but to the city, such a change—such a dismemberment of the property must have resulted either from the operations of law, or from the consent of the former or the present proprietors. It would seem, therefore, that the enquiry before the court is twofold—*first,* into the effect of the act incorporating the city and embracing the property in question, now composing the

faubourgs Delord and Saulet within its limits, and *secondly*, EASTERN DIS.
*April*, 1841.
─────
MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS. whether the laying out of the faubourg as shown by the plans and disposing of lots in conformity thereto, or any other acts of Madame Delord or her successors, taken in connection with the various ordinances of the City Council, furnish sufficient legal evidence of an intention, on her or their part, to dedicate the property claimed by the plaintiffs to public uses, so as to constitute a *locus publicus*. Under the first head I will consider merely the legal operation of the act of 1805, wholly independent of the will of the then proprietor, and how far the character of the property was changed thereby from rural to urban, so far as it regards the right to profit afterwards by any alluvial increase; and under the second, I will consider the effect of the same act, together with the several ordinances of the City Council, and especially that of 1831, by which a part of the faubourgs Delord, Saulet and Lacourse were finally incorporated, as it is termed, that is to say, admitted to all the advantages and subjected to all the burdens of the square of the city, taken in connexion with the acts and declarations of the parties.

I. If the act of 1805 which incorporated and defined the limits of the city of New Orleans, embracing a large extent of territory from Lake Pontchartrain to the river and numerous plantations fronting on the Mississippi, and all previously entitled, according to the existing laws, to any alluvion which might be formed upon their front, had declared in explicit terms, that after the passage of that act, the owners of such tracts of land fronting on the river should no longer be entitled to any alluvion which might be formed, but that the same should thereafter accrue to the benefit of the city, there is not perhaps a single mind, capable of discriminating between the legitimate exercise of legislative authority and acts of sheer spoliation, that would not pronounce such an enactment to be without any constitutional validity. Will it be said that the right to future alluvial formations is not a vested right? I answer that such right is inherent in the property itself and forms an essential attribute

The right to future *alluvial* formation or *batture* is a *vested right,* inherent in the property itself, and forms an essential attribute of it, resulting from natural law, in consequence of the local situation of the land to which it attaches.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

of it, resulting from natural law in consequence of the local situation of the land, just as much as the natural fruits of a tree belong to the owner of the land; and that such an attempt to transfer from the owner of the land to the city, the future increase by alluvion, would be as legally absurd, as if the legislature had declared, that after the incorporation of the city, the fruits of all the orange trees within its limits should belong thereafter to the city and not to the owners of the orchards and gardens. If such would be our judgment upon an express enactment, *a fortiori*, should we declare that such an effect could not follow by mere implication.

But the argument is, as I understand it, that the character of the property was changed from rural to urban by the incorporation of the city; and inasmuch as urban property does not by law enjoy the right of alluvion, as is contended, consequently after that period, the city is entitled to the increase and not the front proprietors.

Admitting for the present, and for the purposes of this argument, that by the Roman and Spanish law, the right of alluvion is not enjoyed by urban estates, and that they form an. exception to the general rule, yet it appears to me the same difficulty recurs; for if the legislature without my consent places my property in a new category or gives it a new classification, or in consequence of which it is shorn of one of its original attributes, it is not easy to distinguish such an act from one by which the same result is sought to be obtained by direct enactment. It is after all but a circuitous way to the attainment of the same end and is equally repugnant to the first principles of justice, and to all constitutional restraint upon the legislative power. This argument presupposes that the original tract was entitled to alluvion, and I now speak only of the effect of the act incorporating the city and extending its limits so as to embrace the Jesuits' plantation; without regard to any subsequent acts of the front proprietors, from which an intention to dedicate to public uses might be inferred, and it appears to me, that in truth the act of incorporation might be

Eastern Dis.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

laid entirely out of view and our inquiry confined to the evidence of dedication—on this point, the court I believe is unanimous.

But supposing these principles are questionable, and that I am mistaken in this view of the subject, is it true that urban property fronting on the river is not entitled to alluvion, and that such an exception is recognized by the Roman or the Spanish law? This question leads me briefly to look into the doctrine of alluvion, its foundation and its limitations and exceptions. The doctrine, in my opinion does not cover a very wide space, and in this discussion, the question as it has been treated, and as I propose to treat it, becomes one rather of language and philology than of law.

The Roman legislator instead of giving the more exact and scientific definition of our modern Codes, announces with oracular brevity a great rule of natural equity; "Præpereà, quod per alluvionem *agro tuo* flumen adjecit jure gentium tibi adquiritur," which I translate as follows: "moreover, whatever the river has added to your land becomes yours by the law of nature, (or nations)". I use the English word *land* instead of *field*, because it appears to me that the word *ager* in the text is employed in its primitive sense to signify land or soil in the abstract, without regard to any idea of property or to any particular form or size, or shape, precisely as it is in the Greek, from which it is derived, (AGROS) and as it is in the compounds into which it enters both in Latin and several modern languages, such as "*agricultura, agricola, agrarius, and agrimensor.*"—It will not be pretended that agriculture is confined in any language to the culture of *a field without a house* or *other building upon it*, as the word *ager* signified according to Rodrigues and even the Roman Digest. The language itself furnishes internal evidence that such was its primitive meaning, for the earliest as well as the most useful of human arts, that which in a great measure feeds and clothes the great family of man, derives its name from that word in combination with another which signifies to *cultivate.*

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

Again, alluvion is a right founded on natural law, in which the maxim certainly applies with all its force, that where the reason is the same, the law is the same, and would that law distinguish between two contiguous estates or tracts of land fronting on a water course, and equally liable to be wasted by its encroachments, deny to that which should have a building upon it the natural chances of accretion, while it gives it to the other? I think not, any more than agriculture should be taken to mean the tilling of a field on which no edifice exists. That the word *ager* was sometimes employed to signify something different there is no doubt, and so is land in English; its primitive signification is *soil, ground;* but it sometimes means a country or territory, as "the land of my fathers," "the land of Canaan." This arises from the poverty of human language and the impossibility of having a distinct word to signify every object in nature, and all the infinite varieties and shades of ideas. The Roman language at an early period was as poor as the Roman people.—Witness the fragments of the twelve tables which it requires a profound antiquarian to decipher.—But it adopted new words, with as much avidity as the Romans accorded to subject tribes the rights of citizenship; and we have the authority of Horace for saying that even in the Augustan age new words were always welcome, provided they flowed from a Grecian source.

" Et nova factaque nuper habebunt verba fidem, si,
    Graeco fonte cadant, parcè detorta."

Not only the same word came to have different significations, but new and sometimes odd combinations of words were resorted to in order to express new ideas or objects. The word *prædium*, for example, about which so much has been said in the course of this argument, is supposed to have been derived from the word *præda*, which means *plunder*, because it was originally an allotment of land, the *spoils* of conquered tribes; as the word plunder among a certain class of our citizens is used to signify the scanty chattels of the poor.

Much stress is laid upon the definition of *ager*, in the Par-

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

tidas (law 8, tit. 33, Par. 7) to prove that it was only fields without buildings on them, which enjoyed by the Roman law the right of alluvion. It is true the Partida says it means in Latin "como campo para sembrar en que no ha casa ni otro edeficio, fueras ende alguna cabaña ó choça para cobrar los frutôs." The authority of even Alphonso the wise, to fix by statute the meaning of a Latin word may well be questioned. That it did not always bear that narrow meaning, and sometimes signified *land* or soil in general, is manifest from the usage of the best authors. Virgil, for example, speaks of Sichaeus the first, husband of Dido, as "ditissimus agri Phœnicum"—meaning as I understand it, the richest of the Phœnicians in land—and afterwards of Camertes as the richest of the Ausonians in the same species of property.—It is probable each had something more than a field without a house— Æneas was promised in his future empire "a rich exuberance of soil—"divitis uber *agri*." In the first book of the Georgics we find within the compass of a few lines the words *tellus*, arvum, ager, terra, and campus used, as nearly synonimous. But in the following lines I think the word *ager* is most manifestly used as contradistinguished from *arva,* which we all know means *fields;* the *soil* is represented as parched with heat, while little streams are conducted so as to irrigate the *fields;* so that *ager* implies more than one field.

" Et cum exustus *ager* morientibus æstuat herbis,
    Ecce supercilio clivosi tramitis nudam
    Elicit : illa cadens raucum per levia murmur
    Saxa ciet, scatebrisque arentia temperat *arva*."

But without relying too much upon the authority of the poets, we have that of Niebuhr, one of the most profound scholars and acute philologists of modern times, and who had made the agrarian institutions of Rome the subject of long and laborious investigation. This authority, I venture to say, is worth all the lexicographers, whose works have been consulted and referred to in argument. In an appendix to his second volume of the history of Rome, he gives us much information

28    VOL. XVIII.

EASTERN  DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

concerning the Roman mode of partitioning landed property, the limitatio or survey, and the peculiar terms of the ancient national law.—He says, "ager, a district, was the whole territory belonging to any civil community, in opposition to *terra* a country, which comprised many such proprietary districts ; as for instance, *terra Italia, Græcia.—All landed property* (ager in its restricted sense,) was either Roman or foreign— "aut Romanus aut peregrinus."—All Roman land was either the property of the State (common land, domain) or private property—"aut publicus aut privatus."—The public domain is always called *ager publicus*, there was also *ager vectigalis*, and ager municipalis according to the same author, and *mentioned in the Pandects*.

But the text of the Pandects shows that the word *ager* in reference to this subject of alluvion was used indiscriminately with *Fundus* and *Prædium*. In three successive paragraphs these words are thus used :

1st. Præterea quod per alluvionem *agro* nostro Flumen adjecit jure gentium nobis acquiritur.

2d. Si vis fluminis partem aliquam ex tuo *prædio* detraxerit et meo *prædio* attulerit, halam est eam tuam permanere.

3d. Plané si longiore tempore *fundo* meo hæserit arboresque quas secum traxerit in *fundum* meum radicis egerit ; in eo tempore vidjtur meo *fundo* acquisita esse.

It will hardly be contended that in these three paragraphs the three different words employed imply as many different kinds of estates. Indeed throughout the whole remainder of the first title of the 41st book of the Pandects which treats of Islands formed of the beds of rivers becoming dry in consequence of a change of course and returning again to the same channel, the words ager, prædium and fundus are used indiscriminately, indicating rather a difference of style among the different jurisconsults who contribute to that great work, than any essential difference of landed property upon the margin of the streams. In no part of it do I find any exception to the right of alluvion, unless it be that established by

the law *in agris limitatis*, of which I shall have occasion to speak presently.—It is essential that the land should be bounded on one side by a water course, but it would seem to have been immaterial by what name the riparian estate was called.

Cities may acquire jure alluvionis, it is contended. This I do not doubt, but then it must be as proprietor of the front or as riparian proprietor. It would be absurd to say it could be otherwise, for that is of the very essence of the right, the alluvion is but accessory, the front tract is the principal—the former cannot exist without the latter.

Cities may acquire *jure alluvionis*, but it must be as owner of the front, or as *riparian* proprietor; for the *alluvion* is but an accessory to the principal estate or land.

But to return to the law *in agris limitatis* which is greatly relied upon to show that cities may acquire jure alluvionis in some manner not easily understood. Such a construction of that law is apparently countenanced by what fell from the court in the case of Packwood vs. Walden, 7 Martin, N. S. 9, in which it was said, "according to the law of the Roman Digest *in agris limitatis;* although the right of alluvion is denied to fields of that description, yet it is granted to land on which a city is founded." I think this an error arising from a hasty consideration of that law, and a translation manifestly erroneous. The text is as follows: "In agris limitatis, jus alluvionis locum non habere constat; idque et Divus Pius constituit. Et Trebatius ait, agrum qui hostibus devictis eâ conditione concessus sit ut in *civitatem veniret* habere alluvionem neque esse limitatum. Agrum autem manucaptum limitatum fuisse ut scieretur quid cuique datum esset, quid venisset, quid in publico relictum esset.

The translation of this law as given by the senior counsel of the plaintiffs is as follows: "It is certain that the right of alluvion does not take place in limited fields. This has been decided by a constitution of the Emperor Antoninus; and Trebatius says that land taken *from a conquered enemy* and conceded *under condition of belonging to a city* enjoys the right of alluvion, and is not considered as limited, &c."

This translation is certainly justified by that of Hulot into French, who appears to consider the expression "eâ condi-

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

tione concessus sit ut in civitatem veniret," as expressing a grant to a city of land taken from the enemy. But such a construction is in my opinion, contrary to the idiom of the language, as well as irreconcilable with the history of the times, to which it refers. If it had been the intention to express a concession to a city, the word, expressing the grantee would have been in the dative, *civitati*, perhaps more properly, *urbi*. If, as is supposed by the plaintiff's counsel, the city is the grantee, the words *eâ conditione* are not only surplusage, but they make nonsense of the passage. Does the grantor make a condition with the grantee, that the thing given shall belong to the latter? If A. gives to B. a tract of land, it belongs to the donee without any such condition. There *can* be no condition in such a case; with whom would it be stipulated? With the grantee? Then you would do so vain a thing as to make the grantee or donee consent to a condition, that the thing should belong to himself, which is already his by the donation or grant. If, on the other hand, we suppose the grantee to be understood indefinite, or not named with a condition that the land should belong to a city, no reason can be imagined, why a nominal grantee should be interposed, when the grant is to take effect in favor of a city. On the contrary, in my opinion the words "*ut in civitatem veniret*," establishes a condition of reversion to the Republic, whether we consider the concession as meant in favor of the conquered enemy, by leaving them in possession, subject to the will of the State, and *devictis hostibus* in a dative, or to an indefinite grantee under the same condition of reversion, and the same words in the ablative, merely expressive of the fact that the land had been taken from a conquered enemy. De Bréau Neuville, the learned translator of Pothier's Pandects, considers the sense of the passage to be, that lands given back to the conquered enemy on condition of reverting to the Republic, enjoy the right of alluvion, and are not limited. Such a translation accords also with the practice of the Republic at that remote period. Pothier, in a note to this law and its context, re-

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

marks, that when lands were taken from an enemy, the possessors of such lots, when passing under the denomination of Rome, were sometimes permitted to retain a part; another part was distributed to the veterans, and another part was sold, deducting that which was left to the ancient proprietor; but every part of those lands thus distributed were measured and bounded, and hence were called *limitati.*

But the most satisfactory authority upon this as well as other points of the Roman land law, is Niebuhr. In speaking of the *Limitatis,* this author says, "according to the Agrarian Institutions no land was held to be marked by boundaries, save what had been divided in conformity to the practice of the State, and to that mode of observing the Heavens which was adopted in taking auspices. Every other kind of boundary was regarded by the Romans as indefinite. The subject treated of by the *Agrimensores,* is land thus marked out: other land they only mention by way of contrast. Every field which the Republic separated from the common domain, was marked out by boundaries: no separation could take place without such a demarkation; and whenever there were any traces of the latter, although particular estates within the region subjected to it might still be a part of the domain, it was yet a certain proof that such a separation had taken place. On the other hand every municipal as well as every foreign region was held to be without boundaries, *(arcifinious)* or merely limited by natural or arbitrary land-marks." "The land which was regularly limited and that which was indeterminate in form along with all the other characteristics of Quiritary property, had both of them that of being free from direct taxes, but their value was registered in the census and tribute was levied accordingly. In other respects the limited fields had certain legal peculiarities, concerning which, scarcely any other express statement is preserved, than that they had no right to alluvial land, the determinateness of their size being the condition of their existence."—History of Rome, vol. II. appendix I.—By Niebuhr.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

The same author further demonstrates that the *limites* which separated these agri limitati were not imaginary lines and stakes or land marks, but spaces of different widths, according to the size of the squares, left forever open and public as highways. They were marked out according to a system, of which the author gives the general outlines in the following words: " The principle of the Roman *limitatio* was to draw lines towards the four quarters of the heavens, parallel and crosswise, in order to effect a uniform division of the lots of land which were transferred from the public domain to private property, and to fix immutable boundaries for them. Hence these boundaries (the *limites*) were marked by a slip of land left for the purpose, untouched by cultivation, as balks or ways; as their extremities were by a row of stones inscribed with numerals." Ibid.

Such appears to have been the ancient law, not as introduced or first established, but rather confirmed at a later period by a constitution of Antoninus Pius; for Trebatius, whose opinion is given, was himself a contemporary of Cicero.

There is a further passage in Niebuhr which tends to illustrate the clause " *ut in civitatem veniret*," which I cannot forbear to quote. " There was," says he, " a by-class in the Roman system, when the Republic restored a conquered territory to its old inhabitants, subject to the payment of a *tithe* or some similar tax; this, as long as the precarious possession lasted, was like any other impost, but *the Republic had the right of claiming the land and turning out the possessors*."

After the most attentive consideration of this part of the case it appears to me there is nothing in the Roman law which provided that the right of alluvion was restricted to land or portions of land bearing particular names or having particular localities, but the right depended altogether upon the question whether the tract had fixed and invariable limits or a natural boundary on one side at least, liable to be affected by a water course—no matter whether it bore the name of ager, prædium or fundus, nor do I find that cities formed any exception to the general rule.

There is nothing in the Roman law which restricts the right of *alluvion* to particular localities, or portions of land, having particular names; but the right depends on the question whether the land had fixed and invariable limits or a natural boundary on one side by a water course.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

But the counsel for the plaintiffs endeavor to fortify their position by the aid of law 26, title 28, Partida 3d. It is in the following words :

"Crecen los rios à las vegadas de manera que tuellen e menguan a algunos en las heredades que han en las riberas dellos e dan, e crecen a los otros que las han de la otra parte. E porende decimos, que todo quanto los rios tuellen à los homes poco à poco, de manera que non pueden entender la quantidad della porque no lo llevan ayuntadamente, quo lo gañan los señores de aquellas heredades, à quien lo ayuntan, e los otros a quien lo tuellen non han en ello que ver. Mas quando acaeciesse, que el rio llevase de una heredad ayuntadamente, asi como alguna parte della *con sus arboles,* ó sin ellos, lo que asi llevase non gañan el señorio dello aquellos á cuya heredad se ayunta; fueras ende, si estuviesse y por tanto tiempo que raigassen los arboles en las heredades de aquellos á quien se ayuntasen; ca estonce ganaria el señorio dellos eldueño de la heradad do raigasen, pero seria tenudo de dar al otro el mercoscabo que recibio porende, segun el aluedrio de homes buenos, et sabidores de lauores de tierra."

This law is nearly a paraphrase of the Roman law *præterea* and the following in which the words ager, fundus and prædium are used without distinction. The word *heredad* is used in the Spanish text to express the riparian property or land entitled to alluvion, and the counsel contends it must bear the same narrow meaning which they give to *ager,* to wit : a field without a house. Heredad, in Spanish, I understand to mean a landed estate, and the text might well be translated by using that English word corresponding to the French word *heritage.* Thus the word conveys the same idea expressed in the *original* law of the Digest by the words *ager, fundus* and *prædium.* I say the original, because the wisdom of Alphonso was after all in a great measure but reflected light, whose source was the Roman law, and which was sometimes not a little refracted by passing through a Gothic medium.

The plaintiffs next invoke the 9th law of the same title of

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

the 3d Partida, as giving in express terms to towns and cities the alluvion which is formed in front of cities. The law is as follows :

" Apartadamente son del comun de cada una ciudad ó villa, las fuentes e las plazas o fazen las ferias é los mercados á los lagares ó se ayuntan à consijo é los *arenales* que son en las riberas do los rios e los otros exidos e las carreras á corren los caballos, e los montes e las ochesas e todos los otros lagares semejantes d'estos, que son establecidos é otorzados para pro comunal de cada ciudad, &c."

The counsel for the plaintiffs confidently assert that this law is clear and explicit in its terms and decisive of this controversy. The word *arenales* they contend means alluvion, and in this they are in some measure countenanced by what fell from this court *arguendo* in the case of Packwood vs. Walden, 7 Martin, N. S., 90. But does the word *arenales* necessarily mean alluvion ? Certainly not, nor can I see any good reason for considering it as used in that sense in this law. None of the definitions of *arenal* to which our attention has been called in various dictionaries, conveys any such idea as alluvion, that is to say that portion of soil which is insensibly (poco à poco in the language of the Partidas) added to and becomes a part of land bordering upon a water course ; and the only comment of Gregorio Lopez upon the word is a quære, " quid de fluminibus?" as if he considered the arenales " en las riberas do los rios," as forming a part of the bank itself of the river, and consequently its use already belonging to the public by a previous law of the Partidas and now given to towns in front of which they exist, and he suggests the enquiry whether the use of the rivers also be given to the city as well as the bank·

If it had been the intention of the law-giver to create an exception to the general rule, as recognized in the Partidas, that the alluvion belongs to the owner of the riparian estate or *heredad*, such an exception would naturally have found its place in immediate connexion with the general law. Again, why treat of the accessory, without any allusion to the principal ?

EASTERN DIS.
*April*, 1841.
————————
MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

I am rather inclined to think it means only the sandy beach common on shallow rivers, which are any thing rather than alluvion formations, and which the inhabitants of cities or towns are authorized to use in common for their domestic or perhaps agricultural purposes, or for public promenades, as the Arenal of Murcia on the river Segura; Mrs. Cushings Letters, vol. 2d, 342. Be that as it may, it appears to me clear, that all the objects enumerated in the law are connected together and are referred to by the words establecidos y ortogados; and if the threshing and grazing grounds and other conveniences mentioned in the law, rest upon a grant to the town, the *arenales* are in the same category, and according to my understanding of the law, it is only an enumeration of those things which are usually given or reserved by the sovereign for the use of towns or cities laid out by royal authority, or which they hold by usage or by concession. In that sense substantially, Gregorio Lopez appears to have understood it. "Præterea quod hic dicitur (que son establecidos) non intelligitur, quod à jure sunt statuti pro civibus; quia civitati vel castro de jure nihil corporale est deputatum, quod sit de ejus pertinencia; nisi quatenus à lege aut consuetudine aut hominum dispositione riperiatur concessum."—Note 6.

But the counsel for the Municipality contends that the corporation is in a certain sense riparian proprietor, and therefore entitled to the increase by alluvion on the front. I cannot do justice to this part of the argument without quoting the language of the senior counsel, in which he developes his views on this point.

"To any person," says the counsel, "who has studied the Civil Law of Louisiana and knows the source from whence this text is drawn (art. 501, La. Code) as well as the legal acceptation of the term '*fonds riverain*' (riparious estate), this text is sufficient to form a decision on the conflicting claims of the city and private individuals—owners of lots which are only portions of the estate *(fonds)* upon which the city is founded *(fondée)*.

Eastern Dis.
April, 1841.

MUNICIPALITY
No. 2.
vs.
ORLEANS
COTTON PRESS.

"He will entertain no doubt that the city and not the owners of these lots is the riparian proprietor."—Page 121.

"To build a city," continues the counsel, "town or village, it is necessary, I conceive, to have first the ground (fonds). This (the fundus) being had, the town is built upon it. Thus built the town becomes inhabited, and the inhabitants, for the purpose of ingress and egress to and from their houses, &c., and for access to the river upon the borders of which it is situated, for returning therefrom, and for that of travelling over the whole front of the town, if their business requires it, have streets, roads, issues and avenues, which are no more than parts of the ground, foundation (fonds) upon which the town is seated.

"What is the nature of this property (fonds) now? Is it not an urban property?

"To whom does it belong? Necessarily to the community called a city; to that aggregation of persons who inhabit it. Each of them is proprietor of the lot on which his house is situated, and all possess in common the streets, roads, issues, and avenues, to the use of which every stranger, whose affairs lead him to the town, is in like manner entitled."

He then supposes the prince or the individual who should have founded a city would no longer be regarded as proprietor, and could no longer sell the soil upon which the city is built than he could the inhabitants; that he no longer remains master of the ground (fonds) upon which the town is built.

"We must therefore conclude," says the counsel, "that the ground (fonds) which was *rural* and by its conversion into a city has become *urban*, no longer does or can belong to its ancient master; that it is and can only be the property of the public—of that aggregation of inhabitants, who by the fact alone of the roads, streets, issues and avenues being destined to their common use form one community."

It is not easy to conceive how the city in the case thus supposed, in its corporate capacity, becomes proprietor of the port in such a sense as to profit by the alluvion. Take the

square of the city, for example, which was laid out by the so-
vereign, the original plan exhibits a front row of houses—next,
a vacant space marked *quai*, then the levee and the river.
The front lots belong to individuals and are bounded in front
by a *locus publicus*, the *quai*. In what sense is the corporation
a front proprietor, even admitting that the owners of the lots
fronting the quai are not so. I admit that if a batture should
be formed in front of the square of the city, it would be an ad-
dition to a *locus publicus*, but that does not prove what is con-
tended for, because the city is not proprietor of the *locus pub-
licus*, but only administrator. It belongs as much to a citizen
of Ohio as to a citizen of New Orleans. It is a place left open
for the convenience of commerce, and for the use of the whole
world—*a thing hors de commerce.*

But so far as the case supposed is meant to apply to the
*locus in quo*, it assumes as true what is yet to be shown, to
wit: that the lots in front are not bounded by the river, that
they are not liable to abrasion by the river to the loss of the
owners ; and that the proprietors would not be bound to give
a new levee or a new road, in the event of the existing one
being carried away. These are questions which we are to ex-
amine in this case, and therefore we cannot begin by assuming
that the corporation is the riparian proprietor. It is certain that
the Jesuit's plantation was originally entitled to the alluvion,
and I am now only arguing what change was produced by the
mere incorporation of the city in 1805. The question of dedi-
cation yet remains to be investigated—for the present it is enough
to say that in my opinion the change of the name of the pro-
perty from rural to urban, by the mere act of incorporation,
neither made the city a front proprietor in the sense contended
for by the plaintiffs, so as to enable it to acquire *jure alluvio-
nis*, nor did it *per se* deprive the front lots into which the pro-
perty was subdivided (provided they fronted on the river,) of
the right of such accretion.

The margin note reads: *The Jesuits' plantation, out of which the* locus in quo *arises was originally entitled to the alluvion or batture in its front. The mere act of incorporation of the city in 1805 changing the name of this property from rural to urban, neither made the city a front proprietor, so as to acquire* jure alluvionis, *or deprive the front lots of the right to such accretion.*

The counsel for the plaintiffs endeavor to fortify the claim of
the city to the alluvion by showing that the charge of keeping

EASTERN DIS.
*April*, 1841.

MUNICIPALITY NO. 2.
*vs.*
ORLEANS COTTON PRESS.

up the levee is borne by the whole city and not by the front proprietors, and that, therefore, the former ought to enjoy all the advantages resulting from the situation of the land—upon the maxim, "*qui sentit onus, sentire debit et commodum.*" That this axiom of equity lies at the foundation of the right of alluvion may be true—it is but just that the risk and loss resulting from the situation of the land should be compensated by the chances of increase by alluvion. But the *onus* or burden spoken of is natural not civil. It is a risk arising from the exposed situation of the land, not the expense or trouble of making embankments to save the land or adjacent tracts from inundation. The right of alluvion exists on streams which do not periodically overflow, as well as others which do, and those police regulations which relate to the making and keeping up of levees have nothing to do, in my opinion, with the question of alluvion.

*The onus or burden consequent on the right of alluvion is natural, not civil; it is a risk arising from the exposed position of the land, not the expense of making embankments; for the right of alluvion exists on streams which do not overflow.*

The arguments of the counsel drawn from the supposed inconvenience of having a port or any part of its bank owned by individuals, and the danger of the public being excluded from the use of it to the great detriment of commerce, would be entitled to serious consideration, if it were not true at the same time, that the public, through the agency of the corporation, has the sole use of the levee and of the bank of the river. That the front proprietors cannot extend the levee without the consent of the corporation, and that the city authorities have a right to make all improvements for rendering the whole most useful to the public and favorable to commerce. So far as it concerns the public convenience it seems to be of little importance whether the future increase of the batture shall be decided to belong to the public or to the front proprietors so long as the municipal authorities alone have the entire control of every thing on the outside of the levee and have a right to establish wharves and other conveniences which commerce may require. In most of the sea-ports of the Union it is believed the wharves are private property. Here they will be public, whoever may be considered the owner of the bank of the river, subject to the

*The public, thro' the agency of the corporation, has the sole use of the levee and of the bank of the river; and the front proprietors cannot extend the levee without the consent of the corporation, which in the meantime has the right to make all improvements for rendering it useful to the public and favorable to commerce.*

public use.   The Louisiana Code is explicit on this point: EASTERN DIS.

" The use of the banks of navigable rivers or streams is pub-     *April*, 1841.

lic, &c., nevertheless the property of the river banks belongs MUNICIPALITY

to those who possess the adjacent lands."   " On the borders of     NO. 2.

the Mississippi where there are levees, the levees shall form the COTTON PRESS.

banks."—Art., 446, 448.

It is not pretended that the question which this part of the

case presents, has ever been directly adjudicated upon by this

court; but it is supposed by the plaintiff's counsel, as well as

the parish judge, that the court has on more than one occa-

sion given a strong intimation, that in their opinion, the

alluvion formed since 1805, belonged to the city in virtue of the

act of incorporation, and especially in the case of Cochran vs.

Fort et al., 7 Martin N. S. 622.   In that case the plaintiff

claimed a city lot fronting on the river, and the alluvion which

had formed upon it since his purchase.  The question presented

was mainly one of fact, to wit, whether the batture in front of

the lot was or was not at the date of the purchase susceptible

of private ownership.   If so, then it could not be presumed

that the vendor of the plaintiff intended to sell it, and the only

principle settled in that case was, that the sale of a lot, *front to*

*the river*, according to a plan which shows the front line to

be within the levee, does not carry with it alluvion, provided,

at the time of the sale, a batture was formed of sufficient height

and magnitude to be susceptible of private ownership.   The

converse of the proposition, it would seem, ought to be tried

also, to wit, that the sale of a *city lot* fronting on the river,

would carry the alluvion which had formed since the sale.

The only difficulty in the case was to ascertain the mere mat-

ter of fact, to wit, did the batture in front exist or not at the

time of the sale.   The court decided in the affirmative, and

consequently the plaintiff failed in his action.   After deciding

the matter of fact decisive of the case, to wit, that in February,

1803, a batture did exist which, with a five feet levee, might

have been used as private property, the judge, who acted as

the organ of the court, made the remark upon which so much

Eastern Dis.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.
stress has been laid, to wit, "supposing this view of the subject incorrect, and that we were to conclude with the plaintiffs that no batture susceptible of ownership existed in February, 1803, their case would not be much stronger. The faubourg was incorporated two years after. To enable them, therefore, to recover .in this action, they must show a batture created between the day of their purchase and the date of the act of incorporation, which was susceptible of ownership; for if the alluvion was formed afterwards, it became the property of the city, and not of the front proprietors." Certainly, the decision of that case did not require such a remark. It was purely speculative, and although it may perhaps express the opinion of that able judge at the time, yet it does not appear to have been a point discussed during the argument, nor at all material in the case. The question now presents itself directly before us between the city and the owners of front lots in relation to alluvion, formed since the act of incorporation, and I am of opinion that the mere act of incorporation did not change the character of the property, and gives no new title to the city. On this point, I believe, we are unanimous.

The words used by me, as the organ of the court, in the case of the Municipality No. 1 vs. Municipality No. 2, 12 La. Rep. 49, have been also alluded to as indicating a strong opinion the other way. The expressions were, " The pretensions of the defendants as set up in their answer to *the exclusive ownership* of the property in question, and those of the plaintiffs, &c., to take one hundred thousand cubic yards of sand from the batture *ad libitum*, &c., are, in our opinion, equally unfounded and preposterous." In that case there was an express dedication to public uses of the alluvion in front of the suburb St. Mary by a formal contract between the city and the front proprietors, and the act of 1836 refers to and sanctions that compromise; and expressly provides that " the Municipality of the upper section of the city of New Orleans shall not in any manner obstruct or impede the inhabitants of any portion of the city, in the free use and enjoyment of any

of their rights on the batture." With such a legislative in-
junction, how could the Municipality with any propriety or
consistency pretend to be the exclusive owners of a *locus*
*publicus*, which it was their duty to administer according to
its destination? But that case and the present have not the
most remote analogy to each other.

II. I now enter upon the second branch of this inquiry, to
wit, whether the laying out of the Faubourg, as shown by the
plans, and disposing of lots in conformity thereto, or any other
acts of Madame Delord or her successors, taken in connexion
with the various ordinances of the City Council, furnish suffi-
cient legal evidence of an intention on her or their part to de-
dicate the property in question to public uses, so as to constitute
a *locus publicus*. The petition alleges that, by reason of the
incorporation with the said city, and the laying out and dividing
the land, of which the Faubourg is composed, into town lots,
streets, &c., as a part of said city, the title to all the said bat-
ture or alluvion, then so imperfectly formed or thereafter to be
formed, *became by law vested in* the corporation of said city
for public uses. It is not distinctly alleged, that there ever
was a *dedication* to public uses in a legal sense of the word,
resting essentially upon the express will of the *dedicator*, and
assented to by the public, evidenced by the public use of it, ac-
cording to the dedication. But the idea is, if I understand it,
that the annexation to the city successively of the different
faubourgs, formed but a continuation of the square of the city,
and imprinted upon the land in front of the street or road near-
est the levee, the same character which the corresponding part
of the squares of the city possesses, that of a *quai*. This system
is developed with ingenuity and learning in a pamphlet which
has been furnished us as a part of the argument in the case,
but the author's name is unknown to us. He considers the
*quai*, marked upon the original plan of the city, as *belonging*
to the city, and not as a *locus publicus*. It is of no consequence
in the present case, whether the original *quai*, as designated
on the plan made by the French authorities of Louisiana, be

EASTERN DIS.
*April*, 1841.
———
MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

regarded in that light as granted to the city, or as a public place. The question is, admitting the old city to be, in that sense of the word, the riparian proprietor, and entitled to any alluvion which might be formed in front of it, whether it results from the plans of the different faubourgs, that all the land between the front row of houses and the levee partook of the same character with that in front of the old city, and that the city was, as relates to the land in front of the faubourgs, also entitled to the alluvial increase,—or in other words, that there was a continuation of the *quai* through the different incorporated faubourgs. The author, above alluded to, treats the old city as the nucleus, around which the faubourgs have gradually clustered, and stand in relation to it as children towards a parent, or perhaps more properly, as partners and associates.

It seems to me clear, that the right to alluvion in front of each faubourg must stand upon its own peculiar grounds, that there is not necessarily any connexion between them. The square of the city was laid out and founded by the Sovereign. The faubourgs were laid out by the proprietors of different estates in the vicinity, each having a right to alluvion, and the question, what was the condition of the front afterwards, would depend not upon a general conformity of the streets and avenues to those of the square of the city, but upon the disposition made of it by the former proprietor. The French authorities of Louisiana indicated an intention to devote to public uses, to consecrate as a *locus publicus* all the vacant space between the first row of houses and the river, by writing the word *quai* upon various parts of the plan, and by leaving it open for public use. If, in laying out the faubourgs, the ancient proprietors of those riparian estates did the same thing or what was equivalent, then there is no doubt it amounted to a dedication, if accepted by the public. The present enquiry is confined to the faubourg Delord, and to the plan of it made by Madame Delord; for with respect to the faubourg St. Mary, it was long since settled, that the alluvion belonged to the front proprietors, and it has subsequently been dedicated to public uses by a compromise between them and the city.

*The French government in laying out the ancient city of N. Orleans, left an open space between the front row of houses and the river, marked* quai *on the plan, which was a dedication of this space to public use, and it became thereby a* locus publicus.

*If in laying out the Faubourgs, the ancient proprietors of those riparian estates, had left an open space between front street and the river, marking it as a public place on the plan, it would have amounted to a dedication, if accepted by the public.*

It may not be amiss, however, to refer to what the court said
in the case of Morgan vs. Livingston, with respect to the effect
of the plan of a faubourg made by Gravier, and the condition
of the property after its division into lots.  " On the morning
of the day," says the court, " on which Bertrand Gravier sent
for a surveyor, to make a plan of his plantation into lots and
streets, the land covered by it was rural property, burdened
with *riparious duties* in his hands, and when the plan was
finished by the division into lots and streets, *no alteration was
wrought* in these burdens.   When nine months after Poeyfarre
purchased the trapezium, he purchased a rural estate, burdened
with riparious duties, having the portion of the bank of the
river before it as an accessory.   The sale discharged the
vendor from and imposed on the vendee, the duties of repairing
the road and levee along the land conveyed.   If any part of
this portion of the road had been found out of repair, the syndic
of the district would have compelled the vendee to repair it
without the least inquiry into the circumstance, whether his
deed bounded him on the road or on the river, if he was really
the owner of the land, and separated from the river by the road
only.   The banks of the river, opposite to the trapezium, pass-
ing to the vendee *cum onere,* must have passed *cum commodo.*
" Had every lot in the faubourg been sold, the liability of the
land which they covered, would have continued the same," &c.

The "member of the Louisiana Bar" whose argument has
been mentioned, undertakes to maintain two propositions.
First, that the city of New-Orleans acquired, at the time of the
union of the suburb Delord with the city, all the riparious
rights which Madame Delord possessed by virtue of a valid
contract, and for a valuable consideration.   And secondly, that
Madame Delord has never disposed of · any portion of her
riparious rights in favor of the defendants.   The record does
not furnish us with any evidence of any such *express* contract,
as is supposed.   In 1805, the plantation which afterwards be-
came the faubourg Delord, formed an integral part of the city
by the act of incorporation.   After it was laid out as a faubourg,

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

it remained for many years what was termed one of the *un-incorporated* boroughs or suburbs of the city, that is to say, not yet entitled to participate with the square of the city in the advantage of being lighted and guarded at the common expense. This last step was not taken until 1831, when by an ordinance of the City Council, a part of the faubourgs Delord, Soulet and Lacourse, between the upper line of the faubourg St. Mary and the centre of Lacourse street, was *incorporated*, and required to pay the same taxes, and authorised to enjoy the same rights and privileges as the inhabitants of the square of the city. Ordinance of April 8, 1831, City Laws, 63. Up to that period I have seen no sanction by the city authorities of the plan of a faubourg adopted by Madame Delord, much less any contract by which she abandoned the front of her land to the city. Indeed, the uniform legislation of the City Council from that time until the inception of this suit, repels such an idea. In 1817, an ordinance was passed concerning the unincorporated boroughs and suburbs within the city of New-Orleans, which provided among other things, that "the levees adjoining the estates bordering on the river, situate in front of unincorporated boroughs or suburbs, which have hitherto been kept in repair at the charge of the proprietors, whose lands are bounded by the river, whether by a particular clause stipulated between the vendor and the purchaser, or of an obligation anterior to the settlement of said boroughs or suburbs, shall continue to be kept in repair at the expense of the said proprietors, in the manner prescribed by the ordinance concerning highways, bridges and levees within the liberties of New-Orleans." The ordinance last referred to was passed in 1815, and requires the front proprietors to keep up the levee. The ordinance of 1830, the execution of which led to the suit between the city and Henderson and others, treated those who held lots under Madame Delord as front proprietors. It directed a new levee to be laid off by the city surveyor, commencing at the lower line of the faubourg Delord, and running parallel with New Levee street to Roffignac street, and then to the upper line of Mr.

Byrne's property.  It directs the proprietors to be notified and
requires them to complete and deliver said levee on the first
day of November, and it was made the duty of the mayor to
notify the front proprietors of lots in the faubourgs Delord and
Saulet, and it further directs the work to be done at their ex-
pense in case of contravention, besides a penalty of one hundred
dollars.  A new road and levee were directed to be laid off in
advance of the former ones, and the questions which arose
in the case of Henderson et al. vs. the Mayor, Aldermen and
Inhabitants, presupposed the plaintiffs to be in point of fact
riparian proprietors, for they related to the obligation of the lat-
ter to furnish a new road, and to make and keep up the new
levee.

But if on the part of the city authorities every official act
which has been brought to our notice, tends to show that the
city did not understand there was a dedication, resulting from
Madame Delord's plan of a faubourg, which constituted the
city the riparian owner, as is now pretended, how do the sub-
sequent acts of Madame Delord and her successors accord with
the theory of a dedication to public use ?  On the 26th of May,
1806, she sells to Larche three lots on the batture, according to
the plan of Lafon, of the 21st March of the same year, the
purchaser taking upon himself the burden of making and keep-
ing in repair the road and levee in front of said lots.  On the
6th of June, 1807, she sells to Armand Duplantier her planta- <span style="float:right">But none of<br>the plans show</span>
tion of about seven arpents, fronting partly on the river and any indication of
Madame Delord
partly on the great route of Tchapitoulas, and among other and her vendees
having ever de-
title papers handed over, appears a plan of the plantation by dicated the front
of her property
Lafon, of the 6th February, 1806.   None of the plans in the on the river to
record contains any indication of the front having been dedicated public use: on
the contrary she
to public use, and her contract with Larche and with Duplan- continued to ex-
ercise acts of
tier shows that she did not so understand it.   She continued to ownership as a
riparian pro-
exercise acts of ownership as a riparian proprietor not only prietor, and was
required by the
without opposition on the part of the city, but the last ordinance city ordinance of
1830 to keep up
of 1830 by the city authorities, acting as a police jury, and the levee in front
laying out a new road and levee, imposes upon her successors, as such.

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

as riparian proprietors, the burden of keeping up the levee along their front.

Lafon's plan of the 6th of February, 1806, is now before me. It exhibits the side lines of the plantation of Madame Delord, which separates it below from the faubourg St. Mary, and above from that of Soulet, as running diagonally down to the water's edge. The front lots are represented as bounded on New Levee street, and the levee is marked along the side of the street and between it and the river, at a distance of about fifteen toises from it. There is no mark indicating any intention on the part of Madame Delord, to give up her claim or title to the land forming the levee and on the outside of it. Since the date of that plan, the land upon which the cotton press stands, has been formed, and the levee and public road, laid out by order of the City Council in 1831, are about two hundred feet outside of New Levee street; and all the land between New Levee street and the new road and levee belongs, according to the judgment rendered in this case, to the front proprietors. The intervention of a public road between the front tract and the river does not prevent accretion by alluvion, because the road and the levee themselves belong to the front proprietors, subject to the public use.—6 Martin Rep. 230; Sirey for 1822, part 2d, page 191.

It is true the public has always possessed and used the levee and the ground between it and the water's edge; and if the city authorities, under whose administration such a right has been enjoyed, had no other title but that which would result from the presumed consent of the front proprietors, such enjoyment in the presence of the latter might tend to show an acceptance on the part of the public of a dedication to public uses. But the law itself gives to the public a right to such enjoyment independently of the consent of the front proprietor, and such use is not legally inconsistent with the ownership by the riparian proprietor. Nothing therefore can be inferred from the public use of the bank of the river and the land on the outside of the levee, and the batture as fast as it forms. The city authorities have the exclusive control of the levee and

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

the banks of the river as a part of the port of New Orleans.

The principles which govern in cases of dedication to public uses are considered as well settled. They were recognized by the Supreme Court of the United States in the case of the city of Cincinnati vs. White's Lessee, 6 Peters' Rep., and were assumed by the present senior judge of this court as the basis of his opinion in the case of De Armas et al. vs. the city of New Orleans ; 5 La. Rep., 148. " The law applies to it" (a dedication) says the court, " those rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor and to secure to the public the befit held out and expected to be derived from and enjoyed by the dedication. That there was no particular form or ceremony necessary in the dedication of land to public uses and that all that was required was the assent of the owner of the land, and the fact of its being used for the public purposes intended by the dedication." Tested by these principles I cannot find, in the case now before us, any evidence of an intention on the part of Madame Delord or her successors to dedicate the front of her or their land to the public use.

But the principle that the intervention of a public road does not cut off the right of alluvion, or in other words, that a tract of land separated from the river by a public road is still considered as fronting on the river, and a riparian estate has been contested in this case on the ground that the land over which the road runs was paid for by the city in pursuance of the judgment of this court in the case of Henderson et al. vs. the City, and that consequently the city became the absolute proprietor of the road and levee, and front owner. Even supposing this to be true, which I am not disposed to admit, and that the road opened under the ordinance of 1831, became by the judgment of the court the absolute and irrevocable property of the city, still it is nothing more than a public road, via publica. This court in the case of Morgan vs. Livingston decided in the most explicit manner this question. The language of the court in that case leaves no doubt upon that point, sup-

EASTERN DIS.
April, 1841.,

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

ported as the principle is by unquestionable authority. The very point now urged was considered and overruled. The court says:

"The bank passes with the field *even when there is an intervening public road.* Ripa cedit fundo, l. Riparum, ff. rer. divis. Inst. eod. tit.—Dicit verum si via est media. Ripæ, respectu proprietatis sunt illorum, quorum prædiis hærent, sed quid si via esset in medio, interflumen et agrum vel domum? Responde idem ut Ripæ sunt eorum. Cæpola, &c.

"If there be a public road between a field and the river, still that which is made by alluvion accrues to the field. Si meum inter agrum et fluvium interjaceat publica via tamen meum fieri quod alluvio adjicit. Grotius &c. Gronovii, nota 68.

"But the defendant's counsel urges that this must be understood of a private road—one of which the *soil belongs to the owner of the field* and is burdened with a right of way, and he refers us to the law, Atticus, ff. 41, 1, 38, and to Grotius, who holds there is no principle of natural law which justifies the position that the owners of estates, separated by a public road from the river, have a right to alluvion, and admits that the field has the alluvion, if it be a private one, which owes a road —qui viam debeat; Grotius, &c. &c.,—so that the soil of the road be the property of the riparious owner.

"The expression used by the writers whom Grotius condemns, is *via publica,* a public road.

"A public road is that of which *even the soil is public;* it is not in a public road as in a private road, the soil of which does not belong to the public, while we have only the right of walking and driving over it; the soil of a public road is public. Viam publicam eam dicimus cujus etiam solum publicum est, non sicuti in privatæ via ita esse in publica accipimus; viæ privatæ solum alienum est. Jus tantum eundi et agendi nobis competit; viæ autem publicæ, *solum publicum est.*—ff. 43, 8, 2, sec. 21.

"We conclude that in the present case the intervention of the public road between the trapezium and the river, cannot be

considered as a proof of the intention of the parties to give the
land conveyed another boundary than the river."

I have copied this part of the opinion of the court in the case
of Morgan vs. Livingston, not only because it is the language
of the court, expressing its deliberate judgment upon a lead-
ing point in the case, which point is again made in the case
now before us, but because it was written by the present senior
judge, then the organ of the court, in pronouncing its decision.

There is a striking resemblance between this case and that
above alluded to, decided by the Cour Royale of Lyon and re-
ported in Sirey for 1829, 2d part. In that case the Commune
of Roques insisted that the property of the defendants was se-
parated from the Garonne by a public road (chemin commu-
nal) and consequently the alluvial increase could not attach to
it, although it might be otherwise if separated only by the tow-
path (chemin de halage) because the latter is but a servitude
imposed upon the riparian property. But the court held other-
wise, and relying upon the same authorities from the Roman
Digest and Institutes which are quoted in the case of Morgan
vs. Livingston, decided that a public road does not legally inter-
rupt the adhesion between the front lands and the river, which
it separates, because the road makes a part of the land itself,
if not *quoad proprietatem*, at least quoad *commodum* et *incom-
modum*.

This argument is based upon the supposition that the new
road in front of the Cotton Press, laid out under the ordinance
of 1831, belongs to the Municipality in full property, or is a
public road, and has been purchased from the front proprietors
in pursuance of the judgment in the case of Henderson et al.
vs. the City. But there is no evidence in the record that such
is the case. That judgment proceeds upon the ground that
the land over which the new road was laid out belonged to the
front proprietors. The city was enjoined from proceeding to
open the road without paying an indemnity to the front pro-
prietors, and the injunction was maintained by the final judg-
ment until the city should pay that indemnity. Nothing fur-

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

ther appears to have been done. No expropriation has ever taken place, either according to the mode pointed out by the Code, or to the act of 1832 relative to the opening of streets. The judgment of the District Court, which was affirmed, was " that the injunction be continued in force as relates to the making of the road until the defendants shall indemnify the plaintiffs for the damages which the establishment of said road may cause them respectively," &c. The court decided little more than the abstract question of right, to wit: that the front proprietors, or those under whom they hold, having already given one road, according to the condition, express or implied, of the original grant, were not bound to furnish another without indemnity. Surely that judgment did not *per se* divest them of their title to the land over which the road passes. Until the amount of indemnity shall have been assessed, there is no price of the thing to be forcibly sold, and the act of 1832 makes the payment of the indemnity or tender and refusal a condition precedent to the divesting of the title. Until then the title of the ancient proprietor is unimpaired.

To conclude : Upon a view of the whole matter which this case presents, I am of opinion that the act of incorporation of 1805 did not and could not legally affect the right to alluvion, which belonged to the original tract of land, that afterwards composed the faubourgs Saulet and Delord.

That each part of it fronting on the river was still entitled to the right of accretion notwithstanding the act of incorporation.

That the laying out of the faubourg in 1806, according to the plan in the record, viewed in connexion with other acts of Madame Delord and of the City Council, do not furnish legal evidence of a dedication to public uses, and that the purchasers of front lots still remained riparious owners.

That urban property fronting on a water course is entitled to alluvion as well as rural estates ; and that cities can acquire *jure alluvionis* only in virtue of a title which would constitute them front proprietors.

That the defendants must be considered as owning down to the road, last laid out, and that the intervention of the road does not in law prevent them being regarded as front proprietors, and entitled to any alluvion which now exists or may hereafter be formed between the levee and the water, subject to the public use under the administration of the municipal authorities.

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

A majority of the court concurring in these views, it is ordered, adjudged and decreed, that the judgment of the Parish court be annulled, avoided and reversed, and that ours be for the defendants, with costs in both courts ; reserving, however, to the public the use of the levee, and of all the alluvion which existed at the inception of this suit, or which now exists, or may hereafter be formed between the levee and the river, to be administered exclusively, and its use regulated, according to law, by the City Council of the Second Municipality.

*Morphy*, *J.*—The opinion just delivered by judge Bullard, sets forth so fully and satisfactorily the views of the majority of this court, on the several questions submitted in argument, that I cannot believe it necessary for me to do more than express my entire concurrence in them.

*Simon*, *J.*—I have carefully considered the opinion which judge Bullard has prepared; it expresses so fully my ideas upon the important questions which this case presents, that I deem it sufficient to state, that the conclusion to which he has arrived, appears to me correct on all the grounds therein assumed; and that I perfectly concur with him in the opinion and judgment which he has just pronounced.

*Garland*, *J.*—Concurring generally in the reasoning of the learned judge who has delivered the opinion of the court, and fully in the judgment, I will give a few of the reasons upon which my judgment is based.

It is the unanimous opinion of the court, as I have always understood, that previous to the act of the 17th of February,

31      VOL. XVIII.

EASTERN  DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

1805, incorporating the city of New-Orleans, the plantation of Madame Delord was a riparian estate, and entitled to the alluvion in front of it.   It is also agreed, that that act of the Legislature did not, in any manner, affect her title to the property, or interfere with her right to enjoy it.   If, therefore any change has taken place in the title or right of enjoyment, either by her or those who hold under her, it must be in consequence of some act of her or them.  What is the act that changes the tenure by which the property is held, or deprives them of that provision of the constitution which says, "nor shall private property be taken for public use, without just compensation."

In February, 1806, Madame Delord laid out a portion of her plantation into lots, extending the streets that previously existed in the Faubourg St. Mary running parallel with the river and giving them the same names, and laying out new streets at right angles (or nearly so) with them, giving them new names. Tchapitoulas street was then the public road alongside the levee, which was a servitude on the land, and she, in laying out the lots, left it as a street, and between it and the edge of the water on the batture, laid out a range of squares, subdivided into lots, having New Levee street in front, between which and the water's edge, there was left an open space, extending along the whole front, on which not a word was written nor is any thing said about the use of it, nor to whom it belongs.   In the rear of the lots a large space is left in the same manner. The strip in front, which has been much increased by alluvion, is the subject of controversy.   Now did the mere act of laying off the land into lots change her title or right of enjoying it in the mode prescribed by law?   I suppose, it did not of itself, because if she had the next month destroyed her plan, and again planted cotton or cane on the land, she could have done so, and no one would have any claim to the lots or the streets, or any right to disturb her in the enjoyment of the whole property.   Then what deprived her of her right to close up the streets, and deprive the public of the use of them ?   It was, in my opinion, because she sold the

lots, and held out to the purchasers by the plan a right of EASTERN DIS.
April, 1841. way, specially mentioned, which they and their successors have a right to use as long as they are proprietors of the MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS. property.

What the presiding judge of this court said in the case of Morgan vs. Livingston, 6 Martin 236, in relation to Bertrand Gravier, his plan and its effects, has been repeated verbatim in the opinion just read.

If that be true, as to Bertrand Gravier and Poeyfarré, and those holding under them, why is it not so in relation to Madame Delord, Larchevèque and Duplantier, and those holding under them? The sale from Madame Delord to Larchevèque is so nearly similar to that of Gravier to Poeyfarré, as to approach identity. A perusal of the whole of this case, will show that the majority of the court are not about to depart as far from the principles, upon which it was decided, as some of those who aided in establishing them.

I am not one of those who hold, that the right of alluvion is based exclusively on the principle of being subject to the expense and burden of keeping up roads and levees. The Roman jurists say, it is a mode of acquiring property by natural law, and comes from the maxim, it is "just, the advantages of a thing should belong to him, who supports its disadvantages." Therefore says a French writer, "nothing is more just than that a proprietor, to whom a stream has often borne prejudice, should have, to the exclusion of all others, when it becomes beneficent, a gift, less a present than an exchange." 4 Nouv. diction. de Brillon, 278. The learned chief of this court has said, "the right of increase by alluvion is grounded on the maxim of law, which bestows the profit and advantages of a thing upon him who is exposed to suffer its damages and losses." 6 Martin, 243. Roads and levees have nothing to do with the right to alluvion; it is the liability to lose a portion of the land by the abrasion of the waters, that gives the benefit, and a man is as much entitled to the alluvion formed in a river, on the banks of which there is

The right of alluvion is not based exclusively on the principle of being subject to the expense and burden of keeping up roads and levees. The Roman jurists say it is a mode of acquiring property by natural law; that it is just the advantages of the thing should belong to him who supports its disadvantages.

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

neither road nor levee, as he, who is on a river that has both.

A good deal has been said in argument about urban and rural property. If by this, it is meant that there is a difference between the tenure, by which property is held in a city, from that in the country, I have not been able to see it. I understand something about urban and rural servitudes and uses; but they differ essentially from the titles by which property is held, and I know of no law by which these accessories or burdens can *ipso facto* deprive a person of title.

*The plan of Mme. Delord, leaving an open space between N. Levee street and the river, was not a dedication of this space to public use. There was nothing marked or written on it indicating an intention so to dedicate it.*

But it is said that Madame Delord when she left the strip of batture in front of her lots, intended to give it to the public, and that, although she said not a word about it on her plan, yet it is dedicated to public uses. This is a matter of fact, and let us examine it. She does not say, either verbally or in writing, it was her intention to give it. She certainly knew she had a right to the batture in front of her property, as a number of squares were laid out on it, and the levee was not made in front of them until sometime after, when it was made at the expense of the front proprietors. Can any one believe, it was her intention to give this batture to the public, when she was daily selling it. In less than ninety days after she made her plan, she sold lots on the batture to Saulet and Larche; in these sales she specifies, they are to keep up the road and levee, and she abandons to each of them all her pretensions to the river, (elle se desiste de toutes pretentions sur le fleuve). In the sale to Duplantier she is very explicit. The sale is for seven arpents, "*face au fleuve,* et l'autre partie à la grande route des Tchoupitoulas," together with "tous les droits de propriété qu'elle a et pour avoir sur la dite habitation." I think, my learned colleague will admit, that when a person has a property that will sell readily at good prices, and is actually selling, it is not a strong presumption of an intention to make a donation to the public.

But it is said, the plan is a sufficient dedication, and the plan of the square of the city is constantly referred to, as if it was similar. If the words, *quay, port, public square,*

or any thing indicative of an intention to give, were on the Eastern Dis.
*April*, 1841.
{ Municipality
No. 2.
*vs.*
Orleans
cotton press. plan, and the public had used the ground, I should say, it was a sufficient dedication; but there is nothing of the kind shown. The case of the city of Cincinnati vs. the lessee of White, 6 Peters, 432, is much relied on, and is said to sustain this dedication. That case is not, in my opinion, understood either as to the facts or the real points decided. It does not appear positively, what words were used to prove a dedication. My colleague says, *none;* I think differently. The court says, " a plan was made and approved of by all the proprietors; and, according to it, the ground lying between Front street and the river, *was set apart as a common,* for the use and benefit of the town forever; reserving only the right of a ferry; and no lots were laid out on the land thus dedicated as a common." The language used by the court proves something was written on the plan, otherwise how could the right to a ferry landing have been reserved. On page 440 the court again says, " in the present case there having been an *actual dedication fully proved,* a continued assent will be pre-sumed, until a dissent is shown." Full proof, I think, means something more than a blank space on the plan. But the real questions in the case were not, whether the plan did not exhibit a dedication, but whether it must not be proved by a deed in the same form, as was necessary to convey title; and also, if there had been a deed, if the grant was not void, the proprietors not having the legal, but only equitable title to the land; and there being no grantee in existence to accept it, the city not being incorporated when it was laid out. The court held neither a deed nor a grantee was necessary, and said, " no par-ticular form or ceremony is necessary in the dedication of land to public use. All that is required, is the assent of the owner of the land, and the fact of its being used for the purposes in-tended by the appropriation." I agree most cordially to all this, and if the assent of Madame Delord or those holding under her, was shown, I should conform my judgment to it.

There is no particular form, necessary to a dedication of land to public use.—But it re-quires the assent of the owner and the fact of its being used for the purposes in-tended.

It is said this assent has been shown by the notorious public

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

use of the ground for thirty-five years. Where the evidence of the notorious use for that space of time is to be found I am unable to discover. It is certainly not in the record. For some time after the lots were laid off it is not probable much business was transacted in that quarter; the levee was used there, it is to be supposed, as at other places near the city. More recently, the evidence shows the city did not keep up the road or levee but compelled the front proprietors to do it. The people there were not considered in the incorporated limits of the city until 1831. The record is full of evidence showing that the levee and batture were appropriated to private purposes, covered with saw mills, wood yards, sheds to make shingles under, and shops of various descriptions. Pilié, a witness, says he never saw a place so incumbered, he had great difficulty in passing along, and so indefensible did the corporation in 1830 regard their pretensions or so powerless was it to enforce them, that the Legislature had to pass a law to enable the Mayor to remove the obstructions. The execution of this law gave rise to the suit of Henderson and others vs. the Mayor, &c., 3 La. Rep., 563; 5 idem, 416; on the second trial of which case, the corporation admitted in the record, that the plaintiffs were the owners and proprietors of the lots and of the batture also.

The admissions made by the attorney of the corporation in that case, it is now said, are not binding, as he had no right to make them. His want of authority has not been shown to my satisfaction, and I know no reason why the regularly appointed attorney of a corporation cannot make admissions as well as the attorneys of individuals, and why they should not be as binding on the principal. Corporations have no higher privileges or rights than citizens unless specially granted, and are especially bound by the acts of their agents, as they cannot be bound in any other manner. It is to me rather a curious doctrine that the corporation can constitute itself the champion of the public, to vindicate or assert its rights, and its acts can the next moment be repudiated. If the admissions made were

null, why were they not so declared at the time. We are in- EASTERN DIS.
formed the decision of the case was based on them, if so they _April_, 1841.
were valid, and being valid then, are equally so now, unless MUNICIPALITY
shown to have been made in error or fraud. I do not recog- NO. 2.
_vs._
nize the existence of a tyrant public which no law can bind, ORLEANS
COTTON PRESS.
that can assert a right to the property of a citizen and deprive
him of it by its _ipse dixit_ at pleasure, under the plea of neces-
sity or the public good. The doctrine bears the impress of
another sphere and has its origin in imperial Rome, or in the
benighted days of France and Spain. But if the public is so
far above all law, it does not prove its agents and champions
are so ; and corporations cannot by assuming or usurping the
exercise of the powers of the sovereign relieve themselves
from their proper responsibility. They cannot, under the pre-
text that their creator has been slumbering for years, suddenly
arouse him and make him rudely seize upon the property of
the citizen in his first waking moments. I concede that if it
were shown the admissions were made in gross error and fraud,
they would be void ; but there must be some stronger evidence
of this, than the mere fact that they are prejudicial to the claims
of the plaintiff.

It is not denied that if a tract of land owes a road to the pub-
lic ; being one of the servitudes imposed by the grantor, that
the alluvion belongs to the proprietor, but, it is said, if the pro-
prietor of his own accord give a road, or one is taken from him
by expropriation, under the acts of the Legislature of 1818
relative to roads, and that of 1832 relative to streets in the city,
that then he is not entitled to the alluvion that may be formed
on the other side of the road. I have sought in vain for any
good reason for this distinction. No man is presumed to give
without compensation, and when for public purposes private
property is appropriated, no more is taken than is neces-
sary for the purpose intended and stated. I should rather
hear a good common sense reason given for such a dis-
tinction, than the citation of a disputable case from a foreign
tribunal.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

It is further contended that the place in front of this property is a part of the port of the city, and being so, the whole bank of the river is public property. To this it may be replied, it was not a part of the port in 1806, nor was it so until a number of years after, any more than the river is a port at other places. Port, with us, has a definite meaning, and that of New Orleans specific boundaries, and it was not until 1821 that the Legislature extended it to the place in controversy. Afterwards Congress extended it to the limits of the three Municipalities; 2 Moreau's Dig., 259 ; 9 Laws U. S., 593. I am not aware of the law which says, when the Legislature extends the port of a city, that the citizens thereby are deprived of their rights to their property.

I have no apprehension that the city will be cut off from the river by an increase of the batture, and if there is one mode more effective than another by which such an apprehension is to be realized, it is by placing, *hors du commerce*, a large space in its front which could not be disposed of, except by the Legislature or Congress.

The Code specifies the rights, privileges and uses to which the public are entitled upon the shores and banks of rivers, and in the ports and harbors, and I am disposed to give full effect to them. As long as the public has need of the use of the bank of the river, the levee and batture in front of it for the convenience of the citizens and for commercial purposes, I thing it is entitled to such use, and the Municipality the right to the administration ; the soil remaining in the proprietors and owners of the front lots. Whenever the space shall become so large as not to be wanting for public use, the law provides a mode for extending the levee, and putting the owners in possession ; La. Code, arts.

I therefore am of opinion that the judgment of the Parish Court should be reversed so far as stated in the judgment, ordered to be recorded, and the rights of the parties must be regulated by it.

*Martin, J., dissenting.*—The plaintiffs claim *for the public use* and *benefit* a square of ground between Front and New Levee streets, in front of the faubourgs Delord and Saulet, which they allege to be a *locus publicus*, and to have been illegally occupied by the defendants. They claim also as a *locus publicus* the batture formed or to be formed before said Front street, which they allege, the defendants claim and partly occupy without title, and they pray that the defendants may be enjoined from any use, occupation or possession thereof.

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

As to that part of the petition which relates to the square of ground, the defendants pleaded, as *res judicata*, a judgment of this court in the case of Henderson et al. vs. the Mayor of New-Orleans et al.; 3 La. Reports, 563. Being vendees of the plaintiffs in that suit, they deny the present plaintiffs' title to any part of the premises. They aver that they are *riparian* proprietors, and as such, entitled to any batture formed or to be formed in front of their property. They set up title in themselves, through several *mesne* conveyances from the original grantee of the king of France, and allege that their rights, or those of the persons under whom they claim, have been frequently recognized by the Mayor and Aldermen of the City of New-Orleans, and by the plaintiffs, by putting them into possession of sundry portions of the batture successively formed in front of their property and attached thereto, since the act of incorporation of the city; by charging these respondents with all the burdens and duties of riparian proprietors, and by doing various other acts and things by which the right, title and ownership of the defendants in and to the property and rights in controversy were distinctly recognised. They also pleaded prescription.

The exception of res judicata was sustained so far as it relates to the square of ground, but overruled in regard to the batture formed or to be formed outside thereof. There was judgment in favor of the plaintiffs, for the alluvion formed or to be formed along the levee, opposite to the square of ground, &c., &c.

The plaintiffs have not appealed, but have prayed that the

EASTERN DIS. judgment sustaining the plea of res judicata, so far as it regards
April, 1841. the square of ground, be amended in their favor, and on this
MUNICIPALITY part of the case, I have come to the same conclusion as the
NO. 2.
*vs.* other members of this court.
ORLEANS
COTTON PRESS. The facts of the case are these. In the early part of the last
century, the city of New-Orleans was founded by the then
king's grantee of the colony of Louisiana, viz.: the West India
Company, according to a plan which has been printed in the
corner of the large plan or map of the city of New-Orleans, pub-
lished by Francis B. Ogden, in the year 1829. Soon after, a tract
of land immediately above the city and extending 32 arpents in
front along the Mississippi, was granted by the Company to
Bienville, who sold it to the Jesuits, and the latter owned it
until the dissolution of their order in 1763, when it was con-
fiscated, divided into smaller tracts and sold. Gravier, Delord,
and Saulet, by several mesne conveyances, became the pro-
prietors of these tracts or a part of them. In the year 1788,
the tract contiguous to the city was laid out into a faubourg by
Gravier. The assent of government to the erection results from an
order which the Baron de Carondelet, Governor of the Province,
afterwards gave to Gravier, to deposit the plan of his faubourg in
the archives of the Cabildo, and by the subsequent appointment
of Alcaldes de Barrios, Syndics and inferior public officers, and
the extension of the city government over the faubourg. In
the year 1805, the city of New-Orleans was incorporated by an
act of the Legislative Council of the Territory of Orleans, and
its limits extended to a considerable distance upwards, covering
the tracts purchased by Gravier, Delord and Saulet. In Fe-
bruary, 1806, Madame Delord erected her plantation into a
faubourg, and it is expressly stated on the face of her plan, that
it is intended as an extension and continuation of Gravier's fau-
bourg or of the city of New-Orleans.

Saulet soon after followed the example of Madame Delord,
and the plan of his faubourg expressly states its being made
in extension and continuation of her faubourg.

There appears on Madame Delord's plan, outside of the

levee, a trapezium of land, which, on the 28th day of May, in the same year, she sold to Larchevèque or Larche, as follows:

" Trois terrains, situés *sur la batture*, en face de son habitation, bornés d'un côté par le Sieur Bellechasse, et de l'autre par le Sieur Saulet, conformément au plan, fait par Mr. Barthélemy Lafon, en date .du vingt Mars dernier, étant à la charge de faire et réparer le chemin et levée en face du dit terrain."

This trapezium was afterwards much enlarged by alluvion, and the latter, by several mesne conveyances, became the property of the defendants, and included the locus in quo, which is the subject of the present suit. It is, therefore, proper to give an accurate description of it, in doing which it becomes necessary to notice the adjoining grounds.

The line between the plantations of Saulet and Delord ran very obliquely from the river; the old levee ran along the king's highway or Tchapitoulas street. Previous to 1806, Madame Delord had constructed a new levee, about one square or three hundred feet from the old levee, thus taking in a portion of the batture; the precise date when this was done, is not ascertained, but it appears to have been before her plantation was converted into a faubourg. Inside of the new levee, Madame Delord had laid out a street which was called New Levee street; the new levee and the street did not run *direct* as far as the line of Saulet, but at some distance, say three or four hundred feet, if we may judge from the plan and scale, made an insett or turn *from* the river, and ran towards the old levee and king's road, until it intersected the aforesaid oblique line. There was thus left a triangular trapezium or irregular piece of ground, lying between the oblique line of Saulet and the insett of the new levee. New Levee street stopped at Roffignac street, and persons who were proceeding out of the city, along the former, were thus compelled to go into the king's road at Roffignac street. The shape of this piece of ground was such that it ran to a point formed by the

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

oblique line of Saulet and the insett of the new levee, and towards the river the lines diverged. A strip of this trapezium, 34 feet front and running along the insett of the levee, is marked with the name of "Solet;" the remainder of the trapezium was the land sold to Larche.

In the act of sale from Delord to Larche as quoted above, the following charge or obligation was also added, to wit, the levee was to be at the charge of Larche.

"Etant à la charge de faire et réparer le chemin et levée *en face* du dit terrain."

From this description and contract it appears: First, that the trapezium was outside of the levee, and if the levee is to be considered as the bank of the river, then the trapezium was a part of the bank of the river.

Second, that the obligation on the part of Larche to maintain the levee, was not intended to apply to the old levee, but was imposed on the presumption, that the new levee was to be continued on a straight line, to join the line of Saulet, and thus constitute a protection against inundation to the land sold to Larche. This view of the matter is also corroborated by the words in which Larche is charged with the burden of the levee, which is to be "*en face;*" and it was the charge to keep up this new levee which was thus intended to be imposed on him. We presume that the new levee and street *were* afterwards continued in a straight line, and the land thus purchased by Larche from Delord, *was* thus protected by the new levee, and made to fall within it.

In 1830, the City Council ordered a levee to be made in front of the faubourgs Delord and Saulet. The surveyor, in executing this duty, found the ground encumbered by wharves, sheds, &c., and by steam saw mills, erected by the then claimants, under whom the defendants hold. The Mayor ordered them to be removed, and an injunction obtained to prevent this was dissolved by the district court, and on appeal this judgment was affirmed, on the ground that all the land outside the levee

was bank of the river, and could not be encumbered in any
manner whatsoever.    See 3d La. Rep. 563.

In that case the counsel for the city made the following ad-
mission.    " It is admitted, that the plaintiffs are the proprietors
of the different lots of ground as stated in their petition, and
as such entitled to the increase of the batture in front of the
same."    5 La. Reports, 419.    And the court was induced to
act upon this admission, which led to the decision in that suit,
in which it recognized the right of the city, to have a new levee
and road made in front of the locus in quo, on paying the de-
fendants for the ground taken for the road.

In 1815 an ordinance was passed by the City Council, re-
quiring the front proprietors in the unincorporated suburbs to
keep up the levee, &c. &c.

In 1817 another was passed, directing that the levees join-
ing the estates bordering on the river and situated in front of
the unincorporated suburbs should continue to be kept in re-
pair at the expense of the proprietors, as provided for by the
act of 1815.

In 1831 the unincorporated Faubourgs Delord, Saulet and
Lacourse were incorporated and required to pay taxes, and au-
thorized to enjoy the same rights and privileges as the inhabi-
tants of the original city, etc.

We have been favored with elaborate arguments and nume-
rous and voluminous briefs.    I have not felt it my duty nor my
inclination, and I have doubted my ability to examine the clas-
sical disquisition which has been given us, on the words *Ager*,
*Fundus*, *Prædium* and *Civitas* in the Roman law, and I coin-
cide with the able view of that subject which the second judge
of this court has presented to the profession.    I have also
thought fit to escape from a discussion of what is called the law
of *Arenales*, and of the difference, if any exists, between the
rights of rural and urban estates, in regard to alluvion.    As-
suming that on the extension and continuation of the city over
a contiguous estate, with the authority of the State and the
consent of the owner, there is a like extension of all the rights

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

and burdens enjoyed and borne in the city before the extension, my first enquiry will be, into the rights, privileges, &c. of the city as originally founded; next, into the consequences of the annexation of the Faubourg St. Mary and that of the Faubourg Delord.

For the better understanding of the conclusions to which I have come, I am to examine the effect of the plan of the city of New Orleans, as originally laid out on the ground which it covers, and the part of the river in front of it. The plan is conclusive evidence of the intention of the founder to retain no property on any part of the ground within the designated limits except the square before the church and the lots, which appear to have been intended for the occupation of individuals who might obtain them by sale or donation. The square being marked *Place D'Armes*, was evidently reserved for military purposes, and it is an historical fact that between the years 1730 and 1757 barracks were built on it along Saint Peter and Saint Anne streets. Our jurisprudence is unacquainted with the division of property known to the Romans as *Res Sacræ*.

The spot marked on the plan for a church has been viewed as a donation to the religious order, who exercised the clerical functions in the colony. In no part of the plan is there designated any lots to the particular use of the city, for jails, market-houses, town halls, &c. &c. So that with the exception of the spot for the church, the square before it, and the lots, every inch of ground comes under the denomination of a *locus publicus*, or ground dedicated to the public as streets, quay, etc., etc., for the benefit not only of the inhabitants of the city and of the colony but of all the subjects of the King and even of aliens.

This conclusion rests upon the principle that the plan having separated by distinct lines what was retained by the founders for future disposition, all the rest was evidently abandoned by them.

The nature of the right thus acquired by the public was one

of absolute property and not of use only. When the whole or any part of a *locus publicus* ceases to be applicable to its original destination, the sovereign, who has the regulation of the use of *loci publici*, may direct its future application to any other object of common utility to the inhabitants of the place, and if necessary to order the sale of it on a ground rent for the benefit of the city, or apply the proceeds of the sale in the same manner.

In order to establish that there is no need of any other evidence in the plan of a city of the dedication of any part of the ground covered by it to the public, except the *negative one* which results from its not being laid out into lots or in any other manner designated as intended for another object, I refer to the decision of the Supreme Court of the United States in the case of Cincinnati vs. the Lessee of White; 6 Peters, 432. With regard to the whole space between Front street and the river in that case, the court grounded their opinion on the circumstance that this space was left open and not divided into lots.

That decision was the basis of my opinion in the case of Cucullu & De Armas vs. the Mayor et al., which was sanctioned by the Supreme Court of the United States in the case of the Mayor, &c. vs. the United States in error.—10 Peters, 662.

In order to show that the public have the absolute property and not the use only of loci publici I refer to the cases cited in Cucullu et al. vs. the Mayor et al; 5 La. Rep., 132. In one of which the French King ordered houses to be built upon a quay, reserving a ground rent thereon for the use of the city; the right of which would have expired on that part of the quay ceasing to be applicable to its original destination, if the sovereign or founder had parted only with the use.

If the Supreme Court of the United States had thought that the West India Company parted only with the use of the quay or large strip of ground in front of the city of New Orleans, they would have given judgment for the United States in the case of the Mayor vs. the United States in error, for that por-

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.
tion of the quay which had been divided into squares and lots and sold, as this part of the quay had ceased to be applicable to its original destination ; for the United States had succeeded to the rights of the West India Company by the treaty of cession, and would have succeeded to the ownership of the property if the use only had been granted.

I am now to examine the effect of the plan on the part of the river in front of the city, or rather the port of New Orleans.

A sea port consists of two principal parts: the one within and the other without the river. The first is that on which vessels lie at anchor, and was by the Romans called *statio.*

" Stationem dicimus à statuendo. Is igitur locus demonstratur, ubicunque naves tuto stare passunt."—ff. lib. 43, tit. 12, l. 1, sec. 13.

The second is that part on land destined to the reception of merchandize landed or to be shipped ; in the plan this is called the Quai. It includes the whole space between the levee and the first line of lots, for the word " *Quai,*" is written twice thereon at an equal distance from the lots and the levee. This latter part as well as the other is public, for the law says " Flumina *et portus* publica sunt." If the part which was within the river was the only one that was public it would have been useless to have told us, " Flumina *et portus* publica sunt." It would have sufficed to have said " Flumina publica sunt," for the river includes the statio and after having told us that the whole was public it would have been useless to have said that a part was so.

This view of the subject is supported by the authority of Sir Matthew Hale, in his treatise, " De Portibus Maris."

" A port is quid aggregatum, consisting of somewhat that is natural, viz: an access to the sea, whereby ships may conveniently come ; a safe situation against winds where they may conveniently lie ; and a good shore where they may well unlade."

" Something that is artificial, as keys and wharfs and crams and warehouses and houses of common receipt; and some-

thing that is civil, viz: privileges and franchises, *jus appli.* candi, *jus mercati,* and divers other additaments given to it by civil authority."

The Quai being a public place lying between the lots and the river would prevent the owners of the lots from having any property in the banks of the river, even if any such could be held by individuals within a port; for the lots are not contiguous thereto; and in a sea port exclusively destined to commerce, the property of any individual is inconsistent with the destination of that part of the port.

Elsewhere, the banks of the river are the property of the owners of contiguous estates, although the public has the use of them; a fisherman may fasten his bark to the trees on the banks; he may erect a hut or cabin to shelter himself from the weather; he may dry his net thereon; all have a right to a tow-path; but in a sea-port there are no trees to which a bark may be fastened; the extension of a net to dry could never be permitted; no hut or cabin could be tolerated; no tow-path is needed or could be used; no property in the bank can exist in any individual, because the bank is part of the port and the whole port is public; besides there is no private estate contiguous to the river; the ground contiguous thereto having been dedicated to the public as a Quai, or part of the port, and as such not being susceptible of private ownership, and being *hors de commerce.* It therefore follows that if an alluvion was formed in the port it would partake of the nature of the ground contiguous to the river, and be, like it, a locus publicus.

A second reason why the alluvion thus formed should not become the property of the owner of the lot immediately opposite thereto, is, that the city must be the immediate sufferer by the first encroachment of the river. If the levee, the quai, or the street which runs along the first line of lots be carried away, a new levee, a new quai and a new street must be provided out of the coffers of the city. The levee must be maintained and repaired in the same manner. To these charges the owners of the lots on Levee street do not contribute one

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

cent more than the owner of any other lot in the city. If the owner of every lot must be an equal sufferer from the action of the river on the bank how can it be said that the owners of those in the front street are exclusively to enjoy the benefit of alluvion? "Eum sequantur commoda, quem sequuntur incommoda." A third reason is, that every lot appears by the plan to be an ager limitatus. It has been urged—first, either that there is no ager limitatus or else that all fields are agri limitati; in other words, that the doctrine of ager limitatus does not exist. I think it does: every field that is not bounded by water is an ager limitatus, for it cannot be diminished except by an earthquake, which is an event so rare as not to be taken into view in the regulation of civil rights, nor can it be increased. Every field that has a sea, lake or river for one of its boundaries, is susceptible of increase or diminution; the first is an *ager limitatus ;* the second an *ager arcifinious.*

All the lots in New Orleans are *agri limitati,* for as the street runs along the river in front of them none of them are bounded by the river; and as the street is not at their risk and charge, they cannot be injured by the action of the water thereon.

The law "*in agris,*" is urged to be an act of positive legislation: the application of it to land granted to soldiers is indeed of this kind, for the reason expressed in the law itself, to wit: that it might be known what lands remained at the disposal of the State after the distribution to the soldiers.

A similar instance exists in the laws of the United States in regard to the division of public lands, into ranges, townships, sections, etc.

A fourth reason is the intervention of a street between the lots and the river. One of the counsel for the defendants (Mr. Hunt) denies this position and contends absolutely that the intervention of a public road does not form an obstacle to the acquisition of the alluvion; and relies on the decision of this court in the case of Morgan vs. Livingston, 6 Martin, p. 19;

and he reminds me, that I had the honor of being the organ of
the court in that case.

The reasons for the opinion there given will be stated hereafter.

This case cannot avail him, for the plaintiff claimed his title to the alluvion through several mesne conveyances from the original grantee; and it was allowed to him avowedly on the ground, that, as successor to that grantee he was bound to keep up the road, and if it was lost to furnish another; and that the property was still rural, the assent of the Spanish government to the erection of Gravier's faubourg, not having been given until the arrival of the Baron de Carondelet in Louisiana several years after Gravier's sale to Poeyfarré, under whom the plaintiff claimed.

The other case on which this counsel relies is one of the Court of Cassation. That tribunal formed its judgment on an article of the Code Napoleon, the examination of which would not assist us, and on several laws quoted from the Corpus Juris Civilis.

It appears to me that we cannot allow to the defendants the benefit of the Roman laws if they be invoked for the purpose of establishing that an estate not bound to furnish a new road on the destruction of the old one, is entitled to the alluvion notwithstanding the intervention of a road; for in that respect they are not declaratory of the natural law nor grounded thereon; but on the contrary, are positive and arbitrary laws, deriving all their force not from reason but from the will of the prince. Grotius holds that there is no principle of the natural law which justifies the position that the owners of estates, separated by a public road from the river, have a right to the alluvion, unless it be an estate which owes the road, " qui viam debet."—Gro. de j., b. et p. 2, 8, 17.

If the law under consideration is to be extended to a case in which the soil of the road be the property of a parish, it is derogatory to, and in direct violation of the natural law, for in that case the benefit and the burden are separated; the benefit goes

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

to the owner of the estate, and the loss is borne by the parish.

Let us, however, examine those Roman laws on which the Court of Cassation relies. They first refer us to the law "Præte-reà" of the Institutes, which defines the alluvion; next, to the law "in agris limitatis," of the Digest; next, to the Institutes, lib. 2, tit. 1, sec. 4, " Riparum;" and lastly to the law " Atticus," ff. 41, 1, 38.

None of these except the law Atticus supports the proposition that the intervention of a highway between a river and a field does not prevent the acquisition of alluvion by the latter, and this law gives as a reason for the acquisition that the field owes the road ; id est, as Grotius says, a field, " qui debet viam."

" Nec tamen impedimento viam esse (ait,) quo minus ager, qui trans viam alluvioni relictus est, Attii fieret; *nam ipsa quoque via fundi esset.*"—ff. 41, 1, 38.

" Fundi, et per hoc Attii, quod est verum quantum ad emo-lumentum non ad proprietatem." " Item quo ad incommodum, quia si quandoque destruitur, ex eodem fundo juxta quod est reparatur." There are other laws in the Digest to the same effect : " Aem via publica vel fluminis impetu vel ruina amissa est, *vicimus proximus viam præstare* debet." ff. 8. 6. 14. Gothofredi has the following note, "sed impensa publica," but the Gloss. adds, " sed contra observatur." " Si viæ publicæ commeatus sit, vel via coàctata, interveniunt magistratus."—ff. 43, 8, 1, 25. On this law, Gothofredi has the following note: " Ut scilicet vicini, viam præstant." The neighbors are to fur-nish a road, but it is not said that they are to be paid for it.

From these I conclude that under the Roman law, high-ways were charges on the estates through which they run; and I presume that they are so in France, otherwise the law Atticus does not support the decision of the Court of Cassation. That court has however held in a decree of the 12th Decem-ber, 1832, ch. civ. 13 Sirey 1, 1, that the communes, being owners of vicinal ways (chemins vicinaux) and bound to keep them in order and to refurnish them if there be occasion for it,

are alone entitled to the alluvion formed before them: as in the case cited by the counsel, the owner of the estate over the way is entitled to the alluvion. The probable ground of the distinction is, that in a chemin communal, the estate before which it was is bound to furnish another in case of its destruction.

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

Taking these two decisions of the Court of Cassation as my guide, I must say that, as the owner of a lot in New Orleans is not bound to furnish another street, if the former be destroyed, the intervention of the street prevents the acquisition of alluvion by the lot. One of the learned counsel has, however, urged, that a new street must be furnished by the owners of the contiguous lots. He has cited no authority, but has supported his position on the alleged ground, that the owner of the lot is the riparious proprietor. This cannot be admitted. First, because the intervention of the street prevents the lot from being riparious. Second, because riparious estates on the Mississippi are bound to furnish a road, in consequence of an express clause in the grant, which binds them thereto; and there is no such clause in the grant of the lot. I conclude then, that none of the lots in the city of New Orleans can have any right to the alluvion formed before them.

The Supreme Court of the United States has taught me, that such an alluvion belongs to the city as a *locus publicus*, because, "if it claim the original dedication to the river, *it has all the rights and privileges* of riparian proprietor." Mayor vs. U. S. in Error, 10 Peters, 717. We have already seen, that it has all the riparian burdens.

I am now to enquire whether there is any difference with regard to the ground covered by the Faubourg St. Mary, which is immediately above the city and contiguous thereto.

Whatever evidence of the dedication to public use by the founder of the city of New Orleans results·from the plan, which preceded the sale of lots therein, must result of the like dedication by Gravier from the plan of his faubourg; for Gravier was as much the founder of his faubourg as the West India Company was of the city.

EASTERN DIS.     This plan is evidently that of a continuation and extension of
*April*, 1841.   the city ; all the streets of New Orleans are continued through
MUNICIPALITY     the faubourg.   The river forming a curve at the end of the
NO. 2,
    *vs.*        city, a new row of squares was added, and the first or front
ORLEANS
COTTON PRESS.    street of the city became the second of the faubourg.

                 The whole space between the new row of squares and the
Where the plan   levee was left open, evidently as the quai of the faubourg.
of a City or Fau-
bourg fronting       In the case of Cucullu and De Armas vs. the Mayor, I
on a navigable
river, or the sea, adopted the suggestion of the counsel for the appellant, that the
has an *open*
*space* between word quai, written twice on the space between the front lots
the front row of and the levee, evidently shows, what would otherwise appear
houses or street,
and the water, it from a mere inspection of the plan, that the space was desig-
becomes part of
the port, and is nated as a part of the port : and I reiterate that the absence of
a *locus publicus*,
dedicated to the word quai would not have made any impression on my
public uses, mind, nor changed my opinion as to the right of the public in
without any
other designa- that space of ground.
tion whatever.
                     The abandonment by Gravier of the whole ground beyond
                 the levee as a locus publicus, was equally manifested by the
                 plan, and still farther by the occupation and use which he per-
                 mitted the people to make of it.   From the year 1788 to 1806,
                 the inhabitants of New Orleans resorted to the large alluvion
                 which had been formed beyond the levee, for sand, to raise the
                 streets and lots, as they would have resorted to a common of
                 turbary for the purpose of getting turf, without ever having
                 been disturbed by the former owner. · And we are informed by
                 the court, in the case of Gravier vs. the Mayor, hereafter
                 quoted, that he made abundant declarations of his having aban-
                 doned the land beyond the levee to the public use; declarations
                 which confirm the evidence, which results from his plan and
                 conduct.

                     In the latter year his heir, probably at the suggestion of
                 others, resorted to a suit against the Mayor and Aldermen of
                 the city of New Orleans, to be quieted in the possession of that
                 alluvion.   His claim was resisted on the ground, that his an-
                 cestor had abandoned and dedicated to the public use as a
                 locus publicus, all the space before the front row of squares in

the faubourg. No evidence of this abandonment and dedication was offered, except the *parol evidence* of declarations which he had made to that effect. There was no attempt to prove this dedication by the production of plans, as in the case of Cucullu and De Armas against the Mayor et al.; and in the Supreme Court of the United States, in the case of the Mayor vs. United States in Error, 10 Peters, 622; or of other written evidence. The plaintiff succeeded through the gross neglect of his opponent, in failing to produce legal evidence.

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

Judge Matthews, in delivering the opinion of the court, said, "*The evidence of abandonment is merely conversation which passed a long time ago. It would be dangerous to divest a man of his property upon evidence of such declarations, without any proof of a consideration.*" 1st Condensed Reports, 454.

The anonymous counsel for the plaintiffs very appropriately observes, " The great mass of mankind have a clear and, as it were, intuitive perception of what is just and right; and though it be not always able to assign a satisfactory reason for its opinions, it rarely errs in the judgment which it forms, especially on questions involved in controversies, publicly discussed."

" The tenacity with which the inhabitants of New Orleans have adhered to the belief, that the city was the owner of the batture in front of it, is truly surprising, and affords a strong presumption in favor of the rights of the city."

In August, 1813, as Attorney General of the State, I instituted unsuccessful proceedings in the nature of an information against the vendee of Gravier's heir, claiming for the public use all the space between the levee and the river in front of the faubourg, as part of the port of New Orleans. But for reasons which cannot be mentioned here, no appeal was taken. In the year 1819, the city having lost all hope of success against this vendee, the proprietors of the lots in the faubourg, fronting the levee, instituted several suits, in order to claim the alluvion before the respective lots as their property. One of them, that

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

of Morgan vs. Livingston, was tried and, by consent, brought to the Supreme Court, with the intention, that the judgment pronounced thereon, would put an end to all the other suits. I was then a member of this tribunal. One of my colleagues was the judge of the superior court of the territory, who had drawn the judgment of that court in 1807. The other had received a power of attorney from some of the heirs of Gravier in France, who had retained their interest in his succession, and this power containing a clause of substitution, he had availed himself of it by a substitution, in favor of the son-in-law of the parish judge, from whose court the appeal came up. The latter member of this court having declined sitting in this case, it was submitted to the other two, to wit, the late presiding judge and myself. Entertaining the opinion, on which I acted as Attorney General in 1813, I insisted on declaring that the premises were a locus publicus, not susceptible of private ownership, and hors de commerce, on the same principles I had laid down as to a public road, in the case of Renthorp et al. vs. Bourg et ux., under circumstances somewhat similar, 4 Martin, 97. My colleague still entertaining the opinion he had formed in 1807, absolutely refused to concur with me, and after a delay of two years we agreed to act on the case, as it was placed before us, both of the parties having an interest to keep the public claim out of view. My colleague consented to abandon the claim of the defendant, and I drew the judgment, which is printed in the sixth volume of my reports. The defendant complained to the Legislature, and made an unsuccessful attempt to have us impeached. On the return of the case to the Parish court, the judge thought it improper to proceed to the trial of the cases of the other front proprietors, as he might be charged with partiality, his son-in-law being the substituted attorney in fact of one of the parties interested. The suits were therefore dismissed, and brought in the district court; from which they were removed to the court of the United States for the Louisiana District.

It is believed, that the plaintiffs, alarmed at the trouble of following their suits to the city of Washington, made a compromise by abandoning one half of their supposed claims.

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

Shortly after, a more important compromise was made between the Mayor, Aldermen, &c., of the city, the vendee of some of Gravier's heirs, and some of his other heirs, so that a line was drawn parallel to the levee, at a certain distance from it, and the alluvion beyond it was abandoned to the city.

In the case of Gravier vs. the Mayor, 1st Condensed Reports, p. 551, the Superior Court of the late territory held, " that Bertrand Gravier had divested himself of all title to that part of his tract on which the Faubourg St. Mary is established by selling the lots fronting and adjoining the highways, and if no alluvion existed at the time when Bertrand Gravier ceased to be the owner of the land adjoining the high road, that an alluvion afterwards formed would not become the property of Bertrand Gravier."

The court gave as a reason for this opinion, " that if Bertrand Gravier could be considered as the proprietor of the road or of the levee lying between this road and the river, he would nevertheless not possess that title of property which gives the right of alluvion, for that the destruction of this property by the encroachment of the river would be a public and not a private loss, since it could not be appropriated to the use of any individual and the said road and levee would have become necessarily liable to be kept in repair at the public expense."

This opinion of the court will receive considerable support from what will be shown hereafter, to wit: That the bank of the river can neither be alienated nor be retained in separate ownership from the contiguous estate and therefore must either belong to the public or to the owners of lots in the faubourgs as a concrete body.

It is in accordance with this principle that this court held in the cases of Packwood vs. Walden and Cochran et al. vs. Fort et al., that alluvions now formed before the city, are *loci publici.* I

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

coincide with this opinion and believe that Gravier could not be considered as owner of the levee or bank of the river after he had ceased to own the riparious estate.

I was a member of this court and concurred in the opinions in those cases. One of the counsel for the defendants in commenting upon the judgment in the latter case, observes : " The learned judge (Porter) who pronounced the decree in the fervor and glow of composition supposes a case which did not in reality exist, and expresses upon it a hasty opinion, thrown out incautiously and without sufficient reflection," to wit : " that if the batture be formed after the incorporation of the faubourg with the city, it became the property of the city and not of the front proprietors." This was indeed an obiter dictum but clearly resulted from a consideration of the case before the court. I then thought and still think that this court gave a correct exposition of the law of alluvion. This was the jurisprudence of the Superior Court of the late territory and of the Supreme Court of the State for upwards of a quarter of a century, to wit : from the year 1807 to the year 1834, when Judge Porter left this court. Every judge that sat in these courts appears to have concurred in the establishment of it ; there never was a dissenting opinion among us in this respect; and I never felt any dissatisfaction therewith. In the case of New Orleans vs. the United States in error, 10 Peters, 717, the Supreme Court of the United States thought, that " if the dedication to public use of the ground before the city of New Orleans be established it would be of the highest importance that the vacant space by alluvial formations should partake of the same character and be subject to the same use as the soil to which it becomes united." They added : " if this was not the case, by the continual deposits of the Mississippi, the city of New Orleans would in the course of a few years be cut off from the river and its prosperity impaired." " If the city can claim the original dedication to the river, it has all the rights and privileges of a riparian proprietor." " But there is another consideration of great weight on this subject. It appears

that the city from time immemorial has been compelled to construct at great expense and keep in repair levees which resist the waters of the river and preserve the city from inundation."

In applying to the Faubourg St. Mary, the principles which the Supreme Court of the nation recognized in the above cases as regulating the rights of the city, as to that portion of it which is covered by the plan made by the West India Company, it does not appear to me that this court errs. The dedication to public use of the ground between the levee and the first row of houses in front of the Faubourg St. Mary has been shown. Is it not then of the highest importance that the accumulations by alluvial formations should partake of the same character and be subject to the same use as the soil to which it becomes united?

If this was not the case, by the continual deposits of the Mississippi would not the city in the course of a few years be cut off from the river, and its prosperity impaired? As the city justly claims the land *to* the river has it not all the rights and privileges of a riparian proprietor? Does this not result also from the consideration that the city has constructed and kept in repair the levee? Conscious that no one of these queries can be correctly answered in the negative, I cannot admit that Judge Porter's exposition above quoted is not perfectly correct. On enquiry I cannot learn that there is any country governed by the civil law, in which there is a city situated on a navigable river, lake or sea shore, where there is a port, in which the landing place or port is not a locus publicus, on which individuals have not any such rights as are claimed for the defendants, and if this be the case, it is strong evidence of the practical rule of law that no such right exists.

Alluvions formed before the city may be considered in two points of view:

First. As partaking of the nature of the locus publicus immediately contiguous to the river and assuming its character; and

EASTERN DIS.
*April*, 1841.

MUNICIPALITI
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

In countries governed by the civil law, the ports or landing places of cities situated on navigable rivers, lakes or the sea, are *locus publicus*, in which individuals have no right of property.

EASTERN DIS.
*April*, 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

it is only as a locus publicus that it is claimed in the present suit.

· Secondly. As belonging to those who bear the burden of riparious ownership; which in a city are not the owners of front lots; because they in no case bear any of the burdens of riparious ownership. They do not bear any more of the expenses of maintaining the levee or furnishing the streets than the owners of any other lots. If the alluvion be the *commodum* which corresponds to the *incommodum* of a riparious estate, the alluvion must accrue to the benefit of all the owners of lots in the city, not individually but as a concrete body, whose rights are to be vindicated by the Municipal authorities. It is in this view that the Supreme Court of the United States considered the city as a riparious owner. In the case under consideration it is useless to consider whether the alluvion before the city be a *locus publicus*, or the property of all the owners of lots in the manner above stated. Some of the counsel have urged that the river might carry away not only the levee but the quai and the street, and thus the front lot might be required for those purposes, and even further, that these lots themselves might be carried away by the action of the river. These events are possible; but the contingencies are so remote as not to be a basis for legal reasoning. In laying out cities on the bank of a river where the cupidity of individuals does not interfere, it is usual to leave such a margin of land between the first line of lots and the river, that by no event in the ordinary course of things, could the first line of lots be interfered with by the river. But if it should happen otherwise it would require but a feeble appeal to the common sense and justice of his fellow citizens for the owner of a front lot to establish that if his lot be taken from him for a levee, quai or street he must be compensated for it.

I believe that what I have said in the first part of this opinion, as to the port, the quai, and the bank of the river before the original city of New Orleans, is applicable to the same objects in the faubourg St. Mary, and also to the faubourgs Delord and

Saulet, within which is the *locus in quo*,' which is the subject of the present suit. In the year 1805, the Legislative Council of the Territory of Orleans, incorporated the city of New Orleans, extending its limits over the faubourg St. Mary and a considerable distance above. Madame Delord was the owner of a plantation, immediately adjoining the faubourg St. Mary; and in the following year she sought to avail herself of the advantages, which the annexation of her estate to the city offered, and divided her plantation by streets, parallel and perpendicular to the river, into squares and lots; and her plan expresses to have been made for the extension and continuation of the faubourg St. Mary, and what is the same thing, of the city of New Orleans. We see on it a street immediately in front of the levee, and running alongside of it, which is called New Levee street.

<div style="float:right">EASTERN ·DIS.<br/>*April,* 1841.<br/>—————<br/>MUNICIPALITY<br/>NO. 2.<br/>*vs.*<br/>ORLEANS<br/>COTTON PRESS.</div>

About the same time Saulet, the owner of the plantation above, and contiguous to the preceding, imitated his neighbor. His plan is avowedly made for the extension of her faubourg, is divided in the same manner, and New Levee street is continued through it. The plans of both the faubourgs, if my opinion in the case of Cucullu and De Armas vs. the Mayor, &c., and that of the Supreme Court of the United States, 10 Peters, 662, be correct, establish the fact, that the former proprietors of these faubourgs, as founders of a new part of the city, divested themselves of all interest in every part of them, except in the lots which the plans presented as objects of sale to individuals in that portion of the estate, which had been divided into squares, lots and streets; to wit, from the levee to a street in the rear of the last row of lots : all the rest was dedicated to the public; that is to say, all the streets, and the land between New Levee street and the river as a quai; these were *loci publici, hors de commerce,* and destined to the use not only of the inhabitants of these faubourgs, of those of the rest of the city of New Orleans, of which these faubourgs formed a part, and of the State, but also of the inhabitants of any other country. This dedication required no other evidence than the plan

<div style="float:right">The plans of<br/>Faubourgs De-<br/>lord and Saulet<br/>laying off these<br/>plantations into<br/>City lots and<br/>squares, divest-<br/>ed the owners<br/>of all interest,<br/>except in the<br/>lots and squares<br/>sold to individu-<br/>als, &c. All the<br/>rest was dedi-<br/>cated to the pub-<br/>lic. The land<br/>or space be-<br/>tween New Le-<br/>vee street and<br/>the river be-<br/>came a *locus<br/>publicus,* destin-<br/>ed to the *public<br/>use.* This dedi-<br/>cation required<br/>no further evi-<br/>dence than the<br/>plan and the *use*<br/>of these places<br/>by the public.</div>

Eastern Dis.
April, 1841.
—————————
MUNICIPALITY
No. 2.
vs.
ORLEANS
COTTON PRESS.
and the use of those places by the public. This use, for upwards of thirty-five years, has been a matter of public notoriety, and the presumption is extremely strong, that it began immediately after the division of the faubourgs into streets, and squares, and lots.

The ground between New Levee street and the levee as a quai, the levee or bank and that part of the river, where the ships were to lie, constituted the port of New Orleans, in front of the faubourg Delord. The obligation, under which Madame Delord had been, to furnish a royal road, according to the king's grant to her author, had been complied with, by giving through her estate the road now known as Tchoupitoulas street. The obligation, to maintain the levee, being a real and not a personal one, vanished as to her, except as a lot owner, on the sale of the lots; for then it bore on all the estate, on which the burden of the levee had been imposed; and that burden, like a rent charge, bore on every part of the estate.

The ground, which had now become the property of the public, *loci publici*, by the consent of the sovereign, had been impliedly exempted from the burden, because the State which had succeeded to the rights of the former sovereign and original grantor, by extending the limits of the city of New Orleans over these estates, had consented, that as urban estates, they should be subdivided into squares and lots, and intersected, as in the rest of the city, by streets, and the whole burden of riparian ownership remained on the lots, until assumed by the city.

As we have already seen in the case of Gravier, with regard to the faubourg St. Mary, Madame Delord, after the sale of all the lots in her faubourg, was without any interest in the levee or bank of the river, and the repairing and replacing the levee could not be a burden on her, since it never was a personal one, and she had parted with the estate, which was encumbered therewith. So long as the proprietors of the lots bore the portions of this burden, with which their respective lots were chargeable, they acquitted a part of the price for which they

had purchased their lots; for a portion of that price was the assumption of a part of the charge which bore upon the whole estate.

The extension of the limits of the city of New Orleans over the estate of Madame Delord, by the act of 1805, could not change its character, or affect it without her consent. We have the evidence of this consent in the intention which she manifested almost immediately, to avail herself of the advantages which the inclusion of her estate within the city presented. This evidence results from the plan which she published in February, 1806, expressly made for the continuation and extension of the city over her estate, and the subsequent sale of lots in accordance with it.

By this plan the character of her estate was instantly changed. She retained no part of it, except the lots into which it was divided; all the streets, and principally the whole space between the margin of the river and the front lots were dedicated to the public use, became loci publici, and were ipso facto hors de commerce. If this view of the subject be correct, no act of Madame Delord, with regard to any part of the ground outside of New Levee street, in making sales thereof, can be considered in any other light, than as done in violation and ignorance of her own plan and of the rights of the public. And the little attention that was paid to these remote parts of the city by the municipal authorities, who confined their care to the square of the city, account for these invasions and irregularities.

It is further to be considered, that the acts of Madame Delord, with regard to any portions of the batture, merely release or abandon her claims and pretensions thereto, but give no substantive title to her vendees, and this mode of transfer of itself, manifests her own want of confidence in any right to the batture.

The port of New Orleans was extended over that part of the river, in front of the new faubourg, which was susceptible of being occupied by vessels lying at anchor or fastened to the bank, and over the levee and portion of land out and inside of

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

it, which might be necessary for the reception of merchandize landed or to be shipped. Both these parts of the port became public, and if the opinion, which I have expressed when examining the original plan of the city, be not incorrect, no part of this port was susceptible of private ownership. Madame Delord, by destroying the contiguity to the river of the estate which she retained, abandoned all claim to the banks.

The defendants urge that their rights and those of the persons, under whom they claim, have been frequently recognized by the Mayor and Aldermen of the city, and by the plaintiffs, by putting them in possession of sundry portions of the batture, &c., by charging them with riparian burdens and duties, and by doing various other acts and things, &c., &c. These allegations, if proven, would have considerable force, if the plaintiffs sued in the right of the Municipality, or if they claimed any thing belonging to the corporation; but they only vindicate the right of the public to loci publici, things out of commerce, and in which the corporation, represented by 'the plaintiffs, can have no property. The dedication to public use being once established, cannot be affected by any act of the municipal officers.

The plea of prescription cannot be invoked in regard to what is hors de commerce, and not susceptible of private ownership or even possession.

Nothing, which should govern this case, should be drawn from the acts of the corporation. It was well known to every one, familiar with the history of the city, in what feeble hands its administration had been for a long time placed. That numerous abandonments and violations of public and even of municipal rights, duties and obligations had been constantly permitted; and we have only to instance the sale of the squares between the front of the original city and the levee, though the Legislature afterwards thought fit to sanction it. Other instances of similar conduct are well known; that in many of their ordinances, which have been submitted to, there has been manifested great ignorance of their own rights and duties, as

well as of those of the citizens. With a knowledge of these
facts, but little importance should be attached to their acts as evidence of the rights of the public on any subject whatever.

I will now proceed to notice some of the leading arguments of the counsel for the defendants.

It is urged that the alluvion has no necessary connection with the levee, and as a deduction from this, that a proprietor may sell the body of his estate, and retain the ownership of the bank of the river. The Civil Code, Art. 448, says, " on the Mississippi, where there are levees, the levees shall form the banks;" and as the alluvion is an accretion to the bank, there *is* a necessary connection between the alluvion and the levee. Authorities have been cited from common law writers, to show that a riparian owner may sell his right on the bank, separately from the estate. The converse of this is the rule of the Civil Law. Cæpola, the author which the counsel has placed before us, expressly says, (page 447,) " ripæ non venduntur, sed magis accedunt rei venditæ ; quod apparet: quia per se vendi non possunt cum riparum usus sit publicus, de jure gen. ut d. leg. riparum, *nam proprietas sola per se esset inutilis.*"'

If the matter was *res nova*, I would say, that the sale of the trapezium was illegal. We have seen, that it was outside of the levee and unconnected with any land on the inside. The bank being a legal accessory to the contiguous estate, cannot be sold separately from it, nor retained when the estate is sold. It is like a right of way, which cannot be separated from the creditor estate, nor retained when the latter is sold.

But the municipal officers have slept over the rights of the city, in permitting the vendees of the defendants, mediate or immediate, and the defendants themselves for a long time, to occupy and improve the trapezium and the alluvion formed thereon as their private property, and in consequence thereof, the defendants have acquired equitable rights, which must now protect them.

The defendants' counsel have further urged, that the plaintiffs have compelled them by several ordinances, after their ad-

35 VOL. XVIII.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

mission into the city, within the period of nearly a quarter of a century, from 1806 to 1831, to support all the riparious charges as rural owners.

To this the same answer may be given, as was given to the alleged recognition of their rights by the plaintiffs, and other acts of theirs set forth in the answer. The plaintiffs do not sue in their own right, nor for any thing belonging to the corporation, but only vindicate the right of the public in *loci publici*.

The dedication being established, cannot be affected by any act of the plaintiffs.

Perhaps the burden of riparian duties was more than compensated by an exemption from all city taxation, which the inhabitants of the faubourg have enjoyed until the year 1831. Had the levee been made through the faubourg by the corporation, they would have been chargeable in common with all the other inhabitants, with the expense of supporting the levee through the whole extent of the city and the faubourgs. Perhaps they might have compelled the city to maintain their levee at the general expense, but refrained from doing so, to avoid taxation.

Much reliance has been placed on the judgments in the two cases of Henderson et al. vs. the Mayor et al. Both of these were made on admissions by the predecessors of the plaintiffs, which, in my opinion, were made either in ignorance or in violation of the rights of the public. As these rights are inalienable, they cannot be destroyed by admissions, made by those whose duty it is to protect them. But judgments obtained upon such admissions, must form a very equitable claim in favor of those who obtained them, and ought not to be disturbed, so far as regards the direct subject matter of the decision, though they cannot be extended beyond it.

Corporations in the Civil Law, are considered as in a continual state of pupilage; and their administrators as the tutors of minors. Until very lately, minors were entitled to relief in all cases, in which they could show, that a proper defence had

not been made for them. It is not very clear, that the same
right does not exist in favor of a corporation, whose interests
have been neglected by its administrators. In those cases, the
city might have sacrificed its own right, but not that of the
public. This is not said with a view of intimating, that those judgments ought not to have their effect, in regard to what is the actual subject of the decision; but they ought not to operate beyond the strictest limits of the matter passed upon.

It appears to me that the idea of *res judicata*, which has been so much pressed upon the court, did not arise from the decisions themselves, but from the supposed effect of the admissions which had been made in these cases. Admissions made by private individuals in the course of litigation, will bind their rights, and have the effect of alienating them, unless shown to have been made in error; but admissions made by parties, who have not the power of alienation, have not the same effect.

A singular fatality seems to have attended every attempt on the part of the city, to assert its claim on the object of litigation. It has been seen, no evidence of the plan of the faubourg St. Mary was produced, and parol dedication and abandonment was alone relied on; although the plans could easily have been procured, being in the archives of the city.

In the case of Cucullu and De Armas, the subject matter of the suit had been adjudicated upon in a previous one, of Gonzales vs. the Mayor, in the Superior Court of the Territory, and the counsel had pleaded this suit as res judicata. He had even ordered a copy of the record to be made, but omitted to give it in evidence, and by this strange and fatal omission, the city lost that case; for the plea of *res judicata* would unquestionably have been sustained.

In the case of Henderson vs. the Mayor, it has been seen also what admissions were made prejudicial to the interests of the city; and I fear, that the consequences of these mistakes have been injurious to the assertion of the public rights in the present case.

EASTERN DIS.
April, 1841.

MUNICIPALITY
NO. 2.
vs.
ORLEANS
COTTON PRESS.

In the very important case of Cucullu and De Armas, so often referred to, I was under the necessity of dissenting from the majority of the court.

But in looking back and reviewing what had been decided upon on that occasion, I see nothing, in my opinion, which I would change or modify; and I have the satisfaction of knowing, that my views in that case were substantially sanctioned by the highest tribunal of the nation.

I should greatly have distrusted my own opinion, in being the sole dissenter from that of my able and learned colleagues in the present case, but that the subject is one which I have so long and so fully considered, and that the difference of our opinions is so radical, that no middle course can be pursued.

After all that has been said, written and printed on this case, it appears to me, that it may be reduced to a single inquiry, viz., who is the owner of the bank of the river in front of the city of New Orleans and of its faubourgs? For that the alluvion belongs to the owner of the bank of the river, I do not understand to be denied by any one; and from the facts I can come to no other conclusion, than that the public is the owner of the bank of the river, and therefore entitled to the alluvion.

After giving the subject the best consideration in my power and regarding it in all its aspects, I am of opinion, that the judgment of the Parish Court is correct. If it be reversed, I am apprehensive that the consequences depicted by the Supreme Court of the United States in the case of New Orleans vs. the United States, in Error, 10 Peters, 717, will result. "By the continual deposits of the Mississippi, the city of New Orleans would, in the course of a few years, be cut off from the river, and its prosperity impaired." It is also obvious, that it will give rise to a series of private intrigues, the object of which will be to extend wharves, thereby increase the alluvion, and carry the levee near to the margin of the river, with a view to give new acquisitions to individuals, and create an interest adverse to that of the public.

Upon the whole matter, therefore, I have come to the conclusion,

EASTERN DIS.
*April,* 1841.

MUNICIPALITY
NO. 2.
*vs.*
ORLEANS
COTTON PRESS.

First. That the founders of a city or faubourg on the banks of a navigable river do by the plan and the acts of sale of lots in accordance therewith, make a dedication of all the land within the limits of such city or faubourg which is not by the plan reserved for the purposes of lots to be sold ; and especially of all such parts of the land, of which the public have the useful domain, and which are essential to the prosperity of a city or faubourg so situated; to wit: the streets and bank of the river; and that the attempt on the part of the defendants, assigns of the original founders, to resume a part of the land so dedicated and abandoned, is a violation of the contract rights of the purchasers of lots and of the public, and tends to impair the original contract.

Secondly. That the founders of a sea port city or faubourg on the banks of a navigable river, do by the plan of the city or faubourg so founded, intend to create a port, and that the river and the land adjoining the river in front of such city or faubourg, necessary for the purposes of lading and unlading merchandize and of commerce in general, constitute the port, which is locus publicus, and that the destination and dedication of land so situated is especially to be presumed, as well from the plan as from the intention to found such city or faubourg, and is clearly evidenced in the present case.

Thirdly. That the levee or bank of the river, being an accessory to the principal estate, cannot be separated from it by any act or intention of parties.

Fourthly. That alluvion formed in a port partakes of its nature and of that of the street immediately along the river, is locus publicus, hors de commerce, and does not belong to the owners of the front or of any other lots in the city.

Fifthly. That the corporations of the city having stood by and permitted individuals to expend large sums of money, and make purchases of the property in dispute and in some measure recognized their rights, the latter have acquired an equi-

EASTERN DIS. *May*, 1841.

table title thereto and ought not now to be disturbed; but the rights of the public as to what is not in the actual possession of the defendants must not be affected by the judgments which they have obtained.

I am therefore of opinion that the judgment of the Parish Court be affirmed.